IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| POST-CONFIRMATION COMMITTEE FOR SMALL LOANS, INC., *et al.*, | : : : : | |
| Plaintiff, | : : | |
| v. | : : | CASE NO.: 1:13-CV-195 (WLS) |
| W. DEREK MARTIN, as Executor of the Estate of Vance R. Martin, *et al.*, | : : : | |
| Defendants. | : : | |

## ORDER

Present before the Court is Plaintiff Post-Confirmation Committee for Small Loans, Inc., *et al.*'s Motion in Limine to Exclude Testimony of Chris Edwards. (Doc. 150.) Also before the court are Defendants W. Derek Martin, as Executor of The Estate of Vance R. Martin, W. Derek Martin, Martin Family Group, LLLP, Martin Sublease, LLC, Martin Investments, Inc., W. Derek Martin, as Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O W. Derek Martin, Jefferey V. Martin, Jefferey V. Martin, as Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O Jefferey V. Martin, Kimala B. Martin, Grace Elizabeth Martin Johnston, Grace Elizabeth Martin Johnston, as Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O Grace Elizabeth Martin Johnston and James Patrick Johnston's Motions in Limine to Exclude Testimony of James Hart (Doc. 168) and Michael Hunter (Doc. 175).

All Parties filed responses (Docs. 155, 212, 213) and replies thereto (Docs. 156, 214, 215), rendering these Motions ripe for review. Upon thorough review of the record and by the findings made and reasons stated herein, the Committee's Motion in Limine to Exclude Testimony of Christopher S. Edwards (Doc. 150) is **GRANTED-IN-PART** and **DENIED-IN-PART**, and the Martin Defendants' Motion in Limine to Exclude Testimony

of James F. Hart is **GRANTED-IN-PART** and **DENIED-IN-PART**, while their Motion in Limine to Exclude Testimony of Michael L. Hunter (Doc. 175) is **DENIED.**

## PROCEDURAL HISTORY

Plaintiff Post-Confirmation Committee for Small Loans, Inc., *et al.* (hereinafter "the Committee") brought this action against former officers, directors, and other insiders (hereinafter "the Martin Defendants") of a group of now-bankrupt consumer lending and retail enterprises known collectively as "The Money Tree" (hereinafter "the Debtors"[1]). (*See* Docs. 1, 113.) The Committee was appointed through an Amended Joint Plan of Liquidation, confirmed by the United States Bankruptcy Court for the Middle District of Alabama, to represent the Debtor's bankruptcy Estates and to enforce all causes of action available to the Debtors, affiliates, subsidiaries, and their estates. (Doc. 113 at ¶¶ 14-15.) Through their appointment, the Committee seeks to avoid and recover amounts made from certain transfers between the Debtors and entities controlled or owned by the Martin Defendants as fraudulent and preferential transfers under federal and Georgia laws. (Doc. 113 at ¶ 16.)

Throughout the Complaint, the Committee alleges the Debtors were insolvent at various times during these alleged fraudulent transfers. In many of those allegations, whether or not the Debtors were insolvent at the time of the transfers is an essential element for recovery. The Parties rely on expert opinion to determine at exactly what point the Debtors became insolvent. Along with the issue of insolvency, the Committee also alleges that the leasing or subleasing agreements between the Debtors and Defendants Martin Family Group, LLLP (hereinafter "MFG") and Martin Sublease, LLC (hereinafter "MSL") were fraudulent and preferential transfers. Specifically, the Committee alleges the Debtors and their subsidiaries were paying inflated, above-market rental rates for the benefit of the Martin Defendants.

---

[1] "Debtors" include Small Loans, Inc. ("SLI"), The Money Tree, Inc. ("TMT"), The Money Tree of Georgia, Inc. ("TMG"), The Money Tree of Florida, Inc. ("TMF"), and The Money Tree of Louisiana, Inc. ("TML"). (Doc. 113 at ¶ 17.) TMT is the corporate parent of each of the remaining Debtors. (*Id.*) The Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code on December 16, 2011 ("Petition Date") in the United States Bankruptcy Court for the Middle District of Alabama, which was jointly administered and proceeded under *In re Small Loans, Inc., et al.*, Case No. 11-12254. (*Id.* at ¶ 9.) The Court takes judicial notices of these proceedings pursuant to Federal Rule of Evidence 201.

The Committee seeks to exclude the testimony of Chris Edwards from consideration on the pending summary judgment motions as well as from trial. (*See* Doc. 150.) Likewise, the Defendants wish to exclude the testimonies of James Hart and Michael Hunter from consideration of pending summary judgment motions and at trial. (*See* Docs. 168, 175.) The professional expertise and qualifications of all experts do not seem to be in dispute; rather, the Parties call into question the methodology of each respective expert for varying reasons.

The Committee seeks to exclude the entirety of Christopher S. Edwards' Report (Doc. 151) and Rebuttal Affidavit (Doc. 152) regarding the solvency of the Debtors and their non-debtor affiliates. (*See* Doc. 150.) They assert Edwards' testimony would be unhelpful to the Court and a jury at trial because he "failed to consider critical criteria and has considered irrelevant and misleading evidence in reaching his opinion regarding solvency. (*Id.* at 2-3.) Specifically, the Committee states Edwards did not opine on the solvency of each of the individual Debtors and their non-debtor affiliates on a standalone basis, failed to consider the Debtors restated financial statements, and made erroneous comparisons regarding the valuation of the Debtors to other lending companies. (*See id.* at 2.)

With respect to James Hart, the Martin Defendants question the reliability of Hart's methodology in assessing the Debtors' solvency in accordance with applicable law. (*See* Doc. 168-5 at 7.) Mainly, they reject Hart's use of Generally Accepted Accounting Principles in reaching his conclusions. (*Id.* at 4-7.) Moreover, the Martin Defendants argue Hart's overall solvency opinion is incomplete, and thus unreliable, because he failed to opine on the Debtors' financial condition on a consolidated basis. (*Id.* at 7-13.) They urge this Court to declare that solvency should be decided on a consolidated basis. (*Id.*) Lastly, they seek to exclude Hart's Rebuttal to Edwards' Report and exclude any reference of the Debtors exhibiting the characteristics of a Ponzi scheme. (*Id.* at 13 n.7.)

The Martin Defendants challenge Michael L. Hunter's methodology of appraising the market values of the subleases entered into between MSL and the Debtors and its subsidiaries and/or affiliates. (*See* Doc. 175-7.) They do not seek to exclude Hunter's opinion on the leases and subleases involving MFG and the Debtors' subsidiaries. (*Id.* at 4.) They assert Hunter assumptions about the market rents in the underlying leases and the

subsequent subleases "fail to reflect the rigorous application of appraisal principles that his industry requires," and thus, his opinions should be excluded for want of reliability. (*See id.*)

## DISCUSSION

### I.  Standard for Admissibility of Expert Opinions

The standard for admissibility of expert witness testimony is measured by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In making admissibility determinations, district courts are charged with the duty to perform the gatekeeping role of ensuring expert testimony is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).  "[T]he test of reliability is 'flexible'" in that "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho*, 526 U.S. 137, 141-42 (1999) (quoting *Daubert*, 509 U.S. at 594) (emphasis in original); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) (recognizing district-court determinations of admissibility of expert testimony are reviewed for abuse of discretion).  Even with this flexible standard, the Court must still "conduct an exacting analysis of the proffered expert's methodology." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

This gatekeeping role, however, should not "supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  Before the expert's opinion testimony can

reach a jury, the Court must determine that the offered expert testimony is "properly grounded, well-reasoned, and not speculative." *United States v. Frazier*, 387 F.3d 1244, 1296 (11th Cir. 2004) (Barkett, J., concurring) (quoting Fed. R. Evid. 702, advisory committee notes, 2000 amends.).  This is critical because unreliable expert testimony has the power and potential to mislead or confuse a lay juror.  *See id.* at 1260, 1263.  Where there is factual dispute and experts reach differing conclusions, the Court is not authorized to "exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, advisory committee notes, 2000 amends.

Arriving at the conclusion of whether or not to admit expert testimony is no small feat.  Fortunately, *Daubert* and its progeny provide guidance.  The Court must engage in a three-part inquiry and consider whether,

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems. Inc.*, 158 F.3d 548, 562 (11th 1998)).  *Daubert* identified four, nonexclusive factors for assessing the reliability of an expert's reasoning or methodology.  These factors include "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *McCorvey*, 298 F.3d at 1256 (citing *Daubert*, 509 U.S. at 593-94.)  The Court may consider other relevant factors outside of the traditional *Daubert* factors, so long as the Court's gatekeeping inquiry is "tied to the facts of a particular case."  *Kumho*, 526 U.S. at 150 (internal citation and quotations omitted).

It is the goal of this Court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.  Thus, the Court's focus will strictly be on the reliability of the expert's testimony and not persuasiveness of arguments or "whether it fits within the narrow

confines of lawyer-urged litmus tests." *Bullock v. Volkswagen Grp. of Am., Inc.*, 107 F. Supp. 3d 1305, 1310 (M.D. Ga. 2015).

While the Court has rigorous standards to apply in its *Daubert* inquiry, the proponent of the expert testimony also carries the burden to show that their expert's opinion is reliable by a preponderance of the evidence. *See Allison*, 184 F.3d at 1312; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) ("The evidentiary requirement of reliability is lower than the merits standard of correctness."). With this framework in mind, the Court will now assess the reliability of each of the challenged expert's methodology.

**A.  Christopher S. Edwards**

Currently in his twenty-seventh year of practice, Christopher S. Edwards has served as a certified public accountant and certified valuation analyst. (Doc. 151 at 10, 31.) He practices in the areas of audit, tax, forensic examination, valuation, and litigation. (*Id.* at 10.) He has additionally dedicated more than 50,000 hours to his litigation, valuation, and forensics practice to a diverse client base. (*Id.* at 31.) His qualifications are not in question with respect to the instant motion.

Edwards provided an opinion as to the solvency of TMT on a consolidated basis. He considered various SEC filings, including TMT's original and amended annual and quarterly financial statements, along with relevant documents such as the Complaint and TMT's prospectuses and consolidated financial statements from 2000-2002. (*See id.* at 12-14.) He first opined that Generally Accepted Accounting Principles, or GAAP,[2] are "unsuitable for use in determining the 'value' of a company and it is not indicative of the actual value of the company's assets." (*Id.* at 17.) The reason for this, Edwards explained, is because GAAP "requires the presentation of capital assets at historical costs," rather than the actual values of an entity's assets, liabilities, and equities. (*Id.* at 19.) He further explained that GAAP conservatively projects figures that lower the value of other numbers such as an entity's investments, accounts receivables, loan portfolio, and goodwill. (*Id.* at 19-22.) Edwards contrasted GAAP with the International Financial Reporting Standards, or IFRS, to show

---

[2] GAAP are "the basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants ('AICPA'). These principles establish guidelines for measuring, recording, and classifying the transactions of a business entity." *S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1222-23 n.17 (S.D.N.Y. 1992).

how its standard allows revaluation the fair value of assets as opposed to relying on the historical cost of the same assets.[3]  (*Id.* at 22.)

In making his balance sheet adjustments at fair valuation, Edwards added back assets to TMT's financial statements for the each of the years 2008 (restated), 2009 (restated), and 2010 in the amount of $991,243 for actual or purchased goodwill.  (*Id.* at 23, 27.)  (Doc. 151 at 22.)  He reasoned that due to TMT's "proven ability to produce positive cash flows and its name recognition," their assets would have undoubtedly exceeded its book value.  (*Id.* at 23.)  He also added amounts to reflect actual bad debt recoveries.  While Edwards stated in his Report that TMT's actual bad debt recoveries were $3,467,385.00, $3,424,066.00, and $3,759,401.00 in their restated financial statements for 2006, 2007, and 2008 respectively, it appears Edwards also added a total of about $7,828,139 for the years 2003, 2004 (restated), 2005 (restated), 2009 (restated), and 2010.  (*Id.* at 24, 27.)  Edwards opined that the drastic increase on reserves for credit losses in TMT's prior financial statements were overly conservative in their estimates and did not show the true value of their assets.  (*Id.* at 23.)

Edwards also hypothetically opined on a situation where an entity's management considered selling the business despite its reported net deficit in stockholder's equity.  (*Id.* at 24-25.)  In doing so, Edwards compared TMT to three other lending companies, Purpose UK Holdings Limited, a United Kingdom company, Instaloans Group of Companies, a Canadian company, and Seminole Finance Corporation, a United States company.  (*Id.* at 25.)  In each case, the companies sold for various amounts that exceeded the book value of their total assets.  (*Id.*)  In applying that same concept to TMT, Edwards articulated that TMT would have sold 0.99 to 2.06 times its total assets, which "would be required to show solvency" for all years from 2003 to 2010.[4]  (*Id.* at 25-26.)  Edwards found that these multipliers were reasonable when comparing the actual sales of the other companies in a similar industry as TMT and considering TMT's established infrastructure and customer base.  (*Id.* at 26.)  In addition to hypothetically acquiring TMT, Edwards opined that

---

[3] It was unclear to the Court whether Edwards relied on IFRS to reach his conclusions.  It appears after Edwards' deposition was taken, it was clarified that Edwards did not revalue TMT's assets and liabilities in accordance with IFRS.  The Committee did not challenge the Martin Defendants' clarification in its reply. (*See* Doc. 156.)  Thus, to the extent the Committee still seeks to exclude Edwards on this basis, the Court will decline to do so here.

[4] Edwards' figures include both TMT's original and restated assets from its financial statements from 2004-2009.  (Doc. 151 at 26.)

acquiring entities would be willing to pay at least a 10% premium on their loan portfolio "merely for the opportunity to continue the relationship with the existing customers."  (*Id.*)  In his summary, Edwards included a flat 15% premium on loan portfolio value, which resulted in adding over $71 million to TMT's assets between the years 2003 to 2010.  (*Id.* at 27.)

Relying on his education, training, and professional judgment, as well as the documents and evidence identified in his Report, Edwards concluded that TMT was "balance sheet" solvent at all times up to and in the months immediately following September 25, 2007, and ultimately became insolvent as of the fiscal year ending September 25, 2008.  (Doc. 151 at 28.)  He further opined that TMT was "balance sheet" insolvent as of the year ending September 30, 2009 and all periods thereafter and remained a "going concern" at all points through 2010.  (*Id.*)

Following the Report of James Hart, which is discussed below, Edwards provided in his Rebuttal (Doc. 152) further commentary on Hart's reliance on subsidiary financial information.  (*Id.* at 2.)  It was Edwards' opinion that analyzing the solvency of the Debtors on a consolidated basis is more appropriate than assessing it on an individual subsidiary basis for several reasons, including declaring that the consolidated statements as "inherently more reliable" than subsidiary financial information because the consolidated statements were filed with the SEC and were uniformly available, TMT's audits were performed on the consolidated level, the investors chiefly invested in the parents rather than the subsidiaries, the significant intercompany debt between subsidiaries and between subsidiaries and their parent, and the subsidiaries are likely to expect their debts owed to their parents would be forgiven.  (*Id.* at 2-3.)  Edwards also criticized Hart's reliance on GAAP to make a fair valuation determination.  (*Id.* at 4.)

Based on the requirements of Federal Rule of Evidence 702 and *Daubert*, the Court cannot unequivocally find Edwards' expert testimony reliable.  While his credentials and qualifications are notable, the Court could not discern whether his methodology, and his application of his method, would be helpful to the Court or a jury should this matter proceed to trial.  The Edwards Report summarily concentrated on denigrating GAAP as a method for assessing TMT's assets and liabilities at fair value, he lost focus on explaining his

own methods for determining TMT's solvency. Notably, Edwards called these changes "subjective adjustments" to the stated values of both assets and liabilities. (Doc. 151 at 22.) Subjectivity and valuation methods may go hand-in-hand, but the Federal Rules of Evidence and *Daubert* requires those methods to be "properly grounded, well-reasoned, and not speculative." *Frazier*, 387 F.3d at 1296.

Getting to the heart of the Committee's Motion in Limine, the Court agrees that Edwards should not be permitted to opine on the solvency of any subsidiaries of TMT because his Report and Rebuttal Affidavit spoke to the solvency of TMT exclusively. Even so, Edwards' decision to not consider the sworn testimony of the Debtors' former Chief Financial Officer, Steven Morrison, or the subsidiary level financial statements is not a sufficient basis to render his expert opinion on the solvency of TMT on a consolidated basis wholly inadmissible. In his Rebuttal, Edwards gave no less than eleven reasons why, in his opinion, he found reliance on TMT's consolidated financial information more appropriate and reliable in reaching his solvency determination. Moreover, his apparent decision to not consider certain restated financial statements, though it appears Edwards did consider the restated financial statements from 2003-2005 in his Report, and not account for leases as liabilities is a proper question for consideration at trial. Even though the Court finds that solvency should be determined on an individual subsidiary basis where the claim requires a solvency determination as to an individual Debtor or Debtors,[5] the Court will not exclude Edwards' opinion on this ground because solvency on a consolidated basis may still be relevant where the Committee's claims are non-specific to any one Debtor or Debtors.

In note 3 of this Order, the Court declined to find Edwards' methodology unreliable because it seems Edwards did not reach his conclusions by applying IFRS. However, the Court questions whether Edwards applied arbitrary and speculative adjustments to TMT's financial statements without specifically supporting or stating his rationale for doing so. Edwards added back almost $3 million in goodwill after acknowledging that the Company removed goodwill in the amount of $991,243 from their books in 2008. While goodwill for 2008 could arguably be added back, Edwards provided no support for adding those amounts

---

[5] The disputed issue of whether or not solvency should be determined on a consolidated basis is discussed further in depth in Section I.B. of this Order.

for 2009 and 2010.  In contrast, the Court finds Edwards' opinion on adding TMT's actual bad debt recoveries more reliable because he explained why TMT was more conservative in their credit loss reserves numbers and how the actual bad debt recoveries should be included as assets to their financial statements.

Furthermore, the Committee's contention that Edwards unreliably used two foreign companies and a smaller United States lender as comparatives to TMT goes to the weight of Edwards' testimony and not necessarily to its admissibility.  He applied those companies' situation to TMT and reasoned that in addition to a hypothetical acquisition of assets, TMT could also acquire a premium on their loan portfolio.  Why Edwards opined that an acquiring company would be willing to pay a 10% premium but included a 15% premium in his final results, resulting in over $71 million in assets, is a proper question to be asked at trial.  Similarly, Edwards' addition of an acquisition premium factor is also an appropriate matter to address before a jury.

The Court has some legitimate concerns with respect to Edwards' expert opinion on the solvency of TMT on a consolidated basis.  However, it is not this Court's place to "supplant the adversary system or the role of the jury."  *Allison*, 184 F.3d at 1311.  The Court finds that Edwards' expert opinion would be more properly vetted through vigorous cross-examination and presentation of contrary evidence.  *Daubert*, 509 U.S. at 596.

Thus, the Committee's Motion in Limine to Exclude Testimony of Christopher S. Edwards (Doc. 150) is **GRANTED-IN-PART** and **DENIED-IN-PART.**  Chris S. Edwards is permitted to opine on the solvency of TMT on a consolidated basis, but is not permitted to opine on the solvency of the individual Debtors on a subsidiary level.  The Edwards Report (Doc. 151) and Rebuttal (Doc. 152) are otherwise admissible for consideration on summary judgment and at trial.

### B.  James F. Hart

James F. Hart is also a certified public accountant accredited in business valuation and certified in the areas of insolvency and restructuring, financial forensics, and fraud examination.  (Doc. 153 at 2, 29.)  He regularly provides "financial consulting services to distressed and bankrupt companies and their advisors," and serves as a court-appointed fiduciary for companies that are either financially troubled or involved in litigation.  (*Id.* at 2.)

Hart has been practicing in this field for over thirty years. (*Id.* at 28.)  He has also written and taught on the subjects of business valuation, commercial damages, forensic services and bankruptcy. (*Id.* at 2-3.)

Hart's Report rendered an opinion as to the solvency of each of the Debtors and their non-debtor affiliates.[6] (*See* Doc. 153.)  In framing his opinions, he reviewed numerous documents including TMT's original and amended filings with the SEC, TMT's consolidating financial statements, TMG's consolidated and consolidating[7] financial statements, TMT's restated trial balances, and audited work papers and schedules provided by Carr Riggs & Ingram, CPAs. (*Id.* at 3-4.)  The Debtors' financial statements filed with the SEC were prepared in accordance with GAAP.  Throughout his Report, Hart walked the reader through each fiscal year, from 2001 to 2012, of TMT's and its subsidiaries consolidated financial statements, while making specific references to Exhibit S. (*Id.* at 8-11, 12-17.)  He described the financial condition of TMT and its subsidiaries by comparing those financial statements with TMT's SEC filings and noted where balances did and did not match total assets, income, interest expenses, or shareholders' equities or deficits and whether certain consolidating schedules were unavailable.[8] (*Id.* at 9, 12-13, 15-16.)

Particularly striking from his Report, Hart did not apply adjustments upwards to any of the Debtors' assets.  Instead, he complied all of TMT's rising shareholder deficits after sifting through TMT's restated consolidated financial statements. (*Id.* at 6-9.)  In fiscal year ending September 25, 2001, TMT's shareholders' deficit was $1,634,000. (*Id.* at 9.)  By fiscal year ending September 25, 2011, their shareholders' deficit grew to $62,464,000. (*Id.*)  TMT would go on to file for Chapter 11 relief that same year.  Hart also assessed the early shareholders' equities and deficits of TMT's subsidiaries from 2001 to 2003. (*Id.* at 13.)  TMG and TML faired positively in the beginning, while SLI and TMF rendered negative figures.  Hart noted, however, TML's decline through the years. (*Id.*)  TML's 2005 profits of

---

[6] Hart also identified and tabulated certain transfers and payments made between companies, trusts, and other entities owned or controlled by the Martin Defendants. (Doc. 153 at 1-2, 17-23.)  These opinions are not the subject of the Martin Defendants' motion.

[7] In his deposition (Doc. 168-1), Hart explained the difference between consolidated and consolidating financial statements.  "The consolidating balance sheet shows you the components that go into the consolidated, so consolidating combines both, consolidated by itself usually doesn't." (*Id.* at 58.)

[8] Where he lacked information, specifically for fiscal years 2005 and 2007, he made allocations to account for the final shareholder deficits for those two years. (Doc. 153 at 10-11.)

$670,307 dwindled to a loss of $1,839,450 by 2008 with shareholder deficits of $694,000. (*Id.*)  He found that TML, like the other subsidiaries to TMT, were wholly dependent on their parent to finance their operations.  (*Id.* at 14.)  This resulted in "large intercompany lines of credit provided by TMT" to fund its subsidiaries.  (*Id.*)  This, along with other "incurred increasing annual net losses, interest expense . . . , and shareholders' deficits" limited TMT's ability to turn a profit on a consolidated basis.  (*Id.* at 15-16.)

Relying on his experience, education, training, and qualifications, Hart expressed with a reasonable degree of professional certainty that each of the Debtors were continuously insolvent from the following dates through the Petition Date: (1) by fiscal year ending September 25, 2001, TMT became insolvent; (2) by fiscal year ending September 25, 2002, SLI and TMF became insolvent; (3) by fiscal year ending September 25, 2004, TMG became insolvent; and (4) by fiscal year ending June 25, 2008, TML became insolvent.  (*Id.* at 16-17.) In addition to his insolvency findings, Hart opined that TMT's overall structure of attracting new investors and depending on new debt issuances to repay existing debtholders and fund their overall operation, "together with its large and growing losses and deficits, mirrored certain . . . characteristics of [a] Ponzi scheme[]."  (*Id.* at 23-25.)  The Committee also seeks to utilize Hart's initial Report to rebut the testimony of Edwards.  (*See* Doc. 212-1.)

In the instant motion, the Martin Defendants seek to exclude Hart's testimony for his reliance on GAAP to support his conclusions.  (*See* Doc. 168-5 at 4-7.)  They argue that GAAP does not comport with the insolvency standards found in either 11 U.S.C. § 101(32)[9] or O.C.G.A. § 18-2-72(a)[10] because GAAP fails to value the Debtors assets at fair value.  (*Id.* at 5.)  Particularly, they argue that GAAP does not include all assets on a company's balance sheet and it does not require assets to be carried at market value.  (*Id.*)  They also attack Hart's failure to include any adjustments to reflect the going concern of TMT.  (*Id.* at 6.) They further assert that "courts have uniformly rejected the use of GAAP accounting principles in determining the solvency or insolvency of a debtor entity," thus rendering Hart's opinions unreliable.  (*Id.*)  The Court disagrees.

---

[9] Insolvency under the Bankruptcy Code is defined as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."  11 U.S.C. § 101(32).
[10] Under Georgia's Uniform Fraudulent Transfer Act, a debtor is insolvent if "the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."  O.C.G.A. § 18-2-72(a).

First, in ruling on these *Daubert* motions, the Court is not making any determination as to the solvency or insolvency of any entity. It is merely considering the admissibility of expert opinion. Second, the case law suggests that courts in making their determinations are simply not bound by GAAP. *See, e.g.*, *In re Sierra Steel, Inc.*, 96 B.R. 275, 278 (B.A.P. 9th Cir. 1989) ("[A]lthough GAAP are relevant, they are not controlling in insolvency determinations."); *In re Advanced Telecomm. Network*, 321 B.R. 308, 333-34 n.31 (Bankr. M.D. Fla. 2005), *rev'd on other grounds*, 490 F.3d 1325 (11th Cir. 2007) (accord); *In re Babcock & Wilcox Co.*, 274 B.R. 230, 260 & n.237 (Bankr. E.D. La. 2002); *In re Bay Plastics, Inc.*, 187 B.R. 315, 330 (Bankr. C.D. Cal. 1995) ("The usual starting point for determining the sufficiency of assets is the balance sheet, particularly if the balance sheet is prepared according to [GAAP] consistently applied. . . . However, these principles do not control a court's decision regarding the solvency of an entity.") (citations omitted).

Here, the Court only intends to determine whether Hart's methods in reaching his conclusions were reliable because the above case law strongly suggests that GAAP is relevant to the solvency inquiry. It is undisputed that Hart relied on TMT's financial statements which were prepared in accordance with GAAP. (Doc. 168-1 at 66.) Hart's sworn testimony and his Report suggest that not only fair value was used in reaching his conclusions (*Id.* at 69-71), but Hart also made the conscious decision to not adjust TMT's assets because his assessment of the Debtors' financial records did not reveal a reason for upward adjustments. (*Id.* at 88 ("I am aware of all of the problems they have . . . , I don't believe the assets were worth more.").) Specifically, he found that TMT's problems with consistent losses and increasing shareholder deficits did not warrant adjusting their assets to reflect a going concern value. (*Id.* at 94-95.) The Court finds that Hart reliably applied the principles and methods in his field to determine that the Debtors were insolvent at various points in their existence. The Court finds most notable that his careful review of over a decade of the Debtors' voluminous financial records led to a well-reasoned and supported decision to not increase or adjust the Debtors' assets upward.[11] Thus, the Court will not

---

[11] In their Reply (Doc. 214), the Martin Defendants seek to exclude explanatory testimony gleaned from Hart's deposition. They assert that Hart's Report is incomplete and thus non-compliant with Federal Rule of Civil Procedure 26(a)(2)(B). "An expert report must be complete to the point where 'opposing counsel is not forced to depose an expert in order to avoid ambush at trial; and moreover the report must be sufficiently

exclude Hart's testimony for his reliance on GAAP-prepared financial statements in determining the insolvency of the Debtors.

The Martin Defendants also seek to exclude Hart's testimony as unreliable because he determined each of the Debtors' insolvency on a subsidiary level.  (Doc. 168-5 at 7-13.)  They also request this Court to find that solvency should be determined on a consolidated basis.  (*See id.*)  In their Response and Motion in Limine to Exclude Edwards' testimony (Doc. 150), the Committee also urges this Court to find that the Debtors' solvency should be valued on a standalone basis.  The Martin Defendants rely on *In re United Finance Corp.*, 104 F.2d 593 (7th Cir. 1939), *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556 (M.D. Pa. 1983), and *Cissell v. First Nat'l Bank of Cincinnati*, 476 F. Supp. 474 (S.D. Ohio 1979) to show that solvency must be considered on a consolidated basis because the Debtors essentially operated as a single business unit, shared common officers and directors, filed consolidated financial statements to the SEC, and underwent audits on a consolidated level.  (Doc. 168-5 at 7-8, 11-13.)  Furthermore, the Debtors' Chapter 11 petition was jointly administered, and thereafter, their estates were "substantively consolidated for all purposes relating to the Plan."  (*See* Doc. 172-1 at 48.)  In contrast, the Committee cites *In re TOUSA, Inc.*, 422 B.R. 783 (Bankr. S.D. Fla. 2009), *aff'd on other grounds*, 680 F.3d 1298 (11th Cir. 2012), for the proposition that solvency as to a parent and its subsidiaries should not be determined on a substantively consolidated basis unless there is a finding or claim that they collectively operate as a "common enterprise."  422 B.R. at 861.  The Parties also rely on selected excerpts from the Amended Disclosure Statement (Doc. 163-3) and the Amended Joint Chapter 11 Plan (Doc. 172-1) to bolster their arguments.  (*See* Docs. 168-5 at 8-10; 212 at 13-14.)

The Court agrees with the Martin Defendants that consolidation should depend on the facts of each case.  However, cases like *Cissell* are distinguishable from the facts of this

---

complete so as to shorten or decrease the need for expert depositions and thus to conserve resources.'" *Frasca v. NCL (Bahamas)*, No. 12-20662, 2014 WL 695413, at *4 (S.D. Fla. Feb. 24, 2014) (quoting *Dyett v. N. Broward Hosp. Dist.*, No. 03–60804, 2004 WL 5320630, at *1 (S.D. Fla. Jan. 21, 2004)).  In review of Hart's detailed and complete Report and deposition testimony, the Court does not find that the Martin Defendants were either prejudiced or ambushed by Hart's testimony in explaining his methodology.  (*See* Doc. 168-1 at 72-73.)  Thus, the Court will not exclude Hart's opinions on this basis.  The Court also notes that while the Committee utilized Hart's deposition to oppose the instant motion in limine, the Martin Defendants also relied heavily on Hart's deposition testimony to attempt to exclude his expert opinion.  (*See* Doc. 168-5.)

case because there the Court could not "find any reference to a treatment of [the parent] as an entity distinct from its subsidiaries," and the parent and its subsidiaries "were treated [on] a consolidated basis by all defendant's officers during the period in question . . . ." 476 F. Supp. at 479; *see also Matter of Total Tech. Servs., Inc.*, 150 B.R. 893, 899-900 (Bankr. D. Del. 1993). In this case, there are sufficient facts to show that each of the individual Debtors operated distinctly from TMT during the periods in question. Furthermore, the Court agrees with the Committee in that the Amended Plan expressly provides that substantial consolidation of the Debtors' estates does not affect "any claim or Cause of Action held by any such Debtor."[12]  In reviewing the Plan, the substantive consolidation seems to be purposed for the equal and equitable settlement and distribution to Holders of Allowed Claims from one consolidated Estate. Thus, having found that solvency should be determined on a standalone, subsidiary level basis, the Court will decline to exclude Hart's testimony on this ground.

The Martin Defendants are, however, correct in that Hart's original Report may not be used as rebuttal opinion to the Edwards Report because Hart's Report more so served to further the Committee's case-in-chief rather than to rebut the opinions reached in the Edwards Report. *See In re Puda Coal Securities, Inc. Litig.*, 30 F. Supp. 3d 230, 252 (S.D.N.Y. 2014) ("If the adverse party has not raised an issue to which such evidence is responsive, it is not 'rebuttal' evidence."); *see also, e.g., Northrup v. Werner Enter., Inc.*, No. 8:14-CV-1627-T-27JSS, 2015 WL 4756947, *3 (M.D. Fla. Aug. 11, 2015) (finding rebuttal expert's opinions proper because their testimony sought to contradict or rebut the opinions of an initial expert witness). Additionally, Federal Rule of Civil Procedure 26(a)(2)(B) requires expert disclosures to be accompanied by a written report. Here, Hart provided no additional written report to rebut the Edwards Report. Thus, the Hart Report may not be utilized to rebut the Edwards Report. The Court, at this late stage, will also decline to reopen discovery for this limited purpose.

Lastly, the Court will not consider nor admit Hart's opinion on TMT exhibiting the qualities of a Ponzi scheme. The Martin Defendants are correct in that such an opinion is

---

[12] In this Court's February 16, 2016 Order, the Parties seemed to agree that the Committee had exclusive standing to retain and enforce all causes of action of the Debtors.  (*See* Doc. 216.)

irrelevant to the issues in this case primarily because the Committee made no such allegations of a Ponzi scheme.  It is also unnecessary in determining the issue of insolvency.  Even if Hart's characterization was relevant, the Court would exclude his testimony under Federal Rule of Evidence 403 because its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.

Therefore, the Committee's Motion in Limine to Exclude Testimony of James F. Hart (Doc. 168) is **GRANTED-IN-PART** and **DENIED-IN-PART.**  Hart is permitted to opine on the solvency of the individual Debtors on a subsidiary level.  Furthermore, the solvency of the Debtors is to be considered on a standalone, rather than consolidated, basis.  Hart is not, however, permitted to utilize the Hart Report to rebut the Edwards Report or to opine on the Debtors exhibiting the qualities or characteristics of a Ponzi scheme.

### C. Michael L. Hunter

Michael L. Hunter is a certified real estate appraiser with more than 28 years of experience.  (Doc. 175-1 at 8.)  As a Member of the Appraisal Institute, Hunter is designated to provide a professional opinion on a "wide range relating to all types of real property," including valuation and market analyses.[13]   (Doc. 175-1 at 6.)  He is experienced in the appraisal of subleases and has done so at least 20-25 times in his past work.  (Doc. 175-1 at 31.)

In his Report, Hunter reviewed the underlying, initial leases and the subsequent subleases of 40 properties in Georgia, Alabama, and Louisiana.  (*See* Doc. 175-2.)  He attached a summary of the MSL transactions, which included addresses and descriptions of the properties as well as the terms of the underlying leases and subleases.  (*Id.* at 7-9.)  In his review, he found that the terms of the "sublease included base rent increases of 13% to 100% and also shifted operating expenses obligations to the sub-lessee."  (*Id.* at 1.)  Hunter concluded that the market rent for each of the examined properties is best reflected by the "lease term and rent reflected in the original 'Underlying Lease,'" which were negotiated between non-related parties, and the higher, subsequent "sublease terms and rents cannot be

---

[13] *See* APPRAISAL INSTITUTE, *AI Designations*, http://www.appraisalinstitute.org/ai-designations/ (last visited Mar. 31, 2016).

supported." (*Id.* at 2.) It is undisputed that the subleases were entered into by related parties.

Upon review of the Report and his sworn testimony, the Court finds that Michael L. Hunter's opinion on the market rents of the underlying leases and later subleases should be admitted under the Federal Rule of Evidence 702 and *Daubert*. Hunter's testimony is reliable because he based his conclusion on his extensive experience in the field and his application of the standards, principles, and methods set forth by the Appraisal Institute. Furthermore, while Hunter admitted he received information regarding the arms-length nature of the underlying leases from counsel for the Committee, he also considered the research completed in his comprehensive report of the MFG leases and subleases. (Doc. 175-1 at 19-20.) There, Hunter reviewed over one hundred properties to determine the market value of the underlying leases. (*Id.* at 20.)

Hunter's opinion regarding the MSL leases and subleases focused on "whether the subleases were consistent within the market as far as the terms and rents." (Doc. 175-1 at 22.) Although Hunter did not reach an opinion on each of the individual properties for the 40 underlying leases, he realized an overall trend where "every time they signed a lease they bumped the rent up and subleased it to what appears to be a related party. And throughout the term they renegotiated with the related party to benefit the landlord, which I don't understand why a tenant would do that." (*Id.* at 21.) Based on his years of experience, he judged the reasonableness of the subsequent rents and found that they were not consistent with or supported by the market. (*See id.* at 29.)

The court finds Hunter's opinions reliable, because he not only based his conclusion on his professional experience, *Frazier*, 387 F.3d at 1261, he also supported his conclusion in connection with the comprehensive report done with the MFG leases and subleases, which is not the subject of the Martin Defendants' motion in limine. Accordingly, the Martin Defendants' Motion in Limine to Exclude the Testimony of Michael L. Hunter (Doc. 175) is **DENIED**.

## CONCLUSION

For the reasons stated above, the Committee's Motion in Limine to Exclude Testimony of Christopher S. Edwards (Doc. 150) is **GRANTED-IN-PART** and

**DENIED-IN-PART.**  Chris S. Edwards is permitted to opine on the solvency of TMT on a consolidated basis, but is not permitted to opine on the solvency of the individual Debtors on a subsidiary level.  The Edwards Report (Doc. 151) and Rebuttal (Doc. 152) is otherwise admissible for consideration on summary judgment and at trial.

  The Martin Defendants' Motion in Limine to Exclude Testimony of James F. Hart (Doc. 168) is **GRANTED-IN-PART** and **DENIED-IN-PART.**  Hart is permitted to opine on the solvency of the individual Debtors on a subsidiary level.  Furthermore, the solvency of the Debtors is to be considered on a standalone, rather than consolidated, basis. Hart is not, however, permitted to utilize the Hart Report to rebut the Edwards Report or to opine on the Debtors exhibiting the qualities or characteristics of a Ponzi scheme.  Lastly, the Martin Defendants' Motion in Limine to Exclude Testimony of Michael L. Hunter (Doc. 175) is **DENIED.**  The Edwards, Hart, and Hunter Reports are otherwise admissible for consideration on summary judgement and at trial.

  **SO ORDERED**, this __31st__ day of March, 2016.

/s/ W. Louis Sands     
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**
