IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| POST-CONFIRMATION COMMITTEE FOR SMALL LOANS, INC., *et al.*, | : : : : | |
| Plaintiff, | : : | |
| v. | : : | CASE NO.: 1:13-CV-195 (WLS) |
| W. DEREK MARTIN, as Executor of the Estate of Vance R. Martin, *et al.*, | : : : | |
| Defendants. | : : | |

## ORDER

Present before the Court is Plaintiff Post-Confirmation Committee for Small Loans, Inc., *et al.*'s Motion for Partial Summary Judgment. (Doc. 171). Therein, the Committee requests partial summary judgment as to Count VII[1] against Defendants W. Derek Martin and Shana Shockley Martin. The Committee seeks a final, executable judgment in the amount of $248,402.59, or any lesser sum, from Defendant W. Derek Martin, $102,300, or any lesser sum, from Defendant Shana Shockley Martin, along with post-judgment interest at the legal rate and such other and further relief deemed just and proper. (*See id.*) For the reasons stated herein, Plaintiff's Partial Motion for Summary Judgment (Doc. 171) is **DENIED.**

## PROCEDURAL HISTORY

The Post-Confirmation Committee for Small Loans, Inc., *et al.* ("the Committee") filed suit against the above-captioned Defendants on December 14, 2013. (Doc. 1.) Among the Defendants are W. Derek Martin ("Derek Martin") and Shana Shockley Martin ("Shana Martin," collectively "the Martin Defendants"). The Martin Defendants answered separately on January 29, 2014. (Docs. 40, 42.) After this Court granted leave to amend (*see* Doc.

---

[1] Although Plaintiff cites VI in their motion, the claim applicable to Defendants W. Derek Martin and Shana Shockley Martin appears in Count VII. Thus, the Court will construe Plaintiff's partial motion for summary judgment as to Count VII.

1

112), the Committee filed their Amended Complaint on November 7, 2014. (Doc. 113.) The Martin Defendants answered the Amended Complaint separately on November 21, 2014. (Docs. 119, 120.)

On May 15, 2015, the Committee filed the instant motion for partial summary judgment as to Count VII of the Amended Complaint. (Doc. 171.) After receiving an extension of time to respond (*see* Doc. 187), the Martin Defendants timely responded on June 12, 2015. (Doc. 194.) The Committee timely replied thereto on June 26, 2015. (Doc. 206.) As the movants for summary judgment, the Committee has complied with M.D. Ga. L.R. 56 by attaching separate and concise statements of material fact to their motion (*see* Doc. 167), and the Martin Defendants have complied as well by responding to each statement of material fact. (*See* Doc. 193-1.) As such, the Court finds that the Committee's Partial Motion for Summary Judgment (Doc. 171) is ripe for review.

## FACTUAL HISTORY

### I. Introduction

The following facts are derived from the Complaint (Doc. 1), as amended (Doc. 113), the Amended Answers (Docs. 119, 120), the Committee's Statement of Undisputed Material Facts (Doc. 167), and the Martin Defendants' Response to the Committee's Statement of Undisputed Material Facts (Doc. 193-1), all of which were submitted in compliance with M.D. Ga. L.R. 56, and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits submitted, all of which are construed in a light most favorable to the nonmoving party. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### II. Relevant Facts

#### A. Founding of the Money Tree

Headquartered in Bainbridge, Georgia, the Money Tree of Georgia, Inc. ("TMG"), Small Loans, Inc. ("SLI"), The Money Tree, Inc. ("TMT"), The Money Tree of Florida, Inc. ("TMF"), and The Money Tree of Louisiana, Inc. ("TML", collectively "the Debtors" or "The Money Tree"), were engaged in the consumer finance business in Georgia, Alabama, Florida, and Louisiana, respectively. (Doc. 167 at ¶ 5.) TMG was founded by Vance "Rudy"

2

Martin in 1987 originally under the name "The Money Tree, Inc." (Doc. 193-1 at ¶ 4.) By 1995, its name was changed to "The Money Tree of Georgia, Inc." and the present company named "The Money Tree Inc." was formed. (Doc. 113 at ¶ 44 n.2.) Over time, Rudy Martin organized various affiliates of the Debtors as their corporate operations expanded throughout the Southeast. (*Id.* at ¶ 44.) Those affiliates included Martin Family Group, LLLP, Martin Sublease, LLC, Martin Investments, Inc., and the Interstate Motor Club. (Doc. 113 at ¶ 65.) Rudy Martin ran the Money Tree alongside his sons, Derek and Jeff Martin, until his resignation in 2006. (Docs. 113 at ¶ 51; 167 at ¶¶ 9, 13.)

### B. Derek Martin

Derek Martin was an officer of TMT from 1997 through 2007, and a director from April 16, 2006 until February 21, 2008. (Doc. 167 at ¶ 9-10.) He was ultimately named President of TMT in December 2005. (*Id.* at ¶ 10.) Derek Martin later resigned from his position as President in August 2007 and selected Bradley Bellville as his successor. (*Id.* at ¶ 25.) However, he still continued to receive a salary from TMT even after his resignation. (*Id.* at ¶ 27.) Derek Martin stated that he remained employed with TMT until 2010. (Doc. 188-1 at 58.) In this new role, he reviewed hundreds of invoices of the Debtors, which ranged from utility bills to repair orders. (*Id.*) On a weekly basis, he oversaw these bills and determined whether there were discrepancies for the Debtors' accounting department, which was headed by Steven Morrison, to investigate. (*Id.* at 59-60.) Derek Martin stated he reviewed these invoices for about 20 to 25 hours per week. (*Id.* at 63.)

Corporate Secretary of TMT, Jennifer Ard, stated that after his resignation, Derek Martin worked every day from 2007 to 2009. (Doc. 188-8 at 86.) Derek Martin admits that from February 2009 and "into 2010," he was not working for the Debtors and continued to receive a salary during that time period. (Doc. 167 at ¶ 40.) Bellville assumed those duties which Derek Martin had been performing, and Derek Martin resumed those duties in 2010. (Doc. 193-1 at ¶ 40.) Derek Martin stated that, during his absence, "The Money Tree was kind enough to let me keep that job," and "They were kind enough to continue to pay me." (Doc. 188-1 at 61, 62.)

Bellville stated that after Derek Martin resigned, he remained on the Debtors' board of directors and was still a shareholder. (Doc. 174-10 at 38.) The Debtors' Form 10-K for fiscal year ending September 25, 2008 stated that Derek Martin was "no longer an officer or

3

actively involved in our operations," after he resigned as President of TMT. (Doc. 174-1 at 15.) Bellville further stated that Derek Martin held no other jobs or roles after Bellville became President of TMT. (Doc. 174-10 at 38.) Bellville believed that Derek Martin was, to some degree, receiving a salary by virtue of his position as a stockholder. (Doc. 174-11 at 58.) However, Bellville also stated that in his new role, Derek Martin both set his own responsibilities and had other responsibilities to the company as well. (*Id.*) Steven Morrison stated that after Derek Martin's resignation, he did not interact with Derek Martin on a frequent basis. (Doc. 174-12 at 20.) Morrison could not recall whether Derek Martin served in any role that assisted the accounting function of the company or assisted the company in managing expenses. (*Id.*)

The Debtors' internal records show that Derek Martin's principal position in the company was "Stockholder," and he received the following compensation amounts: gross pay in the amount of $94,546.56 in 2008, gross pay in the amount of $85,197.11 in 2009, and gross pay in the amount of $68,658.92 in 2010. (Doc. 167 at ¶¶ 28-30.) Each year, Derek Martin received a company car and country club dues from TMT. (*Id.*) However, Derek Martin submits his confidential W-2 Wage and Tax Statement, issued by TMT, which reflects differing amounts. (*See* Doc. 201; *filed under seal*.)

**C. Shana Martin**

Shana Martin is the wife of Derek Martin. (*Id.* at ¶ 12.) Shana Martin received not less than $88,300 in cash and other assets from Derek Martin or the Derek Martin Trust. (*Id.* at ¶ 79.) These assets include, among other things, not less than $88,300 in cash in 2012, 2013, and 2014 from Derek Martin, an $86,000 diamond ring in 2013 paid for in cash from the Derek Martin Trust, a $14,000 diamond Rolex watch received in May 2013 from Derek Martin, and two Louis Vuitton purses, received in December 2008 and February 2011, from Derek Martin. (*Id.* at ¶ 80.) It is undisputed that Shana Martin provided no value to Derek Martin for the transfer of the ring. (*Id.* at ¶ 81.)

As her source of income, Shana Martin stated that she received allowances at the beginning of the year. (Doc. 174-8 at 24.) Her allowances amounted to $37,500.00 and $22,000.00 in the years 2014 and 2013 respectively. (*Id.* at 24-25.) Shana Martin stated that these funds derived from an investment, created by Derek Martin, in an insurance company called Southern Fidelity. (*Id.*) In the years prior, she did not receive an allowance, or

4

"dividend," from the same company. (*Id.* at 25.) Instead, she received $1,200 twice per month from her husband. (*Id.*)

### D. The Money Tree's Bankruptcy and Creation of the Committee

The Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code on December 16, 2011, in the United States Bankruptcy Court for the Middle District of Alabama.[2] (Doc. 167 at ¶ 3.) After confirmation of the Amended Joint Plan of Liquidation, the Committee was formed to represent the Debtors' Estate. (Docs. 167 at ¶ 1; Doc. 172-1 at 22-23.) The Plan provided the Committee exclusive standing to retain and enforce all causes of action of the Debtors, their Affiliates and subsidiaries, and the Estate. (Doc. 172-1 at 22-23.)

Count VII of the Amended Complaint alleges that the Debtors made constructive fraudulent transfers or obligations in the amount of $467,679.15 to Derek Martin for the "Derek Martin Compensation."[3] (Doc. 113 at ¶¶ 135-139.) The Committee is pursuing this claim under 11 U.S.C. §§ 554(B), 550, 551 and Georgia's Uniform Fraudulent Transfer Act. The Committee asserts that the Debtors did not receive reasonably equivalent value for the Derek Martin Compensation because the services he provided in exchange "were either non-existent, small in relation to same, or actually served to harm the Debtors. (*Id.* at ¶ 137.)

The Committee further alleges that, at the time of the transfers constituting the Derek Martin Compensation, the Debtors "(a) were engaged in a business or a transaction, or were about to engage in a business or transaction, for which the assets remaining with the Debtors were unreasonably small in relation to the business or transaction and/or (b) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured and/or (c) were insolvent or became insolvent as a result of the transfers." (*Id.*) The Committee also alleges Shana Martin is the mediate or immediate

---

[2] *See* Bankruptcy Case Nos. 11-12254, 11-12255, 11-12256, 11-2257 and 11-2258, United States Bankruptcy Court for the Middle District of Alabama, Southern Division. The bankruptcy cases were jointly administered and proceeded under *In re Small Loans, Inc., et. al.,* Chapter 11 Case No. 11-12254. The Committee requests that this Court take judicial notice of the Schedules of Assets and Liabilities and amendments thereto filed in the Debtors' bankruptcy cases. *See id.*, Case No. 11-12254, Docs. 131, 243, 246, 289, 559; Case No. 11-12255, Doc. 5; Case No. 11-12256, Doc. 25; Case No. 11-12257, Doc. 25; and Case No. 11-12258, Doc. 25. Finding it reasonable and appropriate to do so, the Court accordingly takes judicial notice of the same. Fed. R. Evid. 201.

[3] The Committee also seeks to avoid the compensations of Jefferey V. Martin and Bradley Bellville, which are not the subject of this motion.

5

transferee of some or all of the Derek Martin Compensation and seeks to recover some or all of those amounts from Shana Martin under 11 U.S.C. § 550.  (*Id.* at 138.)

## STANDARDS OF REVIEW

### I. Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).  "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact.  *See Celotex*, 477 U.S. at 323; *Chapman*, 229 F.3d at 1023.  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *See Celotex*, 477 U.S. at 322-24.  Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted).  Instead, the nonmovant must point

6

to competent record evidence that would be admissible at trial. *See also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form."). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c).

## II. Local Rule 56

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56. As stated above, the Parties complied with the Federal Rules of Civil Procedure and the Local Rules by filing timely motion for summary judgment, response and reply thereto, and attached a separate and concise statement of material facts. The Court will now address this ripe motion.

## **ANALYSIS**

### I. Constructive Fraudulent Transfers Claim

Section 544 of the Bankruptcy Code allows for the trustee[4] to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable

---

[4] Pursuant to the Amended Plan and Confirmation Order in Debtors' bankruptcy cases, and in accordance with 11 U.S.C. § 1123(b)(3), the Committee acts as representative of the Debtors' Estates and has exclusive standing to pursue, retain, and enforce all claims and causes of actions of the Debtors, their Affiliates and subsidiaries, and the Estate. (Doc. 172-1 at 22-23, 52-53.) Thus, when the term "trustee" is referenced, this

under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b). In this case, the applicable law is Georgia's Fraudulent Transfers Act ("GUFTA"),[5] pursuant to O.C.G.A. §§ 18-2-70, *et seq*. Under the Act, constructive fraudulent transfers will be set aside if the elements of O.C.G.A. § 18-2-75(a) are met.

> Section 18-2-75(a) provides,
>
> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

O.C.G.A. § 18-2-75(a). Similarly, 11 U.S.C. § 548(a)(1)(B) allows the trustee to avoid any transfer if the debtor "received less than a reasonably equivalent value in exchange" and was insolvent on the date of transfer or "became insolvent as a result of such transfer."[6] Thus, in order to prevail on a constructive fraudulent transfer claim on motion for summary judgment, the Committee must show that no genuine dispute of material fact exists that "(1) a transfer [was] made or an obligation [was] incurred, (2) for less than reasonably equivalent value, (3) while the debtor was insolvent or likely to become insolvent." *Kipperman v. Onex Corp.*, 411 B.R. 805, 834 (N.D. Ga. 2009) (citing O.C.G.A. § 18-2-75); *see also Atlanta Fiberglass USA, LLC v. KPI, Co., Ltd.*, 911 F. Supp. 2d 1247, 1264-65 (N.D. Ga. 2012); CSX Transp., Inc. v. Leggett, No. 1:07-CV-1152-WSD, 2010 WL 3210841, at *4 (N.D. Ga. Aug. 12, 2010).

Determining whether a debtor received reasonably equivalent value is "largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts."

---

includes the Committee's representative capacity as outlined in the Plan and Confirmation Order. *See* 11 U.S.C. § 1123(b)(3); *see also In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1180 n.1 (11th Cir. 1987).

[5] Georgia's Uniform Fraudulent Transfers Act has been amended to reflect the new "Uniform Voidable Transactions Act." *See* S.B. No. 65, 2015 Gen. Assemb., Reg. Sess. (Ga. 2015). The Court recognizes that these new amendments are inapplicable to this case as the alleged conduct as well as the commencement of this action occurred well before the new Act's effective July 1, 2015 date. Thus, the Court will continue to refer to the Act as GUFTA.

[6] In construing Georgia's Uniform Fraudulent Transfers Act (GUFTA), the Court finds it appropriate to consider similarly worded statutes under other statutory provisions, such as the Bankruptcy Code. *See, e.g.*, *Kipperman v. Onex Corp.*, 411 B.R. 805, 828 (N.D. Ga. 2009) (analyzing "reasonably equivalent value" standard under both 11 U.S.C. § 548 and O.C.G.A. § 18-2-75); *Pettie v. Bonertz (In re LendXFinancial, LLC)*, No. 10-76803-MGD, 2012 WL 1597394, at *7 (Bankr. N.D. Ga. Mar. 19, 2012) (similarly analyzing Georgia's UFTA under 11 U.S.C. § 548 because the statutes "substantially mirror[]" one another).

*Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593 (11th Cir. 1990) (quoting *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829-30 (5th Cir. 1959)) (internal quotation marks omitted).[7] The court is unauthorized to void any transfer that either directly or indirectly "confers an economic benefit upon the debtor." *Gen. Elec. Credit Corp. of Tenn. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990) (construing 11 U.S.C. § 548). Yet, in reviewing the transfer, the Court must find that the debtor must in the very least have received "value" in the exchange. *See Kipperman*, 411 B.R. at 837.

"The purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of a bankrupt's estate." *In re Rodriguez*, 895 F.2d at 727 (quoting *Mayo*, 270 F.2d at 829-30). "In order to determine whether a debtor received 'reasonably equivalent value,' the court must look at what 'value' the debtor received in return for the transfer. The court must then determine whether the value received is reasonably equivalent; this will depend on the facts of each case." *Kipperman*, 411 B.R. at 837. This is a two-step inquiry. *See Anderson v. Patel (In re Diplomat Constr., Inc.)*, No. 09-68613-MGD, 2013 WL 5591918, at *5 (Bankr. N.D. Ga. Aug. 6, 2013). Under GUFTA, "value" is given for a transfer or an obligation if, "in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." O.C.G.A. § 18-2-73(a). In considering whether reasonably equivalent value was exchanged, a court must consider "all aspects of the transaction and carefully measure the value of all benefits and burdens to the debtor, direct or indirect." *In re Pembroke Dev, Corp.*, 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991). The party challenging the transfer or obligation must show that the debtor did not receive reasonably equivalent value by a preponderance of the evidence.[8] *In re Richard & Conover Steel, Co.*, 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001) (construing 11 U.S.C. § 548).

Under O.C.G.A. § 18-2-72(a), "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." Similar to GUFTA's definition, the Bankruptcy Code defines insolvency as the "financial condition such that the sum of

---

[7] The Eleventh Circuit has adopted as binding precedent all decisions issued by the former Fifth Circuit prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F. 2d 1206, 1209 (11th Cir. 1981) (en banc).

[8] In their most recent amendments, the Georgia legislature codified the preponderance of the evidence standard at O.C.G.A. 18-2-75(d) (2015).

9

such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32).

### A. Insolvency

In addressing the issue of insolvency first, the expert testimony of James Hart (*See* Doc. 153) revealed that TMT was continuously insolvent as early as the fiscal year ending September 25, 2001. Hart measured TMT's insolvency on a standalone basis, which Chris Edwards, expert for the Martin Defendants, contends is inappropriate in analyzing the issue of solvency. (*See* Doc. 152.) Instead, Chris Edwards concluded that the Debtors became "balance sheet" insolvent as of the fiscal year ending September 25, 2008 on a consolidated basis. (Doc. 151 at 28.) Moreover, the experts are also in dispute as to whether the Debtors operated as a going concern through the Petition Date. Assessing a debtor's assets and liabilities "at fair valuation" is a two-part test. In *In re DAK Industries, Inc.*, the United States Court of Appeals for the Ninth Circuit identified the first step as determining "whether a debtor was a 'going concern' or was 'on its deathbed.'" 170 F.3d 1197, 1199 (9th Cir. 1999). Next, depending on the outcome of the first step, the court must "apply a simple balance sheet test to determine whether the debtor was solvent." *Id.* In this case, Hart opined that adding a going concern value was not warranted because of the consistent and substantial losses of the Debtors. (Doc. 168-1 at 94.) Edwards, however, concluded that the Debtors remained a going concern "at all points through 2010." (Doc. 151 at 28.) These are just a few of many genuine factual disputes among experts that are best resolved at trial by a jury. However, the experts do not appear to be in dispute that the Debtors, whether on a consolidated or standalone basis, were insolvent from fiscal year ending September 25, 2008 though the Petition Date. (*See* Docs. 151 at 28; 153 at 17.)

While there are many genuine disputes on the issue of insolvency, there are sufficient undisputed facts upon which a reasonable jury could find that the Debtors were insolvent from at least September 25, 2008 through the Petition Date. Therefore, because there is a genuine factual dispute regarding when in 2008 the Debtors became insolvent, the Court must reserve such judgment for a jury. However, construing the evidence in a light most favorable to the nonmoving party, the Court finds sufficient evidence, if believed by the jury, to find that the Debtors were insolvent from September 25, 2008 through the Petition Date.

### B. Reasonably Equivalent Value

The Committee seeks to avoid as constructive fraudulent transfers $248,402.59, or any portion thereof, of the Derek Martin Compensation received as a TMT shareholder under federal and state laws. Specifically, the Committee seeks to avoid gross pay in the amount of $94,546.56 paid in 2008, gross pay in the amount of $85,197.11 paid in 2009, and gross pay in the amount of $68,658.92 paid in 2010. (Doc. 171-1 at 2-3.) The first element, whether there was a transfer made or an obligation incurred (as well as whether the Committee may assert this claim), is undisputed. Yet, Derek Martin contends there is a genuine dispute of material fact as to whether his compensation was a reasonably equivalent value of services performed and whether the Debtors were insolvent during the timeframe the Committee seeks avoidance. (Doc. 194 at 2-3.) Having addressed the disputed issue of solvency above, which the Court found should be reserved for a jury at trial, at least with respect to the year 2008, the Court will address the reasonably equivalent value element here.

The Committee contends the compensation transfers to Derek Martin fail at step one of the reasonably equivalent value analysis because Derek Martin conferred "no palpable benefit" to the Debtors during 2008, 2009, and 2010. The Committee cites *Mellon Bank N.A., v. Offical Comm. of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 149 (3d Cir. 1996), which vigorously distinguished the line between "value" and "reasonably equivalent value." There, the court stated "before determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court must make an express factual determination as to whether the debtor received any value at all." *Id.* Under GUFTA, as noted above, "value" includes an exchange of property or satisfaction or security of an antecedent debt. O.C.G.A. § 18-2-73(a). Value does not, however, include "an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." *Id.*

It is undisputed that from February 2009 into 2010, Derek Martin was not rendering professional services to the Debtors. By his own admission, he stated that "The Money Tree was kind enough to let me keep that job," and "They were kind enough to continue to pay me."[9] In his absence, Bellville assumed Derek Martin's duties, and Derek Martin continued

---

[9] The Committee objects to the admissibility to any reference to Derek and Shana Martin's son's illness or care from consideration on motion for summary judgment and at trial, pursuant to Federal Rules of Evidence 401 and 403. The Court will reserve ruling on trial matters, but finds that for consideration of the instant

11

to receive a salary during that time period. However, Derek Martin argues that in "[c]onsideration of employee morale, employee retention and public perception of the humanity of the company would, in the eyes of many people, justify the continued payment of that compensation." (Doc. 194 at 5.) Derek Martin asserts that an economic benefit to the Debtors need not be tangible. (*Id.*) He relies on *In re J. K. Chems., Inc.*, 7 B.R. 897, 898 (Bankr. D. R.I. 1981), for the proposition that maintaining goodwill "cannot be said to be totally bereft of consideration, as a matter of law." In that case, the Debtor offered excess storage space to its "best customer" on a gratuitous basis in order to maintain goodwill. *Id.* at 897. The Trustee sought to prevent the customer from reclaiming its property after Debtor's bankruptcy filing and argued that the storage arrangement was a fraudulent conveyance under 11 U.S.C. § 548. *Id.* at 897-98. The bankruptcy court, not necessarily reaching the issue of reasonably equivalent value, found that the Trustee offered no evidence on the issue of reasonably equivalent value and allowed the Debtor's customer to reclaim its property from Debtor's warehouse. *Id.* at 898.

Derek Martin's reliance on *In re J. K. Chems. Inc.* is misplaced. A more compatible case is *In re Green*, 268 B.R. 628, 651 (Bankr. M.D. Fla 2001). There, the Trustee sought to avoid a $50,000 transfer from the Debtors to their daughter as a fraudulent transfer under 11 U.S.C. § 548. *Id.* The Debtors opted to give their daughter a cash gift in lieu of paying for her wedding. *Id.* The bankruptcy court found that the Debtors received less than reasonably equivalent value in exchange for the cash gift. *Id.* The court noted, that the Debtors "understandably felt a moral or family obligation to pay for [their daughter's] wedding or to give her a sizeable wedding gift; however, the Debtors had no legal duty to do so." Similarly, the Debtors in this case had no legal duty to continue to compensate Derek Martin when he failed to provide value or services to the Debtors in exchange for compensation with respect to his former position, even if the Debtors' leadership believed it to be right and moral. Thus, even in view of the record most favorably to the nonmoving party, no reasonable juror could find that Derek Martin provided value to the Debtors when he was not providing professional services in exchange for compensation.

---

motion, references to the Martin's son is irrelevant as it does not have any tendency to make the fact that Derek Martin was not working for Debtors in any capacity during those times more or less probable.

However, the Court is unable to find some or all of Derek Martin's 2009 and 2010 compensation voidable because Derek Martin has identified a genuine material factual dispute regarding when and what he actually received in compensation for the relevant time periods. Derek Martin stated that he resumed his duties in 2010, and he is correct in that the Committee failed to establish that date of return. Furthermore, the Committee submits Derek Martin's gross pay of $94,546.56, $85,197.11, and $68,658.92 for the years 2008, 2009, and 2010 respectively. However, Derek Martin submits that the wages reflected in his confidential W-2 Wage and Tax Statement, issued to him by TMT, which reflects vastly differing amounts. While both amounts may be accurately stated in their records, the Court cannot find upon the record which, if either, is correct as a matter of law. Thus, a jury must decide the amounts Derek Martin actually received in compensation from the Debtors as well as at what point, if any, Derek Martin returned to work in 2010.

Furthermore, considerable latitude should be given to the jury when determining the reasonably equivalent value of Derek Martin's services for anytime period it may determine services were rendered. After his resignation as President of TMT, Derek Martin remained employed with the TMT until 2010. He stated that he reviewed the hundreds invoices of the Debtors on a weekly basis. He states that his responsibility was to oversee and report discrepancies to the Debtors' accounting department and worked approximately 20 to 25 hours per week in discharge of those duties. Jennifer Ard stated that he worked every day from 2007 to 2009. Here, unlike the times when he was not providing services in his former position with the Debtors, Derek Martin provided some economic benefit to the Debtors he contends was otherwise provided.

In contrast, the Committee asserts that Derek Martin's compensation was grossly inflated for the part-time nature of his duties.[10] The Committee points to the Debtors' Form 10-K for fiscal year ending September 25, 2008, which revealed that Derek Martin was "no longer an officer or actively involved in our operations," after he resigned as President of TMT. (Doc. 174-1 at 15.) The Committee also submits the testimony of Bradley

---

[10] The Committee requests that this Court take judicial notice the U.S. Government's census records of the *per capita* income in Decatur, County Georgia during from 2008 to 2010, which they purport is $18,059. Finding it reasonable and appropriate to do so, the Court takes judicial notice of the same here under Federal Rule of Evidence 201. *See Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 572-73 (5th Cir. 2011). The Court makes no further findings or presumptions, nor draws any inferences.

13

Bellville, who stated that, while Derek Martin remained on the board of directors and was still a shareholder, he had no other jobs with the company after Bellville became President. Bellville further stated that he believed Derek Martin was to some degree receiving a salary by virtue of his position as a stockholder. (Doc. 174-11 at 58.) While this newly created role did not exist prior to Derek Martin's resignation, Bellville stated that Derek Martin also has some duties to the company on top of setting his own responsibilities. (*Id.* at 58-59.) Steven Morrison stated that while his interaction with Derek Martin was less frequent after Derek Martin resigned as President, Morrison could not recall whether Derek Martin served in any role assisting the management of expenses.

Viewing the record in a light most favorably to Derek Martin, there exists a genuine dispute of material fact as to whether the Debtors received reasonably equivalent value for Derek Martin's services. A jury need not accept any of these individuals' statements as conclusively true or false. These statements are all credibility determinations that are to be best resolved before a jury at trial. *See Anderson*, 477 U.S. at 255. Additionally, these statements do not provide the Court with a basis of determining whether or not the Debtors received reasonably equivalent value in exchange for Derek Martin's services. Furthermore, the Court must give considerable latitude to the jury, who is the best entity for determining whether Derek Martin's services in his post-resignation role were exchanged for reasonably equivalent value to the Debtors.

## II. Immediate or Mediate Transferee Claim

The Committee also seeks summary judgment against Shana Martin for the value of cash, not less than $88,300, and a $14,000 diamond Rolex, which they assert were received from Derek Martin in the years 2012 through 2014, pursuant to 11 U.S.C. § 550. (*See* Doc. 171.) Section 550[11] of the Bankruptcy Code allows the trustee to recover avoidable transfers

---

[11] Section 550 provides in part:
  (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

  (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
  (2) any immediate or mediate transferee of such initial transferee.

  (b) The trustee may not recover under section (a)(2) of this section from—
  (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

14

from "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a)(2). Unlike an initial transferee, however, an immediate or mediate transferee may assert an affirmative defense to prevent the trustee from recovering. *See Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988). The trustee is exempt from recovering from a subsequent transferee that "takes for value . . . in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). The burden of proving this affirmative defense rests squarely on the parties seeking to assert the defense. *See In re Nordic Vill., Inc.*, 915 F.2d 1049, 1055 (6th Cir. 1990) *rev'd on other grounds sub nom. United States v. Nordic Vill. Inc.*, 503 U.S. 30 (1992) ("The language of the statute clearly places the burden of showing value, good faith, and lack of knowledge, on the transferee as a defense."); *Dev. Specialists, Inc. v. Hamilton Bank. N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 797 (Bankr. S.D. Fla. 2000) (accord).

Here, it is undisputed that Shana Martin received not less than $88,300 in cash and other assets from Derek Martin of the Derek Martin Trust. It is also undisputed that Shana Martin received an $86,000 diamond ring in 2013, a $14,000 diamond Rolex in 2013 and two Louis Vuitton purses in December 2008 and February 2011 from Derek Martin. Instead of seeking shelter under the good-faith subsequent transferee defense, Shana Martin contends there are triable issues of fact regarding whether she received any portion of any compensation paid to Derek Martin. She asserts that it is not clear whether the amounts she received in 2012 were from her husband or his trust, but she contends that her allowances in 2013 and 2014 came from investments Derek Martin created for her. Thus, she argues that these transfers cannot be traced as a matter of law to Derek Martin's compensation. She also submits that transfers to a spouse for necessary and reasonable household and living expenses cannot be avoided as a fraudulent transfer, as household expenses are transfers for value. However, Shana Martin submitted no evidence to suggest that she used any of the challenged subsequent transfers for reasonable and necessary household expenses. Thus, the Court rejects this argument.

"In an action seeking recovery, the plaintiff has the burden of tracing funds it claims to be property of the estate." *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 708 (11th Cir. 2005). "Commingling funds does not prohibit tracing." *In re Palisades at W. Paces Imaging Center,*

---

(2) any immediate or mediate good faith transferee of such transferee.

*LLC*, 501 B.R. 896, 917 (Bankr. N.D. Ga. 2013). However, in this Circuit, tracing does not require a "dollar-for-dollar accounting." *In re Int'l Servs., Inc.*, 408 F.3d at 708. So long as the transferred funds can be identified, "[i]t is undeniable that equity will follow a fund through any number of transmutations, and preserve it for the owner." Id. (quoting *In re Bridges*, 90 B.R. 839, 848 (Bankr. E.D. Mich. 1988)).

The Committee submits that it is not required to trace the actual funds paid to the Derek Martin Compensation to the same funds transferred to Shana Martin in the form of money or gifts. To meet its burden, the Committee relies on Shana Martin's deposition testimony, which revealed that Derek Martin made such transfers to Shana Martin. However, it was the Committee who alleged that Shana Martin was the immediate or mediate transferee of "some or all of the Derek Martin Compensation." (*See* Doc. 113 at ¶ 138.) The Committee has not set forth a sufficient basis for this Court to determine conclusively whether the transfers to Shana Martin were derived from the Debtors' transfers to Derek Martin in the form of compensation. Shana Martin has stated that her allowances derived from investments in an insurance company. While this investment was set up by Derek Martin, the record does not reflect whether or not this investment derived from the Derek Martin Compensation. Thus, Shana Martin has identified genuine issues of material fact, which are most appropriately resolved at trial by the trier of fact. Moreover, the Court has not found and cannot conclusively find upon the record that some or all of the Derek Martin Compensation is voidable under 11 U.S.C. § 544 or GUFTA. The Committee has also failed to establish conclusively that it can avoid the alleged transfers to Shana Martin under 11 U.S.C. § 550. These are necessarily genuine questions of material fact.

## CONCLUSION

For the above-stated reasons, Plaintiff Post-Confirmation Committee for Small Loans, Inc., *et al.*'s Motion for Partial Summary Judgment (Doc. 171) is **DENIED.**

**SO ORDERED,** this   31st   day of March, 2016.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**