## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | | |
|---|---|---|
| POST-CONFIRMATION COMMITTEE FOR SMALL LOANS, INC., *et al.*, | : : : : | |
| Plaintiff, | : : | |
| v. | : : | CASE NO.: 1:13-CV-195 (WLS) |
| W. DEREK MARTIN, as Executor of the Estate of Vance R. Martin, *et al.*, | : : : | |
| Defendants. | : : | |

### ORDER

Present before the Court are Defendants W. Derek Martin, Jefferey V. Martin, and Martin Family Group, LLLP's Motion for Summary Judgment (Doc. 164) and Defendants W. Derek Martin, as Executor of the Estate of Vance R. Martin, W. Derek Martin, Jefferey V. Martin, and Grace Elizabeth Martin Johnston's Motion for Summary Judgment. (Doc. 169.) For the reasons stated herein, the Defendants' Motions for Summary Judgment are **DENIED.**

### PROCEDURAL HISTORY

The Post-Confirmation Committee for Small Loans, Inc., *et al.* (hereinafter "the Committee") filed suit against the above-captioned Defendants on December 14, 2013. (Doc. 1.) Among the Defendants are W. Derek Martin, as Executor of the Estate of Vance R. Martin, W. Derek Martin ("Derek Martin"), Jefferey V. Martin ("Jeff Martin"), and Grace Elizabeth Martin Johnston ("Grace Johnston"), and Martin Family Group, LLLP ("MFG") (hereinafter "the Family Group Defendants" or "the Motor Club Defendants" and collectively "the Martin Defendants").[1] The Martin Defendants answered the Complaint on

---

[1] When discussing Defendants W. Derek Martin, Jefferey V. Martin, and Martin Family Group, LLLP's Motion for Summary Judgment (Doc. 164), the Court will refer to Defendants as "the Family Group Defendants." When discussing Defendants W. Derek Martin, as Executor of the Estate of Vance R. Martin, W. Derek Martin, Jefferey V. Martin, and Grace Elizabeth Martin Johnston's Motion for Summary Judgment

January 29, 2014.  (Docs. 37, 38, 40.)  After the Court granted leave to amend (*see* Doc. 112), the Committee filed their Amended Complaint on November 7, 2014.  (Doc. 113.)  The Martin Defendants answered the Amended Complaint on November 21, 2014.  (Docs. 119, 121, 123.)

On May 15, 2015, the Martin Defendants filed the instant motions for summary judgment as to Counts XI, XIII, XIV, and XV of the Amended Complaint.  (Docs. 164, 169.)  Specifically, the Family Group Defendants seek summary judgment with respect to Counts XIII, XIV, and XV, and the Motor Club Defendants seek summary judgment with respect to Count XI.  After receiving an extension of time to respond (*see* Doc. 187), the Committee timely responded on June 12, 2015.  (Docs. 197, 196.)  The Martin Defendants timely replied thereto on June 26, 2015.  (Docs. 207, 209.)  As the movants for summary judgment, the Martin Defendants have complied with M.D. Ga. L.R. 56 by attaching separate and concise statements of material fact to their motion (*see* Doc. 169-7), and the Committee has partially complied by responding to each statement of material fact with respect to the Motor Club Defendants.  (*See* Doc. 196-1.)  The Committee did not include a response to the Family Group Defendants' statement of material facts.[2]  As such, the Court finds that the Martin Defendants' Motions for Summary Judgment (Doc. 164, 169) are ripe for review.

## FACTUAL HISTORY

### I.  Introduction

The following facts are derived from the Complaint (Doc. 1), as amended (Doc. 113), the Amended Answers (Docs. 119, 121, 123), the Martin Defendants' Statement of Undisputed Material Facts (Docs. 164-9, 169-7), and the Committee's Response to the Motor Club Defendants' Statement of Undisputed Material Facts (Doc. 196-1), all of which were submitted in compliance with M.D. Ga. L.R. 56, and the record in this case.  Where relevant, the factual summary also contains undisputed and disputed facts derived from the

---

(Doc. 169), the Court will refer to Defendants as "the Motor Club Defendants."  When discussing all Defendants collectively, the Court will refer to Defendants as "the Martin Defendants."

[2] Under M.D. Ga. L.R. 56, "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate."

pleadings, the discovery and disclosure materials on file, and any affidavits submitted, all of which are construed in a light most favorable to the nonmoving party. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## II.   Relevant Facts

The Money Tree of Georgia, Inc. ("TMG"), Small Loans, Inc. ("SLI"), The Money Tree, Inc. ("TMT"), The Money Tree of Florida, Inc. ("TMF"), and The Money Tree of Louisiana, Inc. ("TML", collectively "the Debtors"), were engaged in the consumer finance business in Georgia, Alabama, Florida, and Louisiana, respectively. (Doc. 113 at ¶ 17.) TMT is the corporate parent of each of the Debtors, as well as other entities. (*Id.* at ¶¶ 17, 44.) The Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code on December 16, 2011 in the United States Bankruptcy Court for the Middle District of Alabama, which was jointly administered and proceeded under *In re Small Loans, Inc., et al.*, Case No. 11-12254. (Doc. 113 at ¶ 9.)

### A.   Martin Family Group Withdrawals

Debtor TMT funded its operations in large part by the sale to investors of debentures and demand notes. (Doc. 164-9 at ¶ 1.) For each investor, TMT created a separate account into which the investment proceeds (and any earnings) were deposited. (Docs. 164-9 at ¶ 2; 164-3.) Among the investors who purchased demand notes were Derek Martin and MFG, and TMT maintained an account in Derek Martin's individual name and an account in the name of MFG. (Doc. 164-9 at ¶ 3.) However, Derek Martin's name also appeared on the account of MFG as follows: "Investor Name:  Martin Family Group, LLLP or Derek Martin." (*See* Doc. 164-3 at 6-7.)

The record shows whenever MFG made an initial investment or deposit, it was done with Derek Martin's authorization. On April 27, 2009, MFG made an initial investment in a TMT demand note in the amount of $500,000. (*See* Doc. 164-3 at 6.) On the same day, Derek Martin signed a check in the amount of $500,000 to "The Money Tree Inc. Investments" from the MFG bank noted as "Demand Note" on the memo line. (*See* Doc. 164-4 at 24.) The Family Group Defendants contend that the demand notes associated with the account named "Martin Family Group, LLLP or Derek Martin" were all purchased by MFG and not by Derek Martin individually. (Doc. 164-9 at ¶ 4.) They further contend that

all investment proceeds deposited into the MFG account were made by the purchase of demand notes by MFG and were made after Derek Martin resigned as the president of TMT and as its sole director. (*Id.* at ¶ 6.) Derek Martin was an officer of TMT through August 17, 2007 and director of TMT through February 21, 2008, and Jeff Martin was a director of TMT through April 2012. (Doc. 193-1 at ¶ ¶ 10, 14.)

It is undisputed that MFG periodically invested money in TMT to meet the company's short-term liquidity needs and then later withdrew those cash investments once the liquidity needs had been met. (*Id.* at ¶ 7.) In 2009, MFG transferred $2,250,000.00 to TMT and withdrew $1,750,000.00 the same year. (Doc. 164-3 at 6.) It continued to withdraw another $420,000.00 in 2010 and 2011 while accumulating interest. (*Id.*) Investors of TMT generally were able to withdraw funds from their demand note from their respective accounts until the summer of 2011. (Doc. 164-9 at ¶ 5.) Typically, investors sought out demand notes from TMT for the purpose of earning interest income on the principal investment. (*Id.* at ¶ 8.)

Jennifer Ard served in various capacities for Debtors and their affiliates. She was the Debtors' designated selling officer for debentures and demand notes, which was offered without an underwriter and on a continuous basis. (Doc. 197-1 at 3.) The record shows that she was employed by TMT from late 1999 through early 2012 and served as an officer from 2000 through early 2012. (Doc. 193-1 at ¶ 58.) She was appointed Corporate Secretary for TMT in 2008. (Doc. 174-3 at 64.) Ard was also employed as an officer of Martin Investments, Inc., a management company of MFG and Vance R. Martin Holdings, which was also owned by Derek Martin and his trust. (Doc. 197-5 at 2.) From at least 2007 forward, in addition to her role as an officer and employee of Debtors, Ard also worked for Derek Martin. (Doc. 193-1 at ¶ 60.)

Whenever MFG needed to make a withdrawal, Derek Martin would call on Ard to directly request withdrawals from Karen Harrell, TMT's Vice President of Investments. (*See* Doc. 164-4.) For instance, on January 10, 2011, Ard requested a $60,000 withdrawal on MFG's demand note. (*Id.* at 2.) Minutes later, Harrell made the withdrawal. (*Id.* at 1.) On July 15, 2010, Ard made a $100,000 withdrawal from the MFG demand note for the purpose of paying off property loans. (*Id.* at 6.) It appears that whenever the withdrawal exceeded a

certain amount, TMT's President and Chief Financial Officer needed to be aware.   On August 12, 2009, Ard requested a $500,000 withdrawal and informed Harrell that "Steve and Brad" were aware.   (*Id.* at 10.)   Likewise, on July 15, 2009, Ard requested a $500,000 withdrawal and Bradley Bellville confirmed his awareness of the withdrawal.   (*Id.* at 14.)   The arrangement happened so frequently, that by January 15, 2010, Ard stated to Harrell, "Bet you know I am going to ask this, but can I get $200k from the MFG demand note?"   (Doc. 164-4 at 8.)

Under Count XIII of the Amended Complaint, the Committee seeks to recover the following transfers, among others, from the Family Group Defendants: (1) $2,707,089.83 transferred from TMT to MFG or Derek Martin for the Derek Martin/MFG Withdrawals; (2) $83,000.00 transferred from TMT to Derek Martin; and (3) $32,000.00 transferred from the Debtors to Jeff Martin.[3]   (Doc. 113 at ¶ 175.)   The Committee alleges these transfers, based on the purported sales and redemptions of the Debtors' debt securities, were made with "actual intent to hinder, delay, or defraud creditors" in violation 11 U.S.C. §§ 544, 550, 551 and Georgia's Uniform Fraudulent Transfer Act (hereinafter "GUFTA"), O.C.G.A. §§ 18-2-70 *et seq.*[4]   (*Id.* at ¶¶ 176-177.)   Similarly, Count XIV seeks to set aside and recover the Withdrawals as constructive fraudulent transfers because Debtors allegedly "did not receive reasonably equivalent value in exchange for the Withdrawals because the investments purportedly redeemed in exchange for the Withdrawals were either non-existent, small in relation to the Withdrawals, or actually served to harm the Debtors."   (*Id.* at ¶ 179.)

Count XV alleges that $60,000 of the Derek Martin/MFG Withdrawals made on or about January 10, 2011 is avoidable under O.C.G.A. § 18-2-75(b) as an insider preference because this amount was made by TMT to an insider for an antecedent debt while TMT was insolvent at the time of the transfer, and the insider had reasonable cause to believe that TMT was insolvent.   (*Id.*   at ¶ 182.)   The Committee seeks to avoid, preserve, set aside, and

---

[3] The Committee also seeks to recover $128,066.49 transferred from TMT to Defendant Bradley Bellville, but this transfer does not appear to be the subject of this motion as Defendant Bellville is not a party to this motion. (*See* Doc. 113 at ¶ 175.)

[4] Georgia's Uniform Fraudulent Transfers Act has been amended to reflect the new "Uniform Voidable Transactions Act." *See* S.B. No. 65, 2015 Gen. Assemb., Reg. Sess. (Ga. 2015). The Court recognizes that these new amendments are inapplicable to this case as the alleged conduct as well as the commencement of this action occurred well before the new Act's effective July 1, 2015 date. Thus, the Court will continue to refer to the Act as GUFTA.

recover the January 2011 transfer from Derek Martin, MFG, or any mediate or immediate transferee of the same, or the value thereof, under state and federal laws.  (*Id.* at ¶ 183.)

### B. The Motor Club

The Interstate Motor Club, Inc. ("the Motor Club") was created in 1990 by Vance "Rudy" Martin to provide membership services to consumer loan customers of the Debtors. (Doc. 113 at ¶ 79.)  These services included "bail bonds, emergency road service, wrecker service, emergency ambulance expense, lock and key service, emergency travel expenses, and legal fees."  (*Id.*)   The premium associated with the Motor Club's membership fees were financed with the consumer loans.  (Doc. 169-4 at 74-75.)

On December 9, 1994, Debtors, by and through their corporate parent, TMT, and the Motor Club entered into an Agency Sales Agreement ("the 1994 Agreement").  (Doc. 169-3.)  Under the terms of the 1994 Agreement, TMT sold Motor Club memberships to its customers, received 90% in commission from collected membership fees, and remitted the remaining 10% to the Motor Club every month.  (*Id.* at ¶ 5.)  The 1994 Agreement was signed by then-President of the Motor Club, Debby Inlow,[5] and then-President of TMT, Rudy Martin.   The 1994 Agreement was revised by an April 16, 2009 Agency Sales Agreement ("the 2009 Agreement") between Inlow and then-President of TMG, TMF, TML, and SLI, Brad Bellville.   Under the 2009 Agreement, TMG, TMF, TML, and SLI would pay the Motor Club 20% of collected membership fees and retain 80% in commission.  (Doc. 169-5 at 87-89.)   From fiscal year ending September 25, 2007 to September 25, 2010, the Debtors received the following amounts in commission: $1,957,000.00 in 2007, $1,844,000.00 in 2008, $1,602,00.00 in 2009, and $1,371,000.00 in 2010.  (Doc. 174-3 at 19.)

Although Inlow served as the Motor Club's President during those times, she stated she was also employed by TMT and worked in their headquarters in Bainbridge, Georgia. (Doc. 196-1 at ¶ 8, 10.)  Inlow also stated she answered to TMT executives, including Rudy Martin, Derek Martin, and Bradley Bellville.  (*Id.* at ¶ 9.)  At the time of the 2009 Agreement, Inlow did not appear to have the ability to negotiate the change of percentages.  (*Id.* at ¶ 13.)

---

[5] While Debby Inlow's name is signed "Debby Inlon" on the 1994 Agreement, Inlow acknowledged the error in her December 1, 2014 deposition and confirmed recognizing the December 9, 1994 Agreement.  (Doc. 169-4 at 30.)

She stated, "I've signed several over the years where they—we would change the percentage; you know, if Money Tree well, if—if The Money Tree was doing bad, I guess they would keep more money in.  If they were doing good, they would give us more.  I'm not quite sure exactly how that worked, but it did change over the years." (Doc. 169-4 at 30.)

With respect to the 2009 Agreement, the extent of her negotiating the Agreement was her signing the Agreement.  (Doc. 169-4 at 41 ("[A]ll I know is I signed it." "I didn't negotiate anything.").)   She further assumed that the percentage changes came at the direction of Bradley Bellville, but was ultimately unsure who brought about the changes.  (Doc. 169-4 at 35.)  The 2009 Agreement was reviewed by Natasha Wood, corporate counsel for TMT.  (Doc. 169-4 at 37.)  Inlow also stated that Wood served as counsel for both TMT and the Motor Club, and the Motor Club did not attain outside counsel for purposes of these negotiations.  (*Id.*)  Aside from an accounting fee that had already been in place prior to the execution of the 2009 Agreement, Inlow could not identify any additional costs or expenses to the Motor Club to warrant an increase in their percentage.  (Doc. 196-1 at ¶ 4.)

In addition to the Debtors, the Motor Club sold memberships to third parties in Georgia, Alabama, and Louisiana.  (Doc. 169-4 at 13.)  Under those arrangements, Inlow recalled the Motor Club retaining between 30% to 40% in membership fees.  (Doc. 169-4 at 31.)  However, this practice ended in the late 1990s after the Motor Club was sued by a third-party loan company. (Doc. 169-4 at 13-14.)  Rudy Martin decided then that no one else could sell Motor Club memberships except for his companies.  (*Id.* at 14.)  The Motor Club also paid rent to Martin Family Group, LLLP, even though it operated in TMT's headquarters.  (Doc. 169-4 at 56-57.)  Inlow did not speak to Derek Martin or Jennifer Ard about the Motor Club's rental rates, but did not believe the rental amounts were fair.  (*Id.* at 57.)

In a June 15, 1994 "Special Meeting of the Shareholders of Interstate Motor Club, Inc.," it was decided that Rudy Martin would own 40% of the outstanding shares of stock, while Derek Martin,  Jeff Martin, and Grace Johnston would own the remaining 60% in equal shares.  (Doc. 169-5 at 23.)  After Rudy Martin's death, Bradley Bellville acquired 60% stock ownership in the Motor Club from the Martin Trust in 2007.  (Docs. 169-8 at 74; 169-4 at 20.)  Between 2007 and 2011, Derek Martin, Jeff Martin, and Grace Johnston received

approximately $181,265.00, $139,788.00, and $138,945.00 in Motor Club distributions respectively.[6]  (*See* Doc. 196-2.)  Most notable from their financial records, the Motor Club had insufficient funds in the amount of $49,662.08 on March 7, 2011.  On the same day, the Motor Club paid approximately $2,995.00 in taxes and $170,080.00 in distributions to Bradley Bellville, Derek Martin, Jeff Martin, and Grace Johnston.  (*See id.* at 35.)  On March 9, 2011, the Motor Club had sufficient funds after a $16,680.80 membership deposit and $40,000 advance on commission from TMT.  (*See id.*)  Inlow confirmed that the purpose of this advance on commission was to pay out dividends to Motor Club shareholders until their membership fees came in.  (Doc. 169-1 at ¶ 15.)

Count XI of the Amended Complaint alleges the Debtors both "paid or incurred obligations to the Motor Club, namely the Motor Club Transfers, the Agency Sales Agreement, and certain other agreements, with actual intent to hinder, delay, or defraud its creditors."  (Doc. 113 at ¶ 158.)  While citing numerous badges of fraud, including Debtors' insolvency at the time of the transfers and the transfers paid to or for the benefit of insiders while insiders were aware of Debtors' insolvency, the Committee also alleges TMT did not receive reasonably equivalent value.  (*Id.* at ¶¶ 159-160.)  The Committee seeks to avoid, preserve, and recover those transfers, or value thereof, from Rudy Martin, Derek Martin, Jeff Martin, Grace Johnston, and Bradley Bellville.  (*Id.* at ¶¶ 163.)

## STANDARDS OF REVIEW

### I.  Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law.  "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor."  *Chapman v. AI Transp.*, 229 F.3d

---

[6] Though not a party to this motion, Bradley Bellville also received approximately $241,253.00 in distributions from the Motor Club.  (*See* Doc. 196-2.)

1012, 1023 (11th Cir. 2000) (en banc).  "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact.  *See Celotex*, 477 U.S. at 323; *Chapman*, 229 F.3d at 1023. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *See Celotex*, 477 U.S. at 322-24.  Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted).  Instead, the nonmovant must point to competent record evidence that would be admissible at trial.  *See also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form.").  Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant.  *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict.  *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.  However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## II. Local Rule 56

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56.  As stated above, the Parties complied, with exception to the Committee as noted above, with the Federal Rules of Civil Procedure and the Local Rules by filing timely motions for summary judgment, responses and replies thereto, and attached a separate and concise statement of material facts.  The Court will now address these ripe motions.

## ANALYSIS

The Family Group Defendants seek summary judgment with respect to Counts XIII, XIV, and XV of the Amended Complaint.  (*See* Doc. 164.)  They argue that they are entitled to judgment as a matter of law with respect to the Committee's actual-fraud claims because each of the initial investments were made to meet TMT's periodic liquidity needs, and investors were entitled to later withdraw on those notes at any time upon demand prior to the summer of 2011.  (Doc. 164-10 at 3-6.)  They further assert they are entitled to judgment as a matter of law with respect to the Committee's constructive-fraud claims because the challenged withdrawals were payments made by TMT to satisfy an antecedent debt obligation owed to Derek Martin or MFG.  (*Id.* at 6.)  The Family Group Defendants argue that the withdrawals were given by TMT in exchange for "a reasonably equivalent value," and were not constructively fraudulent as a matter of law.  (*Id.*)  However, the Family Group Defendants made no arguments with respect to the Committee's insider-preference claims under Count XV.  Accordingly, they are not entitled to summary judgment on Count XV.

In response, the Committee asserts that there is a genuine dispute of material fact regarding whether the Family Group Defendants' withdrawals were made with actual intent

to hinder, delay, or defraud creditors of Debtors.  (*See* Doc. 197.)  They emphasize that numerous "badges of fraud" exist regarding the withdrawals at issue, which would render summary judgment inappropriate.  (*Id.* at 3-8.)  They note certain alleged badges of fraud, among others, such as: the transfers at issue were to insiders, Debtors were insolvent at the time of the transfers, and Debtors did not receive reasonably equivalent value because the investments were "disguised capital contributions and are subject to recharacterization as equity." (*See id.*)  Similarly, the Committee contends that summary judgment on their constructive-fraud claim is unwarranted because the challenged Withdrawals were not payments of antecedent debts; instead they argue that Debtors did not receive reasonably equivalent value because the debentures and demand notes were equity contributions, in actuality, and the law allows those transfers to be recharacterized as such.[7]  (*Id.* at 8-11.)

The Motor Club Defendants move for summary judgment as to Count XI of the Amended Complaint, which seeks to avoid the Motor Club transfers as actual and constructive fraudulent transfers.  They submit there is no evidence the Motor Club transfers were made with actual intent to hinder TMT's creditors in that the challenged transfers were made in accordance with a contractual obligation by TMT to the Motor Club and were made on terms more favorable to TMT than were arranged with unrelated third-parties who also sold Motor Club memberships.  (*See* Doc. 169-6 at 3.)   They further argue that all Motor Club payments made between December 16, 2007 and December 16, 2010 were made "in exchange for reasonably equivalent value (namely, the extinguishment of antecedent contractual debt under the 1994 and 2009 Agreements), and there is no evidence creating a genuine dispute of fact to the contrary" with respect to the Committee's constructive fraudulent transfer claim.[8]  (*Id.* at 4.)

---

[7] In its response, the Committee seeks to judicially and collaterally estop MFG from arguing that MFG is similarly situated to the claims of arms' length investors, and thus not an insider, and that its debt was not subordinated by the Amended Chapter 11 Plan, which MFG voted in favor of, and Confirmation Order.  (*See* Docs. 172-1; 156-2 at 4.)  In their reply, the Family Group Defendants do not appear to disagree or attempt to argue that MFG was not an insider or that MFG's debts were not subordinated by the Plan and Confirmation Order.  In an abundance of caution, the Court makes no findings here and simply notes it as a genuine issue of material fact to be determined at trial.

[8] The Motor Club Defendants also argue the Committee is not entitled to recover certain transfers under 11 U.S.C. § 547 because "the transfers were in payment of a debt incurred by the Debtor in the ordinary course of its business and that of IMC, and the transfers made both in the ordinary course of affairs of IMC and TMT and were made according to ordinary business terms."  (Doc. 169-9 at 4.)  However, in their reply brief,

To the contrary, the Committee contends the instant motion should be denied in its entirety because a genuine dispute of material fact exists as to their actual-fraud and constructive-fraud claims against the Motor Club Defendants. (*See* Doc. 196.)  For their actual-fraud claims, they assert that far too many badges of fraud exist, such as transfers and obligations to an insider (*i.e.*, the Motor Club), lack of reasonably equivalent value, and Debtors' insolvency, for summary judgment to be proper. (*Id.* at 3-6.)  The Committee also contends that summary judgment on their constructive-fraud claim is unwarranted because Debtors did not receive reasonably equivalent value for the Motor Club transfers and Debtors were insolvent at the time of the transfers. (*Id.* at 7.)  Specifically, they assert that the terms of the 2009 Agreement were materially worse in that Debtors did not receive an additional benefit, except for an accounting fee that was already in place prior to the 2009 Agreement, for the Motor Club to receive double the amount in membership fees. (*Id.*)

## I. Actual-Fraud Claims

Section 544 of the Bankruptcy Code allows for the trustee[9] to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim."  11 U.S.C. § 544(b).  In this case, the applicable law is Georgia's Fraudulent Transfers Act, or GUFTA, pursuant to O.C.G.A. §§ 18-2-70, *et seq.*  Under Georgia law, a transfer made or obligation incurred with "actual intent to hinder, delay, or defraud any creditor of the debtor" may be avoided as a fraudulent transfer. *See* O.C.G.A. § 18-2-74(a).  Specifically, subsection (a)(1) states,

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

---

the Martin Defendants retract their "ordinary course of business" defense and acknowledge it "is applicable only to the claims of Plaintiff asserted in Count XII of the Amended Complaint (preferential transfers) and not to Count XI." (Doc. 209 at 2 n.2.)  Count XII is not the subject of the Martin Defendants' motion for summary judgment, and as such, the Court will not reach a determination on their ordinary-course-of-business defense here.

[9] Pursuant to the Amended Plan and Confirmation Order in Debtors' bankruptcy cases, and in accordance with 11 U.S.C. § 1123(b)(3), the Committee acts as representative of the Debtors' Estates and has exclusive standing to pursue, retain, and enforce all claims and causes of actions of the Debtors, their Affiliates and subsidiaries, and the Estate. (Doc. 172-1 at 22-23, 52-53.)  Thus, when the term "trustee" is referenced, this includes the Committee's representative capacity as outlined in the Plan and Confirmation Order. *See* 11 U.S.C. § 1123(b)(3); *see also In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1180 n.1 (11th Cir. 1987).

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

O.C.G.A. § 18-2-74(a)(1).   "In order to prove that the relevant transfers were actually fraudulent, a plaintiff must show through direct evidence or various 'badges of fraud' that the relevant transfers 'were made with actual intent to hinder, delay, or defraud' the debtor's unsecured creditors." *Kipperman v. Onex Corp.*, 411 B.R. 805, 829 (N.D. Ga. 2009) (quoting O.C.G.A. § 18-2-74(a)(1).   Actual intent to hinder, delay, or defraud requires a showing of debtor's manifest objective to prevent its creditors from enjoying a benefit rightfully owed to them.   *See, e.g.*, *Perkins v. Crown Fin., LLC (In re Int'l Mgmt. Assocs. LLC)*, No. A06-62966-PWB, 2007 WL 7141787, at *3 (Bankr. N.D. Ga. Mar. 7, 2007) (recognizing the existence of a Ponzi scheme would sufficiently show debtor's actual intent to defraud); *see also Official Comm. of Unsecured Creditors v. Liberty Sav. Bank (In re Toy King Distribs., Inc.)*, 256 B.R. 1, 139 (Bankr. M.D. Fla. 2000) ("Fraudulent intent does not require an intent to run the company aground; it requires merely an intent to hinder or defraud creditors." (internal citation and quotation omitted)).

"In determining whether the circumstantial evidence supports an inference of fraudulent intent, courts should look to the existence of certain badges of fraud." *In re XYZ, Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998).   The "badges of fraud" are eleven (11) enumerated considerations for determining actual intent under subsection (b) of O.C.G.A. § 18-2-74.[10]   They are just as the statute states—considerations.   However, these nonexclusive

---

[10] The eleven "badges of fraud" are as follows:
1. The transfer or obligation was to an insider;
2. The debtor retained possession or control of the property transferred after the transfer;
3. The transfer or obligation was disclosed or concealed;
4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
5. The transfer was of substantially all the debtor's assets;
6. The debtor absconded;
7. The debtor removed or concealed assets;
8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
10. The transfer occurred shortly before or shortly after a substantial debt was incurred; and
11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

considerations enable creditor-plaintiffs with another way of showing actual intent on the part of the debtor they would not otherwise be able to prove directly. *See* UNIF. FRAUDULENT TRANSFER ACT § 4 cmt. 5, 7A U.L.A. 654 (2004) (establishing that proof of one or more of the factors indicate "relevant evidence as to the debtor's actual intent"). Yet, "proof of some, or even all, of the factors listed in the Fraudulent Transfer Act does not create a presumption of actual intent to defraud. Rather, those factors are indicators of such intent on which the trial court may rely to make its findings based on evidence presented by the parties." *Lindholm v. Holtz*, 581 N.E.2d 860, 864 (Ill. App. 2d 1991) (interpreting "badges of fraud" under the Illinois UFTA) [11]; *see also Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991) ("The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose.").

### A. Martin Family Group Withdrawals

In support of their motion, the Family Group Defendants rely on *Varn Inv Co. v. Bankers' Trust Co.* to show that suspicious circumstances surrounding the transfer of property only become a badge of fraud when those circumstances are unexplained. *See* 141 S.E. 900, 901 (Ga. 1928). The Family Group Defendants assert that the undisputed facts, Derek Martin's testimony, along with the supporting account documents, serve as the explanatory, rebuttal evidence to dispel any air of suspicion surrounding the challenged withdrawals. Namely, they point out that the investments funded TMT's day-to-day operations by providing quick liquidity when needed, and the later withdrawals did not exceed the invested amounts. When investments were not made to provide liquidity, they were made to earn a yield on the principal investment amount. Also, the withdrawals were all made in accordance with the contractual rights outlined in the demand notes, and thus, TMT

---

[11] The Court specifically notes that Georgia's "badges of fraud" provision under O.C.G.A. § 18-2-74(b) is the same as Illinois' "badges of fraud" provision under 740 Ill. Comp. Stat. 160/5. Because Georgia's UFTA is "modeled on the Uniform Fraudulent Transfer Act promulgated by the National Conference of Commissioners on Uniform State Laws and adopted in various forms by 43 states and the District of Columbia," *Bishop v. Patton*, 706 S.E.2d 634, 639 (Ga. 2011), disapproved on other grounds by *SRB Inv. Servs., LLLP v. Branch Banking and Tr. Co.*, 709 S.E.2d 267 (Ga. 2011), the Court finds it appropriate to consider case law outside of its jurisdiction to determine matters under the UFTA. *See, e.g., Truelove v. Buckley*, 733 S.E.2d 499, 501 (Ga. Ct. App. 2012).

received reasonably equivalent value in exchange.  In their reply, they further assert that the Committee failed to make a showing of over half of the statutorily-enumerated badges. Also, they argue the date of Debtors' insolvency is in dispute, and even when the Family Group Defendants had reason to question solvency, the withdrawals at issue predated the event.  Additionally, they argue that the Committee failed to point to evidence that the Family Group Defendants attempted to conceal or avoid inquiries concerning the withdrawals, or that that withdrawals occurred shortly before or after a substantial debt was incurred.

The Committee argues that at least five statutory badges, along with several other non-statutory badges, exist to show TMT's intent to hinder, delay, and defraud investors. First, the Withdrawals at issue were to insiders which do not seem to be in dispute.  *See* O.C.G.A. § 18-2-71(7) (definition of "insider").  While satisfying one inference of fraud may not necessarily be sufficient to establish an actual intent to hinder, delay, or defraud any creditors, insider transfers are "one of the most important" and concerning badges of fraud. *Kipperman v. Onex Corp.*, No. 1:05-CV-1242-JOF, 2007 WL 2872463, at *9 (N.D. Ga. Sept. 26, 2007); *see also Freehling v. Nielson (In re F& C Servs., Inc.)*, 44 B.R. 863, 868 (Bankr. S.D. Fla. 1984) ("Fraud will be presumed when the transfer occurs between two corporations controlled by the same officers and directors.").  While the Family Group Defendants are correct that not every transfer to an insider is fraudulent, *see Nelson v. U.S.*, 821 F. Supp. 1496, 1502 (M.D. Ga. 1993), the Court cannot overlook the closeness of the Family Group Defendants' ability to call on demand notes directly from TMT's executives.

The record reflects that, on a number of occasions, Derek Martin was able to directly request MFG withdrawals through TMT's Corporate Secretary, Jennifer Ard.  (*See* Doc. 164-4.)  During these withdrawals, Ard was also employed by Martin Investments, Inc., a management company of MFG and Vance R. Martin Holdings, which was also owned by Derek Martin and his trust.  Moreover, Ard was designated selling officer of TMT's demand notes, which gave her the insight and ability to review all of TMT's demand notes.  Viewing the evidence in a light most favorable to the Committee, these material facts weigh strongly against the Family Group Defendants.  On these facts, a reasonable juror could infer fraudulent intent on the part of Family Group Defendants and find in favor of the

Committee.  Even if the Family Group Defendants invested in the debt instruments on the same terms as other investors, none of those investors were as close to the withdrawal transactions as the Family Group Defendants.

Additionally, the expert testimony of James Hart (*See* Doc. 153) revealed that TMT was continuously insolvent as early as fiscal year ending September 25, 2001, which is well before the time of the withdrawals.  Hart measured TMT's insolvency on a standalone basis, which Chris Edwards, expert for the Martin Defendants, contends is inappropriate in analyzing the issue of solvency.  (*See* Doc. 152.)  Moreover, the experts are in dispute as to whether the Debtors operated as a going concern through the Petition Date.  Assessing a debtor's assets and liabilities "at fair valuation" is a two-part test.  In *In re DAK Industries, Inc.*, the United States Court of Appeals for the Ninth Circuit identified the first step as determining "whether a debtor was a 'going concern' or was 'on its deathbed.'"  170 F.3d 1197, 1199 (9th Cir. 1999).  Next, depending on the outcome of the first step, the court must "apply a simple balance sheet test to determine whether the debtor was solvent."  *Id.*  In this case, Hart opined that adding a going concern value was not warranted because of the consistent and substantial losses of Debtors.  (Doc. 168-1 at 94.)  Edwards, however, concluded that Debtors remained a going concern "at all points through 2010."  (Doc. 151 at 28.)  These are just a few of many genuine factual disputes among experts that are best resolved at trial by a jury.  However, the experts do not appear to be in dispute that the Debtors, whether on a consolidated or standalone basis, were insolvent from fiscal year ending September 25, 2008 though the Petition Date.  (*See* Docs. 151 at 28; 153 at 17.)

While there are many genuine disputes on the issue of insolvency, there are sufficient undisputed facts upon which a reasonable jury could find that the Debtors were insolvent from at least September 25, 2008 through the Petition Date.  Therefore, because there is a genuine factual dispute regarding when in 2008 the Debtors became insolvent, the Court must reserve such judgment for a jury.  However, construing the evidence in a light most favorable to the nonmoving party, the Court finds sufficient evidence, if believed by the jury, to find that the Debtors were insolvent from September 25, 2008 through the Petition Date.

Aside from the battle of the experts, the record also reflects the Family Group Defendants' awareness of TMT's financial decline from their securities filings as early as

fiscal year ending September 25, 2007, where their shareholders' deficit grew from $929,700.00 to $45,908,992.00 by fiscal year ending September 25, 2010.  (Docs. 172-12 at 15; 174-3 at 15.)  It was acknowledged in their 2007 filings that TMT operated without a significant line of credit, which they determined would make them more dependent on the proceeds from their debenture and demand notes.  (Doc. 172-12 at 13.)  They concluded that if their debt instruments were curtailed for any reason and they failed to obtain a line of credit, their ability to meet their obligations could be "materially adversely affected."  (*Id.*)  By fiscal year ending September 25, 2009, TMT questioned its ability to continue as a going concern.  (Doc. 174-2 at 19.)  During the time of these filings, Derek Martin was an officer of TMT through August 17, 2007 and director of TMT through February 21, 2008, and Jeff Martin was a director of TMT through April 2012.  This issue of awareness of deepening insolvency could also amount to a showing of bad faith, which is a nonexclusive factor worthy of a jury's consideration.  These facts, viewed most favorably to nonmoving party, could lead a reasonable juror to infer fraudulent intent and find in favor of the Committee.

Another badge the Committee attempts to assert is that the withdrawals at issue were concealed from creditors because there was no public disclosure of the transfers.  In a footnote, they note that "[h]ad investors been advised of the substantial withdrawals by MFG during a relatively short time frame, they might not have invested in the Debtors." (Doc. 197 at 4 n.3.)  The Committee also asserts that the challenged withdrawals occurred shortly before and after substantial debts were incurred, namely the continuous issuance of new debt to non-insider investors.  The Family Group Defendants attempt to rebut these badges by stating that the Committee failed to point to any evidence that the withdrawals were concealed or that the Family Group Defendants avoided inquiries concerning the payments.  They also state that while withdrawals and continuous offering of debt instruments to the public occurred, the outstanding amount of those debt instruments was substantially reduced between September 25, 2007 and September 25, 2010 by approximately $13,000,000.  The Family Group Defendants also argue that the amount of their withdrawals were small in relation to the outstanding amount of debt instruments, and by the time the Debtors filed for bankruptcy, the Family Group Defendants had an aggregate unpaid balance on those debt instruments in excess of $115,000.

Upon review of the record in a light most favorable to the Committee, a reasonable juror could find in favor of the Committee despite the Family Group Defendants' asserted rebuttals. There was no indication under "Certain Relationships and Related Transactions" of the Debtors' public securities filings that MFG's substantial purchases and withdrawals of demand notes from TMT were disclosed to the investing public. As indicated above, MFG was indeed an insider to the Debtors, and this information arguably could have been relevant to a potential investor's decision to invest in debt instruments with TMT. Also, the fact that the Family Group Defendants had withdrawn amounts substantially less than the total debt instrument paid by TMT and had an unpaid balance does not conclusively establish an absence of fraudulent intent. Due to the problematic insider nature of the their transactions, a jury could infer that the Family Group Defendants had the ability to determine when it was prudent to make withdrawals based on the amount of incoming and outgoing debt instruments.

The Committee need not show that all eleven statutorily-enumerated badges of fraud exist to prove that the Family Group Defendants acted with actual intent to hinder, delay, or defraud. The above considerations and findings are sufficient for this Court to deny summary judgment. These badges, for better or for worse, are better suited for a reasonable jury's determination at trial rather than before this Court on motion for summary judgment.

**B. The Motor Club Transfers**

With respect to the Motor Club transfers, the Motor Club Defendants assert the undisputed evidence shows that the Motor Club transfers were legitimate in that the Debtors payments to the Motor Club "were made in accordance with a contractual obligation owed by TMT to IMC" and the payments "were made on terms more favorable to TMT" than those made to other third-party finance companies also selling Motor Club memberships. (Doc. 169-6 at 3.) However, the Committee offers substantial evidence that implicates several of GUFTA's enumerated badges of fraud, as well as other instances not exclusive to the list found under § 18-2-74(b).

The Parties agree the Motor Club was an "insider," as defined by O.C.G.A. § 18-2-71(7)(D), in that the Motor Club was an affiliate of Debtors. As discussed above in part, this important badge is weighed heavily in favor of finding a presumption of fraud. *See*

*Kipperman*, 2007 WL 2872463, at *9.  Georgia law requires these types of transactions to be observed with close and particular scrutiny.  *See Brown v. Cooper*, 514 S.E.2d 857, 862 (Ga. Ct. App. 1999).  Here, it is undisputed that the Motor Club Defendants were shareholders of the Motor Club since June 15, 1994.  It is also undisputed that Debby Inlow, President of the Motor Club, was also an employee of TMT and worked in their headquarters.  Additionally, she answered to TMT executives and Motor Club shareholders, Rudy Martin, Derek Martin, and Bradley Bellville.  Moreover, the Motor Club Defendants received substantial amounts of distributions from the Motor Club, even when the Motor Club did not have sufficient funds to provide for such amounts and TMT enabled the Motor Club to do so by providing a $40,000 advance on commission.  Based on these facts, a reasonable jury could conclude that these periodic transfers were a disguised dividend scheme made for the benefit of the Motor Club Defendants as shareholders and insiders to Debtors.

Furthermore, in viewing the evidence favorably to the Committee together with the aforementioned, the circumstances surrounding the negotiations of the 2009 Agreement could be sufficient for a reasonable jury to return a verdict in favor of the Committee.  Inlow is on record stating that she did not negotiate the Agreement, which came about at the direction of other interested parties.  The terms of the Agreement were reviewed by Natasha Wood, who served as corporate counsel of TMT.  The Motor Club did not obtain outside counsel and Wood represented both entities during negotiations.  With no negotiating power, Inlow only served as a signatory to execute this Agreement.  A reasonable jury could infer fraudulent intent if it finds that interested parties existed on both sides of the transaction, and with this inference, could return a verdict for the Committee.  All of these reasons compel this Court to deny summary judgment with respect to the actual-fraud claims against the Motor Club Defendants.

## II. Constructive-Fraud Claims

Under GUFTA, constructive fraudulent transfers will be set aside if the elements of O.C.G.A. § 18-2-75(a) are met.  Section 18-2-75(a) provides,

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the

19

debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

O.C.G.A. § 18-2-75(a).   Similarly, 11 U.S.C. § 548(a)(1)(B) allows the trustee to avoid any transfer if the debtor "received less than a reasonably equivalent value in exchange" and was insolvent on the date of transfer or "became insolvent as a result of such transfer."[12]   Thus, in order to prevail on motion for summary judgment, the Martin Defendants must show that no genuine dispute of material fact exists that the challenged withdrawals and transfers were not constructively fraudulent.  A transfer is constructively fraudulent under O.C.G.A. § 18-2-75(a) if "(1) a transfer made or an obligation incurred, (2) for less than reasonably equivalent value, (3) while the debtor was insolvent or likely to become insolvent." *Kipperman v. Onex Corp.*, 411 B.R. 805, 834 (N.D. Ga. 2009) (citing O.C.G.A. § 18-2-75); *see also Atlanta Fiberglass USA, LLC v. KPI, Co., Ltd.*, 911 F. Supp. 2d 1247, 1264-65 (N.D. Ga. 2012); *CSX Transp., Inc. v. Leggett*, No. 1:07-CV-1152-WSD, 2010 WL 3210841, at *4 (N.D. Ga. Aug. 12, 2010).

Determining whether a debtor received reasonably equivalent value is "largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593 (11th Cir. 1990) (quoting *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829-30 (5th Cir. 1959)) (internal quotation marks omitted).[13]   Thus, the court is unauthorized to void any transfer that either directly or indirectly "confers an economic benefit upon the debtor."  *Gen. Elec. Credit Corp. of Tenn. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990) (construing 11 U.S.C. § 548).  However, in reviewing the transfer, the debtor must in the very least have received "value" in the exchange.  *See Kipperman*, 411 B.R. at 837.

"In order to determine whether a debtor received 'reasonably equivalent value,' the court must look at what 'value' the debtor received in return for the transfer.  The court

---

[12] In construing Georgia's Uniform Fraudulent Transfers Act (GUFTA), the Court finds it appropriate to consider similarly worded statutes under other statutory provisions, such as the Bankruptcy Code. *See, e.g., Kipperman v. Onex Corp.*, 411 B.R. 805, 828 (N.D. Ga. 2009) (analyzing "reasonably equivalent value" standard under both 11 U.S.C. § 548 and O.C.G.A. § 18-2-75); *Pettie v. Bonertz (In re LendXFinancial, LLC)*, No. 10-76803-MGD, 2012 WL 1597394, at *7 (Bankr. N.D. Ga. Mar. 19, 2012) (similarly analyzing Georgia's UFTA under 11 U.S.C. § 548 because the statutes "substantially mirror[]" one another).

[13] The Eleventh Circuit has adopted as binding precedent all decisions issued by the former Fifth Circuit prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F. 2d 1206, 1209 (11th Cir. 1981) (en banc).

must then determine whether the value received is reasonably equivalent; this will depend on the facts of each case." *Id.* This is a two-step inquiry. *See Anderson v. Patel (In re Diplomat Constr., Inc.)*, No. 09-68613-MGD, 2013 WL 5591918, at *5 (Bankr. N.D. Ga. Aug. 6, 2013). Under O.C.G.A. § 18-2-72(a), "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." Similar to GUFTA's definition, the Bankruptcy Code defines insolvency as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32).

### A.  Martin Family Group Withdrawals

The Family Group Defendants assert that all the challenged withdrawals were exchanged for "reasonably equivalent value" in that the payments were made in accordance with demand promissory notes issued by TMT before the date of the withdrawals. As such, TMT's payments to the Family Group Defendants were made to satisfy an antecedent debt obligation. *See* O.C.G.A. § 18-2-73(a) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ."). In contrast, the Committee asserts that these withdrawals were not satisfaction of an antecedent debt. They argue that reasonably equivalent value was not received by Debtors because the investments were instead "disguised capital contributions and are subject to recharacterization as equity."

The Family Group Defendants oppose the Committee's recharacterization arguments and assert that the defense is both untimely and baseless because the Committee did not seek to specifically recharacterize the debt instruments as equity in their pleadings. The Family Group Defendants cite *Richards v. Conn. Dep't of Corr.*, 349 F. Supp. 2d 278, 291 (D. Conn. 2004) for the proposition that the Committee's failure to plead a recharacterization defense deprived them of the opportunity "to conduct discovery and prepare a defense." They also point to the Committee's failure to attempt to recharacterize the debt instruments as equity contributions during the pendency of Debtors' bankruptcy petition proceedings. The Family Group Defendants further assert that the Amended Joint Chapter Plan, which was confirmed by the United States Bankruptcy Court for the Middle District of Alabama on May 6, 2013, did not recharacterize the debt instruments as equity. Instead, it created

separate classes of claims that distinguished debt instruments held by insiders (Class 4 – Subordinated Claims) from equity interests held by shareholders (Class 5 – Equity Interests of The Money Tree).   Class 5 claims include "any certificates, *instruments* and other documents evidencing such" equity interests.  (Doc. 172-1 at 15 (emphasis added)).

The Court is persuaded by the Family Group Defendants' arguments that it is inappropriate for the Committee to now seek a recharacterization defense at this late stage. The Committee's allegation that the challenged withdrawals were "either non-existent, small in relation to the Withdrawals, or actually served to harm the Debtors" is insufficient to put the Family Group Defendants on notice of the Committee's intent to recharacterize the withdrawals as equity.   Nor is their citation to Count XXIII, which pertains to illegal dividends, sufficient to do the same.   To do so now would in effect deprive the Family Group Defendants of the chance of conducting adequate discovery to challenge this newly raised argument.   Furthermore, the Family Group Defendants are correct in that the Committee may not now seek recharacterization after the Bankruptcy Court treated subordinated insider debt instruments differently and distinctly from the equity interests of TMT.  Thus, the Court rejects the Committee's untimely debt recharacterization arguments.

The Family Group Defendants are not, however, entitled to summary judgment on the constructive-fraud claims against them because as to the issue of insolvency, as determined above, the Court found that there is not an anticipated dispute that a reasonable juror could find that the Debtors were insolvent from September 25, 2008 through the Petition Date.  In any case, a jury must determine whether the Debtors were insolvent prior to that date.

### B.  Motor Club Transfers

The Motor Club Defendants assert Debtors received reasonably equivalent value for the Motor Club transfers because they were made under a binding contractual obligation to the Motor Club.   They further assert the value of the retained commission was the reasonably equivalent value of services rendered as an agent for the Motor Club.  As noted above, "value" is given if "in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."  O.C.G.A. § 18-2-73(a).  A "debt" is defined as "liability on a claim," and a "claim" is defined as a "right to payment."  O.C.G.A. § 18-2-71

(3), (5).  The Motor Club Defendants assert that TMT's contractual obligation satisfies these statutory definitions, and further assert that there is no evidence that the execution of the Agency Sales Agreements did not provide reasonably equivalent value.  They point to the profits derived from the arrangement, which shows Motor Club commission earnings in the amount of $1,957,000.00 in 2007, $1,844,000.00 in 2008, $1,602,00.00 in 2009, and $1,371,000.00 in 2010.

The Committee, however, argues that the 2009 Agreement was made on materially worse terms than the prior 1994 Agreement, and due to the insider nature of the relationship between the Motor Club and the Debtors and the fraudulent nature of the obligations, the Motor Club transfers did not represent a reasonably equivalent value to the Debtors. Debtors clearly received something of value in exchange from the Motor Club, that being their 80% in commission.  However, upon review of the record, the Court finds there is a genuine question of material fact as to whether the Debtors received reasonably equivalent value from the Motor Club arrangement.  Aside from the accounting fee in place prior to the execution of the 2009 Agreement, Inlow could not recall any additional expense or costs that would warrant a doubled percentage increase in the Motor Club's membership fees. Moreover, the evidence shows how closely involved insiders to Debtors were in reaching this Agreement.  As stated above, Inlow had no negotiation power or input into the matter, which could show that other interested parties were the true actors in executing the 2009 Agreement.  The record also shows insiders financially benefiting from the 2009 Agreement while Debtors continued to lose money as bankruptcy neared.  A reasonable juror could infer that the 2009 Agreement was not an arm's length transaction, which would prevent Debtors from receiving reasonably equivalent value in exchange.  Because considerable latitude is reserved for the jury, *In re Chase & Sanborn Corp.*, 904 F.2d at 593, the Court cannot here grant summary judgment in favor of the Motor Club Defendants.  Because there is a genuine dispute of material fact as to reasonably equivalent value, the Court need not reiterate the issue of insolvency here.  Therefore, summary judgment must be denied with respect to the Committee's constructive-fraud claim against Motor Club Defendants.

## <u>CONCLUSION</u>

For the reasons stated above, Defendants W. Derek Martin, Jefferey V. Martin, and Martin Family Group, LLLP's Motion for Summary Judgment (Doc. 164) is **DENIED,** and Defendants W. Derek Martin, as Executor of the Estate of Vance R. Martin, W. Derek Martin, Jefferey V. Martin, and Grace Elizabeth Martin Johnston's Motion for Summary Judgment (Doc. 169) is **DENIED.**

**SO ORDERED,** this __31st__ day of March, 2016.

_/s/ **W. Louis Sands**_____
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**