**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| POST-CONFIRMATION COMMITTEE FOR SMALL LOANS, INC., *et al.*, | : : : : | |
| Plaintiff, | : : | |
| v. | : : | CASE NO.: 1:13-CV-195 (WLS) |
| W. DEREK MARTIN, as Executor of the Estate of Vance R. Martin, *et al.*, | : : : | |
| Defendants. | : : | |

**ORDER**

Present before the Court is Defendants Grace Elizabeth Martin Johnston and Grace Elizabeth Martin Johnston, as Trustee for the Vance R. Martin GST Exempt Family Trust F /B/O Grace Elizabeth Martin Johnston's Partial Motion for Summary Judgment. (Doc. 176.) For the reasons stated herein, the Defendants' Partial Motion for Summary Judgment is **DENIED.**

**PROCEDURAL HISTORY**

The Post-Confirmation Committee for Small Loans, Inc., *et al.* (hereinafter "the Committee") filed suit against the above-captioned Defendants on December 14, 2013. (Doc. 1.) Among the Defendants are Grace Elizabeth Martin Johnston and Grace Elizabeth Martin Johnston, as Trustee for the Vance R. Martin GST Exempt Family Trust f/b/o Grace Elizabeth Martin Johnston (hereinafter "the Johnston Defendants"). The Johnston Defendants answered the Complaint on January 29, 2014. (Doc. 37.) After the Court granted leave to amend (*see* Doc. 112), the Committee filed their Amended Complaint on November 7, 2014. (Doc. 113.) The Johnston Defendants answered the Amended Complaint on November 21, 2014. (Doc. 123.)

On March 25, 2014, the Johnston Defendants moved for dismissal of Counts III, IV, X, XIX, XX, XXI, and XXIV of the original Complaint (Doc. 1) and additionally argued

1

that this Court lacked personal jurisdiction over her name. (*See* Doc. 70.) On October 14, 2014, this Court construed the motion as a motion to dismiss for failure to state a claim and lack of personal jurisdiction. (*See* Doc. 98.) The Court denied the motion to dismiss, found it could exercise personal jurisdiction over Johnston both individually and as trustee, and that the Committee properly stated claims against the Johnston Defendants. (*Id.* at 7.)

On May 15, 2015, the Johnston Defendants filed the instant partial motion for summary judgment as to Counts IV, V, XXIII, and XXV of the Amended Complaint. (Doc. 176.) After receiving an extension of time to respond (*see* Doc. 187), the Committee timely responded on June 12, 2015. (Doc. 199.) The Johnston Defendants timely replied thereto on June 26, 2015. (Doc. 210.) As the movants for summary judgment, the Johnston Defendants have complied with M.D. Ga. L.R. 56 by attaching separate and concise statements of material fact to their motion (*see* Doc. 176-3), and the Committee has complied as well by responding to each statement of material fact.[1] (*See* Doc. 199-1.) As such, the Court finds that the Johnston Defendants' Partial Motion for Summary Judgment (Doc. 176) is ripe for review.

## FACTUAL HISTORY

### I. Introduction

The following facts are derived from the Complaint (Doc. 1), as amended (Doc. 113), the Amended Answers (Doc. 123), the Martin Defendants' Statement of Undisputed Material Facts (Doc. 176-3), and the Committee's Response to the Martin Defendants' Statement of Undisputed Material Facts and Statement of Undisputed Material Facts (Doc. 199-1), all of which were submitted in compliance with M.D. Ga. L.R. 56, and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits submitted, all of which are construed in a light most favorable to the nonmoving party. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

---

[1] The Committee has also provided the Court with its own Statement of Undisputed Material Facts. (*See* Doc. 199-1.)

## II. Relevant Facts

Grace Elizabeth Martin Johnston serves as Trustee for the Vance R. Martin GST Exempt Family Trust f/b/o Grace Elizabeth Johnston (hereinafter "Johnston Trust"). (Doc. 113 at ¶ 26.) Johnston, either individually or through her trust, is a former shareholder of The Money Tree, Inc. (hereinafter "TMT"). (Docs. 176-1, 199-1 at ¶ 1.) Similarly, Johnston owned or owns interests in Defendants Martin Family Group, LLLP, Martin Sublease, LLC, and Interstate Motor Club (respectively "MFG," "MSL," and "IMC") either individually or through the Johnston Trust. (*Id.* at ¶ 13.) Johnston also is the daughter of Vance "Rudy" Martin, founder and former President of TMT, and sister of Defendants W. Derek Martin and Jefferey V. Martin, former officers and/or directors of TMT. (Docs. 113 at ¶ 31; 176-3 at ¶ 2-4.) However, the record does not reflect whether Johnston served in any formal role or capacity as officer, director, or employee of TMT or its entities and affiliates. (Doc. 176-1 at ¶¶ 5-7.)

The Johnston Trust normally received disbursements or distributions from various entities on a quarterly basis. (Doc. 176-1 at 190:6-14, 190:4-6, 205:19-25, 206:3-4, 206:12-18.) All while receiving these amounts, Johnston stated that she essentially had neither involvement with nor discussions about the financial condition of TMT or its entities and affiliates. (Doc. 176-3 at ¶¶ 8-12, 14-20.) After receiving an email from TMT's then-CEO, Defendant Bradley Bellville, Johnston stated that she then became informed of the dire financial condition of TMT. (Doc. 176-3 at ¶ 11; *see also* Doc. 199-5.) Regarding the disbursements or distributions, Johnston expressed she "did not know where [the] money came from," and that she "was not privy to how or why [distribution] decisions were made." (Doc. 176-3 at ¶¶ 21-22.) She emphatically declared that she "never made a disbursement," "never made a decision about a disbursement," and never inquired as to why her distribution amounts varied. (*Id.* at ¶¶ 23-24.)

The record also reflects Johnston having some knowledge of the way TMT and its entities and affiliates operated. Johnston grew up with "The Money Tree" name in her family and knew it sold debentures and subordinated notes to the public. (Docs. 199-1 at ¶ 5; 176-1 at 171:19-25; 172:12-15.) Johnston was also aware that MFG leased properties and collected rent from TMT. (Docs. 199-1 at ¶ 2; 176-1 at 168:9-11, 18-22.) Whenever she

3

received a distribution from MFG, she assumed that it was because MFG was a profitable business. (Doc. 199-1 at ¶ 8.) While she did not make those same assumptions of IMC, she presumed that her receipt of dividends was due to her shareholder status. (Doc. 176-1 at 190:6-25, 191:1-6.) Johnston was also aware that her brothers, Derek and Jeff Martin, served on TMT's board of directors. (Doc. 199-1 at ¶ 9.) However, she could neither express the purpose of a board of directors nor speak to their duties, mainly their fiduciary duties. (Doc. 182-1 at 393:22-25, 394:1-15.)

Johnston began receiving a series of internal or otherwise confidential communications from Bellville concerning TMT's financial condition in 2011. (*See* Docs. 199-3 to 199-7.) She requested to "be in the loop *more* frequently about the goings on of The Money Tree," after learning from either Derek or Jeff Martin of TMT's "struggles." (Doc. 176-1 at 243:12-14, 17-25, 244:1-7) (emphasis added). Accordingly, Johnston received a confidential November 2, 2011 email informing her and her brothers of a third-party preliminary assessment of TMT's operations and whether certain properties should remain open or be closed permanently. (*See* Doc. 199-7.) Bellville assured them that "this is all preliminary work to see if we can survive on any level." The purpose of this email was to "keep [them] in the loop since this affects MSL and MFG of our plans [sic]." (*Id.*)

In an August 4, 2011 email, Johnston voiced her disapproval of a lottery-method to boost revenue for TMT. (*See* Doc. 199-3.) Bellville then replied informing Johnston of TMT's "significant losses in the last two years (around 25 Million[ ]),"[2] suggested that she sell her TMT stock, and encouraged her to speak with her brothers for further information. (*Id.*) By October 25, 2011, Johnston was able to negotiate the sale of "virtually worthless" stock from $25,000 to $39,000 with Bellville. (*See* Doc. 199-6.) When asked what the purpose for the sale of stock was, Bellville told Johnston that her sale would grant him and Jeff the ability to "make faster decisions" and "relieve [her] of having to personally guarantee debts when [she did] not have an active role in the Company." (*Id.*) Even if Johnston sold

---

[2] However, by fiscal year ending September 25, 2009, TMT revealed in its 10-K filings with the Securities and Exchange Commission ("SEC") shareholders' deficits in the amount of $24,847,859. (*See* Doc. 162-6 at 16.) TMT concluded that this meant their total liabilities exceeded their total assets, which according to bankruptcy law, rendered them "balance sheet insolven[t]." (*Id.*)

4

all of her stock, Bellville assured her that TMT would "continue to represent [her] on any matters that relate to the Company." (*Id.*)

In a confidential August 16, 2011 email, Bellville informed Johnston, as well as Derek and Jeff Martin, that TMT did not have the funds to pay its investors their due and owed funds. (*See* Doc. 199-4.) He also stated that they were "currently about $600,000 in the hole for paying bills." (*Id.*) He presented a few solutions, such as filing for bankruptcy, renegotiating leases with MFG, becoming indebted to MFG, or buying out his stock and demoting him to regain control of TMT. (*Id.*) Bellville stated that MFG was at serious risk as well. He, along with then-CFO of TMT, Steven Morrison, sought Johnston's and the Martin brothers' input on "ways to save the Company." (*Id.*)

Johnston received another update from Bellville on September 29, 2011. (*See* Doc. 199-5.) There, he informed Johnston and Jeff Martin of TMT's decision to no longer accept new investments and to cease paying on "requests for demands notes, interest requests, or early maturity requests." (*Id.*) He also presented several hypotheticals, such as if TMT filed for bankruptcy and they are unable to afford to pay their investors, then their stock would be worth "[z]ero." (*Id.*) Additionally, he informed Johnston and Jeff Martin to be prepared, if Chapter 11 relief is obtained, to be sued, attend court hearings, and expect to be personally liable "if any securities fraud/theft has occurred." (*Id.*) Bellville gave Johnston this information due to her shareholder-status in the Company. (*Id.*) Just months later, TMT, along with its subsidiaries, petitioned for Chapter 11 relief in the United States Bankruptcy Court for the Middle District of Alabama on December 16, 2011.[3]

On December 14, 2013, the Committee brought action against Johnston, along with many others, seeking to recover substantial amounts in alleged fraudulent and preferential transfers, together with damages for other alleged violations of law. (*See* Doc. 1.) The Committee alleges in Count IV of the Amended Complaint that the Johnston Defendants, as well as others, "intentionally conspired to breach the fiduciary duties owed by the directors and officers of the Debtors." (Doc. 113 at ¶ 123.) Allegedly, the Johnston Defendants did so by "controlling and issuing directives to the Debtors' directors and officers" and

---

[3] *See* Bankruptcy Case Nos. 11-12254, 11-12255, 11-12256, 11-2257 and 11-2258, United States Bankruptcy Court for the Middle District of Alabama, Southern Division. The Bankruptcy Cases were jointly administered and proceeded under *In re Small Loans, Inc., et. al.*, Case No. 11-12254.

"knowingly participated in that breach." (*Id.* at ¶ 124.) Count V alleges that the Johnston Defendants "aided and abetted the Debtors' directors and officers in breaching their fiduciary duties." (*Id.* at ¶ 126.) Specifically, the Committee alleges that the Johnston Defendants were aware that Debtors' directors and officers owed fiduciary duties, knew the actions of those directors and officers breached their duties, and by controlling and issuing directives, the Johnston Defendants knowingly participated in that breach. (*Id.* at ¶ 127.) In both Counts, the Committee seeks to recover up to $84 million for loss and damage to the Debtors. (*Id.* at ¶¶ 124, 127.)

Count XXIII seeks to hold the Johnston Defendants liable for the receipt of illegal dividends under O.C.G.A. § 14-2-640. (*See id.* at ¶¶ 223-226.) It is specifically alleged that the illegal dividends included "the amounts paid to or for the Martin Family Group and Martin Sublease which were paid for the benefit of shareholders of the Debtors, namely . . . Johnston." (*Id.* at ¶ 224.) The Committee claims that the Johnston Defendants, as a shareholder, "knew or should have known that the Debtors did not have a surplus or net profits from which dividends could be lawfully paid." (*Id.* at ¶ 225.) With this knowledge, it is alleged the Johnston Defendants "nevertheless orchestrated the transactions by which these dividends were paid and received the dividends or the benefits thereof in bad faith." (*Id.*) Lastly, the Committee intends to pursue punitive damages against the Johnston Defendants under Count XXV. (*See id.* at ¶¶ 235-238.)

## STANDARDS OF REVIEW

### I. Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). "An issue of fact is 'material' if it is a legal element of

the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323; *Chapman*, 229 F.3d at 1023. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted). Instead, the nonmovant must point to competent record evidence that would be admissible at trial. *See also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form."). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c).

### II. Local Rule 56

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56. As stated above, the Parties complied with the Federal Rules of Civil Procedure and the Local Rules by filing timely motion for summary judgment, response, and reply thereto, and attached a separate and concise statement of material facts. The Court will now address this ripe motion.

## ANALYSIS

In the instant motion, the Johnston Defendants seek summary judgment with respect to Counts IV, V, XXIII, and XXV of the Amended Complaint. For the following reason, the Johnston Defendants' Partial Motion for Summary Judgment (Doc. 176) is **DENIED.**

### I. Breach of Fiduciary Duties Claims

The Johnston Defendants argue summary judgment on both breach of fiduciary duties claims is warranted because "the factual record and evidence" in this case "entirely contradicts the notion of the Johnston Defendants' involvement with the operations and decisions of TMT, and confirms that at all times Johnston was simply a passive shareholder in a company founded by her late father." (Doc. 176-1 at 6.) In response, the Committee asserts there is a genuine dispute of material fact regarding the extent of Johnston Defendants' involvement with TMT and its various entities and affiliates. (*See* Doc. 199.)

#### A. Conspiracy to Breach Fiduciary Duties

Conspiracy under Georgia law is a combination of two or more individuals agreeing "to accomplish an unlawful end, or to accomplish a lawful end by unlawful means." *Foster v. Sikes*, 42 S.E.2d 441, 443 (Ga. 1947) (internal quotation and citation omitted); *see also U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 443 S.E.2d 833, 835 (Ga. 1994); *Cook v. Robinson*, 116 S.E.2d 742, 744 (Ga. 1960). The parties need not seek out to obtain an agreement or understanding formally or informally, nor need they enter into an explicit, written agreement

8

to show their unlawful intent or purpose. *Sachdeva v. Smith*, 306 S.E.2d 19, 20 (Ga. Ct. App. 1983). A mere positive or tacit mutual agreement or understanding is sufficient to show the essential element of common design. *Id.*; *see also Parrish v. Jackson W. Jones, P.C.*, 629 S.E.2d 468, 472 (Ga. Ct. App. 2006). Thus, a showing of "[c]oncert of action, amounting to conspiracy, may be shown by circumstantial as well as direct evidence." *First Fed. Sav. Bank v. Hart*, 363 S.E.2d 832, 833 (Ga. Ct. App. 1987) (internal quotation and citation omitted).

The Johnston Defendants cite *Summit Auto. Grp., LLC v. Clark*, 681 S.E.2d 681 (Ga. Ct. App. 2009) to show that mere allegations of a conspiracy are insufficient to overcome summary judgment when the uncontroverted evidence fails to support such a claim. (Doc. 176-2 at 7-8.) In *Summit*, the Court of Appeals of Georgia reversed the trial court's denial of summary judgment because the record was devoid any evidence of Summit's knowledge or participation in the alleged conspiracy to defraud consumers. 681 S.E.2d at 685. The court of appeals especially noted that the record revealed Summit's knowledge of their co-defendant's distressed financial condition came long after the majority of alleged fraudulent conduct took place. *Summit*, 681 S.E.2d at 685. Here, however, Grace Johnston is dissimilar to the defendant in *Summit* because she or her trust has been a longtime shareholder of Debtors' entities and affiliates during the time the alleged fraudulent and preferential transfers occurred. (Docs. 176-1 at 42:4-25, 43:1-2; 176-3 at ¶ 1.) There is also evidence that Johnston had constructive knowledge of TMT's financial condition through their public filings with the SEC. (*See* Doc. 162-6 at 16.) Also unlike the *Summit* defendant, the record does not appear to reflect whether Grace Johnston investigated, or desired to investigate, the financial condition of the entities and affiliates she or her trust benefited from.[4] (*See* Doc. 176-1 at 170:6-8, 171: 11-18, 190:6-25, 191:1-17.)

The record reveals Grace Johnston's stated lack of knowledge about TMT's financial condition, distance from executive decision making, and lack of involvement with the day-to-day functions of the Debtors' entities and affiliates (*see* Docs. 176-1 at 152:15-17, 237:4-13; 182-1 at 354:10-14, 387:22-25, 388:1), all while reaping financial benefits from an apparently failing entity. (Doc. 176-1 at 177:19-25, 178:1-17.) However, the record also

---

[4] Here, the Court does not intend to imply the Johnston Defendants had a legal duty to investigate the financial condition of the Debtors' entities and affiliates with respect to Count IV.

reflects some conflicting testimony with respect to Grace Johnston's overall involvement with and knowledge of Debtors' entities and affiliates operations. While Grace Johnston adamantly stated she was "wholly ignorant of the arrangements" between TMT and MSL (Doc. 182-1 at 387:22-25, 388:1), she also admitted she was aware that MSL and MFG were leasing properties to TMT prior to receipt of an email from Bellville concerning the potential closures of certain locations, which would affect the profitability of MSL and MFG. (Doc. 176-2 at 266:21-25; *see also* Docs. 176-2 at 267:22-25, 268:1-11, 269:3-7; 199-7.) Grace Johnston also acknowledged receiving disbursements relating to sublease arrangement. (Doc. 182-1 at 380:13-16.)

While the Johnston Defendants argue that Grace Johnston's awareness of public information is immaterial to the Committee's conspiracy to breach fiduciary duty claim, the very crux of their argument for summary judgment rests on Grace Johnston's asserted lack of involvement and unawareness of the operations of Debtors' entities and affiliates. In drawing all the evidence and factual inferences most favorably to the nonmoving party, Grace Johnston's conflicting testimony gives rise to a factual dispute, in the very least, regarding her involvement with Debtors' entities and affiliates. If the subleasing arrangements were indeed schemes designed to defraud Debtors and its creditors, which is still a matter of dispute, a jury, the only entity authorized to make credibility determinations, could infer Johnston's knowledge of the arrangements while she or her trust continued to profit from the alleged schemes was a tacit, mutual agreement or understanding to breach fiduciary duties. Moreover, assessment of a party's credibility is a factual evaluation for a jury at trial rather than an issue decided on motion for summary judgment. *See Anderson*, 477 U.S. at 255. The fact finder may consider direct and circumstantial evidence along with the circumstances as it finds them to be.

While the law requires more than "some speculative suspicion" of the alleged conspiracy, *see Summit*, 681 S.E.2d at 685, the Committee has sufficiently raised a genuine factual dispute with respect to the alleged conspiracy to breach fiduciary duties claim. Thus, summary judgment must be denied on Count IV of the Amended Complaint.

### B. Aiding and Abetting Breach of Fiduciary Duties

In Georgia, a claim for aiding and abetting breach of fiduciary duties requires a showing of each of the following elements:

> (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Insight Tech., Inc. v. FrieghtCheck, LLC*, 633 S.E.2d 373, 379 (Ga. Ct. App. 2006) (footnotes and citations omitted). Procurement of a breach of fiduciary duty does not require direct "lending of assistance" in the primary wrongdoer's actual breach; "but if one, acting only through advice, counsel, persuasion, or command, succeeds in procuring any person to commit an actionable wrong, the procurer becomes liable for the injury, either singly or jointly, with the actual perpetrator." *Id.* at 379 n.12. Furthermore, acting with malice and intent to injure does not necessitate acting with personal ill will or animosity toward another. *Id.* at 379 n.13 (citing *Arford v. Blalock*, 405 S.E.2d 698, 704 (Ga. Ct. App. 1991)). Rather, it merely entails "any unauthorized interference" or "interference without legal justification or excuse" done with the knowledge of the rights of another and the intent to interfere with such rights. *Id.*

Here, the Johnston Defendants maintain that the evidence does not support any finding that Grace Johnston "took any specific act to procure the breach of a fiduciary duty," and the Committee cannot show Grace Johnston aided and abetted an alleged breach of fiduciary duties by "controlling and issuing directives to the Debtors' directors and officers," as claimed in the Amended Complaint. (Docs. 176-2 at 9; 113 at ¶ 127.) They further argue the record lacks any showing that Grace Johnston acted with any malice and intent to injure. (Doc. 176-2 at 10.) Because the Johnston Defendants "took action to participate in these schemes with knowledge that the Debtors were in financial distress," the Committee contends that "factual grounds for the aiding and abetting claim exists." (Doc. 199 at 7.)

11

Upon review of the record, the Court agrees with the Committee. Procurement of a breach of fiduciary duties need not be direct. *Insight Tech.*, 633 S.E.2d at 379. Here, however, there is a genuine dispute of material fact as to whether the Johnston Defendants, either individually or as trustee, acted to advise, counsel, persuade, or command the Debtors' directors and officers to breach their fiduciary duties. The competent record reveals that Johnston was aware of TMT's financial difficulties through her brothers. With this knowledge, she requested, presumably from Bellville, to be informed, or kept "in the loop," about the "goings on of The Money Tree." Though the record does not reveal at exactly what point Johnston became aware of TMT's financial circumstances, the record does show that she was informed of a lottery-method to boost TMT's revenues by at least August 4, 2011. (*See* Doc. 199-3.) It was then she was informed by Bellville of TMT's $25 million losses in the prior two years. By August 16, 2011, TMT was unable to pay its investors and its own bills. (Doc. 199-4.) Bellville mentioned the possibility of TMT's impending bankruptcy and sought Johnston's, as well as her brothers', input on "ways to save the Company." By September 29, 2011, TMT was effectively shutting down its operations by not accepting any new investments and ceasing payment on demand notes, interests request or early maturity requests. Bellville mentioned the idea of filing for Chapter 11 relief once more, but it was only this time that there was the mention of the stock being worth nothing if they were also unable to pay its investors.

Yet, on October 25, 2011, Johnston was presented with an option to sell her "virtually worthless" stock for $25,000. (Doc. 199-6.) Along with the sale of her stock, according to Bellville, was the security of TMT continued representation of Johnston on company-related matters and the relief personally guaranteeing debts when she did not have an active role in TMT's operations. Most pertinent to Count V, the sale of her stock would enable Bellville and Jeff Martin to "make faster decisions" with respect to TMT's affairs. Instead of accepting the price of $25,000, Johnston negotiated a higher price of $39,000. Bellville assured Johnston that he would make this happen. Less than two months later, Debtors filed for bankruptcy.

Viewing the evidence in a light most favorably to the Committee, a reasonable juror could infer from Johnston's email communications with Bellville that she intended to aid

and abet a breach of fiduciary duties from a director and officer of TMT. It could be inferred that Johnston's negotiation of $39,000 for worthless stock with the knowledge of TMT deteriorating financial condition could constitute an act to procure Bellville's breach of fiduciary duties to TMT with malice and intent to injure. The sale of her stock, as stated by Bellville, was necessary to enable him and Jeff Martin to make faster decisions about TMT's affairs. If this evidence were presented at trial, a material question of fact would exist as to whether this communication, along with the others, constituted acts of advising, counseling, persuading, or commanding a breach. For these reasons, the record reflects this genuine dispute as to material fact. Thus, the Johnston Defendants are not entitled to judgment as a matter of law on Count V of the Amended Complaint.

## II. Illegal Dividends Claim

Under the Georgia Business Corporation Code, O.C.G.A. §§ 14-2-101 *et seq.*, a board of directors may authorize and the corporation may make distributions to its shareholders, unless the distribution would in effect prevent the corporation from "pay[ing] its debts as they become due in the usual course of business" or if the corporation's total assets would become "less than its liabilities plus any amount needed to satisfy the claims of shareholders with superior distribution rights upon dissolution." O.C.G.A. § 14-2-640(c); *In re W.T. Mayfield Sons Trucking Co., Inc.*, 225 B.R. 818, 826 (Bankr. N.D. Ga. 1998). While liability for authorization of unlawful distributions typically falls on the voting or assenting directors, *see* O.C.G.A. § 14-2-832, shareholders may also be personally liable "by reason of [their] own acts or conduct." *See* O.C.G.A. § 14-2-622(b).

> The Code defines a "distribution" as,
>
> a direct or indirect transfer of money or other property except its own shares or rights to acquire its own shares or incurrence of indebtedness by a corporation to or for the benefit of its shareholders in respect of any of its shares. A distribution may be in the form of a declaration or payment of a dividend; a purchase, redemption, or other acquisition of shares; a distribution of indebtedness; or otherwise.

O.C.G.A. § 14-2-140(6). One court within this Circuit has deduced the definition of a distribution into three elements: (1) "the corporation must make a transfer in money or property;" (2) "the transfer must be to or for the benefit of shareholders;" and (3) "the

13

transfer must be 'in respect of' the shares of stock of the transferor." *In re W.T. Mayfield Sons Trucking Co., Inc.*, 225 B.R. at 826.

The Johnston Defendants assert summary judgment is proper on Count XXIII for several reasons. First, they argue the Committee's failure to specify, and support from the record, exactly which transfers from TMT to the Debtors' entities and affiliates constitute alleged unlawful distributions under Georgia law. (Doc. 176-2 at 11-12.) Second, they argue the Committee also failed to show whether any of the transfers between TMT and the Debtors' entities and affiliates even amounts to a "distribution" under O.C.G.A. § 14-2-640. (*Id.* at 12.) Specifically, the Johnston Defendants challenge whether TMT's transfers to the MSL and MFG were made "in respect of" the shares of stock of TMT. Lastly, the Johnston Defendants argue the factual record fails to show Grace Johnston "took any action or engaged in conduct sufficient to render the Johnston Defendants liable" as a shareholder under O.C.G.A § 14-2-622. (*Id.* at 14.)

The Court will decline to grant summary judgment with respect to the Committee's supposed failure to identify which transfer is the subject of the illegal dividends claim. Paragraph 224 of the Amended Complaint clearly defines the alleged illegal dividends to include, "without limitation, the amounts paid to or for the Martin Family Group and Martin Sublease which were paid for the benefit of shareholders of the Debtors, namely . . . Johnston." (Doc. 113 at ¶ 224.) The Committee alleges "The Money Tree" as the transferor who "made payments to or for the benefit of the Martin Trusts . . . and Johnston that constitute illegal dividends under O.C.G.A. § 14-2-640." (*Id.*) Thus, summary judgment is not warranted here.

Nor will this Court grant summary judgment on the Johnston Defendants' contention that the Committee set forth no factual basis that TMT's transfers to MSL and the MFG were "in respect of the shares of stock of" TMT. The Johnston Defendants rely on *In re W.T. Mayfield Sons Trucking* to show how, unlike the recipient of transfers in that case, the TMT's transfers here were for the legitimate business reason of making payments under established lease obligations for the benefit of TMT. (Doc. 176-2 at 12-13.) In *In re W.T. Mayfield Sons Trucking*, the debtor's subsidiary paid for the debtor's legal representation during their Chapter 11 bankruptcy petition. 225 B.R. at 821. There, the bankruptcy court

14

found that the subsidiary's transfers were made "in respect of" the debtor's stockownership in the subsidiary, because the subsidiary was not legally obligated to pay its parent's legal costs. *Id.* at 826. Finding no other business reason for the transfers, the court concluded that the subsidiary made the transfers only because "the Debtor owned its stock and the common management directed it to pay [their attorney]." *Id.*

The Johnston Defendants' reliance on a single case, which narrowly interprets the definition of "distribution" under Georgia law, is unpersuasive. Section 14-2-140(6) includes the "indirect transfer of money or property . . . for the benefit of its shareholders in respect of any of its shares." No other Georgia court, state or federal, has ever agreed with the interpretation made in *In re W.T. Mayfield* or held that a distribution must directly be made "in respect of the shares of stock of" the transferor. The Court agrees with the Committee in that O.C.G.A. § 14-2-140(6) should be read expansively, which could otherwise include an indirect transfer of money for the benefit of its shareholders through lease payments from TMT to MSL and MFG.

Reviewing the evidence most favorably to the Committee, a reasonable juror could conclude that TMT's transfer of lease payments to MSL and MFG were indirect transfers of money to Johnston individually or through the Johnston Trust. It is undisputed that the Johnston Defendants were shareholders of TMT and retained ownership interests in both MSL and MFG. It is also clear from the record that TMT's financial troubles would affect MSL and MFG. (*See* Doc. 199-7. ("I am wanting to keep you in the loop since this affects MSL and MFG . . . plans.").) A reasonable juror could infer that MSL and MFG stood as a conduit through which TMT was able to pay indirect distributions to the Johnston Defendants, even if the overt purpose of the transfers were to satisfy lease obligations.

Lastly, the Court will not grant the Johnston Defendants summary judgment on Count XXIII with respect to their shareholder liability arguments. Indeed, the Committee failed to point to any competent record evidence to show how the Johnston Defendants "orchestrated" transactions by which dividends were paid and received in bad faith. (*See* Doc. 199.) However, it remains a factual dispute as to whether Johnston Defendants knew or should have known "Debtors did not have a surplus or net profits from which dividends could be lawfully paid." (*See* Doc. 113 at ¶ 225.) Johnston's sworn testimony suggests that

15

she became aware of TMT's financial difficulties towards the end of 2011. (*See* Docs. 176-1 at 171:11-18; 199-3 to 199-7.) It also shows that Johnston "never made a disbursement" nor "made a decision about a disbursement." (Doc. 176-3 at ¶ 23.)

However, by fiscal year ending September 25, 2009, TMT's shareholder deficits were nearing $25 million dollars and described their financial state as "balance sheet insolven[t]," as shown through their 10-K filing with the SEC. (*See* Doc. 162-6 at 16.) Viewing the evidence in a light most favorably to the Committee, this could be construed as the Johnston Defendants having constructive notice of TMT's inability to pay out lawful distributions. It could also be construed that Johnston had notice of the 10-K filing due to her shareholder status. With this knowledge, whether actual or constructive, a reasonable juror could infer that the Johnston Defendants' act or conduct of merely receiving of the dividends was unlawful under O.C.G.A. § 14-2-622. Thus, the Court must deny summary judgment on this ground.

### III. Punitive Damages

Having found that the Johnston Defendants are not entitled to summary judgment as to Counts IV, V, and XXIII of the Amended Complaint, summary judgment with respect to the Committee's claim for punitive damages under Count XXIV must also be denied.

### CONCLUSION

For the reasons stated above, Defendants Grace Elizabeth Martin Johnston and Grace Elizabeth Martin Johnston, as Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O Grace Elizabeth Martin Johnston's Partial Motion for Summary Judgment (Doc. 176) is **DENIED.**

**SO ORDERED**, this   31st   day of March, 2016.

                                               **/s/ W. Louis Sands**
                                               **W. LOUIS SANDS, SR. JUDGE**
                                               **UNITED STATES DISTRICT COURT**