IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| POST-CONFIRMATION COMMITTEE FOR SMALL LOANS, INC., *et al.*, | : : : : |
| Plaintiff, | : : |
| v. | : CASE NO.: 1:13-CV-195 (WLS) : |
| W. DEREK MARTIN, as Executor of the Estate of Vance R. Martin, *et al.*, | : : : |
| Defendants. | : : |

## ORDER

Present before the Court is Defendants W. Derek Martin, as Executor of the Estate of Vance R. Martin, W. Derek Martin, Martin Family Group, LLLP, Martin Sublease, LLC, W. Derek Martin, as Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O W. Derek Martin, and Jefferey V. Martin's Motion for Summary Judgment. (Doc. 162.) For the reasons stated herein, the Martin Defendants' Motion for Summary Judgment is **DENIED.**

## PROCEDURAL HISTORY

The Post-Confirmation Committee for Small Loans, Inc., *et al.* ("the Committee") filed suit against the above-captioned Defendants on December 14, 2013 (Doc. 1) and amended their Complaint on November 7, 2014. (Doc. 113.) Among the Defendants are W. Derek Martin, as Executor of the Estate of Vance R. Martin, W. Derek Martin, Martin Family Group, LLLP, Martin Sublease, LLC, W. Derek Martin, as Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O W. Derek Martin, and Jefferey V. Martin ("the Martin Defendants"). The Martin Defendants answered the initial Complaint on January 29, 2014 (Docs. 38, 40) and answered the amended Complaint on November 21, 2014. (Docs. 119, 121.)

On May 15, 2015, the Martin Defendants filed the instant motion for summary judgment as to Counts VI, VII, IX, XIII, and XIX of the Amended Complaint. (Doc. 162.)

1

After receiving an extension of time to respond (see Doc. 187), the Committee timely responded on June 12, 2015. (Doc. 198.) The Martin Defendants timely replied thereto on June 26, 2015. (Doc. 203.) As the movants for summary judgment, the Martin Defendants have complied with M.D. Ga. L.R. 56 by attaching separate and concise statements of material fact to their motion (*see* Doc. 162-7), and the Committee has complied as well by responding to each statement of material fact. (*See* Doc. 198-1.) As such, the Court finds that the Martin Defendants' Motion for Summary Judgment (Doc. 162) is ripe for review.

## FACTUAL HISTORY

### I. Introduction

The following facts are derived from the Complaint (Doc. 1), as amended (Doc. 113), the Amended Answers (Docs. 119, 121), the Martin Defendants' Statement of Undisputed Material Facts (Doc. 162-7), and the Committee's Response to the Martin Defendants' Statement of Undisputed Material Facts and Statement of Undisputed Facts (Doc. 198-1), all of which were submitted in compliance with M.D. Ga. L.R. 56, and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits submitted, all of which are construed in a light most favorable to the nonmoving party. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### II. Relevant Facts

The Money Tree of Georgia, Inc. ("TMG"), Small Loans, Inc. ("SLI"), The Money Tree, Inc. ("TMT"), The Money Tree of Florida, Inc. ("TMF"), and The Money Tree of Louisiana, Inc. ("TML," collectively "the Debtors"), were engaged in the consumer finance business in Georgia, Alabama, Florida, and Louisiana, respectively. (Doc. 113 at ¶ 17.) TMT is the corporate parent of each of these remaining Debtors. (*Id.*) The Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code on December 16, 2011, in the United States Bankruptcy Court for the Middle District of Alabama.[1] (*Id.* at ¶ 9.)

---

[1] *See* Bankruptcy Case Nos. 11-12254, 11-12255, 11-12256, 11-2257 and 11-2258, United States Bankruptcy Court for the Middle District of Alabama, Southern Division. The bankruptcy cases were jointly administered and proceeded under *In re Small Loans, Inc., et. al.,* Chapter 11 Case No. 11-12254.

Throughout their existence, the Debtors were led by various officers, directors, and/or other principals, including Vance "Rudy" Martin, Derek Martin, and Jeff Martin. (*Id.* at ¶¶ 1, 27, 29, 51.) The Committee alleges that the Debtors' corporate-level employees received inflated salaries while Debtors continued to lose profits each year. (*Id.* at ¶¶ 100-106.) The Debtors also engaged in subleasing arrangements with Martin Family Group, LLLP and Martin Sublease, LLC ("MFG" and "MSL," respectively). (*Id.* at ¶¶ 66-78.) Like the compensation payments, the Committee also alleges this inflated arrangement was in fact a covert scheme to usurp the corporate opportunities of the Debtors while paying disguised dividends to interest-owning members of the Martin Family. (*Id.* at ¶¶ 67, 68, 77.)

The Martin Defendants contend that all this information, specifically Debtors' lease payments and compensation payments made to Debtors' insiders, was publically disclosed in their yearly filings with the Securities and Exchange Commission ("SEC"). (*See* Doc. 162-7.) Regarding Debtors' lease payments, the Martin Defendants point specifically to the language found in Debtors' February 4, 2005 Form S-1, Registration Statement:

> As of the date of this prospectus, we lease all 97 of our branch office locations, the three used car lots and our corporate headquarters in Bainbridge, Georgia. *Vance R. Martin, our President and sole director, owns and leases to us the real estate for 12 of these branch office locations, the three used car lots and our corporate headquarters. In addition, Mr. Martin leases from the owners, and subleases to us, 49 of these branch office locations.*
>
> * * *
>
> Mr. Martin owns the real estate for 12 of our branch office locations, the three used car lots and our principal executive offices. *We have entered into lease agreements with Mr. Martin whereby rent is paid monthly for use of these locations.* In addition, Mr. Martin leases from the owners, and then subleases to us, another 49 branch office locations *for a greater amount than he pays under the underlying leases.* Some of *this spread covers costs for leasehold improvements and property operating costs paid directly by Mr. Martin.* Management believes that these leases are at *rates which are comparable to those obtainable from independent third parties.* During fiscal year ended September 25, 2004, we paid total lease payments of $1.7 million to Mr. Martin.

(Doc. 162-1 at 45, 49 (emphasis added)). Similar information appears in Debtors' annual Form 10-K filings for the years 2006 through 2009. (*See* Docs. 162-2 at 16, 78; 162-3 at 15, 69; 162-4 at 16, 70; 162-5 at 16, 59; 162-6 at 18, 58.) Regarding executive compensation, the Martin Defendants similarly point to the Debtors' securities filings. In their February 4,

3

2005 Form S-1, the executive annual compensation of Rudy Martin, Derek Martin, and Bradley Bellville were disclosed. (Doc. 162-1 at 48.) Similarly, executive annual compensation was disclosed for all executive officers in their Forms S-1 and 10-K, with exception to Jeff Martin. (Docs. 162-7 at 48; 162-2 at 77; 162-3 at 68; 162-4 at 67-69; 162-5 at 69-71; 162-6 at 68-71.)

Under Counts VI and VII of the Amended Complaint, the Committee seeks to avoid and recover these compensations from Rudy Martin's Estate (Count VI only), Bradley Bellville, Derek Martin, and Jeff Martin under theories of actual and constructive fraudulent transfers, pursuant to 11 U.S.C. § 544 and Georgia's Uniform Fraudulent Transfers Act ("GUFTA"), O.C.G.A. §§ 18-2-70 *et seq*.[2] (Doc. 113 at ¶¶ 128-131, 135-137.) Similarly, in Count IX, the Committee seeks to avoid compensations payments paid by Best Buy Autos of Bainbridge, Inc. to Bradley Bellville, which the Committee alleges was in turn substantially all paid to the Derek Martin Trust. (*Id.* at ¶¶ 143-150.) The Committee seeks to recover these compensations under theories of actual and constructive fraud under GUFTA. (*Id.*)

Count XIII alleges that the Debtors made transfers to MFG, Derek Martin and Jeff Martin with actual intent to hinder, delay, or defraud creditors in violation of GUFTA. (*Id.* at ¶¶ 174-177.) Lastly, Count XIX alleges that the Debtors made fraudulent transfers or incurred fraudulent obligations for the benefit of the Rudy Martin Estate, MFG, and MSL. (*Id.* at ¶¶ 203-207.) The Committee seeks to recover over four years of lease payments under 11 U.S.C. § 544 and GUFTA. (*Id.*) In each count, with exception to Count IX, the Committee cites O.C.G.A. § 18-2-79(1) and alleges that it is entitled to avoid all transfers made to the Martin Defendants in excess of four years "because the transfers could not reasonably have been discovered by creditors until the Debtors' bankruptcy filing." (*Id.* at ¶¶ 129 n.11, 139 n.12, 175 n.13, 204 n.15.)

To establish their contention that the transfers could not have reasonably been discovered, the Committee submits the Schedules of Assets and Liabilities and amendments thereto, as well as the proof of claims, filed in the Debtors' bankruptcy cases. (Doc. 198-1 at

---

[2] Georgia's Uniform Fraudulent Transfers Act has been amended to reflect the new "Uniform Voidable Transactions Act." *See* S.B. No. 65, 2015 Gen. Assemb., Reg. Sess. (Ga. 2015). The Court recognizes that these new amendments are inapplicable to this case as the alleged conduct as well as the commencement of this action occurred well before the new Act's July 1, 2015 effective date. Thus, the Court will continue to refer to the Act as GUFTA.

4

¶ 1.) The Debtors had non-investor creditors, such as landlords, taxing authorities, and trade creditors. (Doc. 198-1 at ¶ 1) The Committee offers the sworn testimony of Behzad Ghazvini of Ghazvini Partners, Ltd. (*See* Doc. 198-2.) Mr. Ghazvini leased commercial real estate to TMF prior to their December 16, 2011 bankruptcy filing. (*Id.* at ¶ 2.) He presently holds an allowed claim in the bankruptcy cases of TMF and its affiliates in the amount of $7,189.26 relating to unpaid rent. (*Id.* at ¶ 3.) Mr. Ghazvini maintains that he had no knowledge that the Debtors were selling debt securities to the public. (*Id.* at ¶ 4.) He also avers that he had no knowledge that the Debtors were registrants with the SEC or that their securities filings and prospectuses contained information relating to the Debtors' operations and affairs. (*Id.* at ¶ 5.)

The Committee also submits the affidavit of Harold Blount, an investor in TMT prior to their bankruptcy filing. (*See* Doc. 198-3.) At the time of his investment, Mr. Blount states he was provided a prospectus by TMT.[3] (*Id.* at ¶ 3.) The prospectus contained language substantially similar to the language found in Debtors' public filings with the SEC, as noted above. (*Id.* at ¶ 4.) Mr. Blount avers that, upon review of the prospectus, he had no reason to question whether TMT and its affiliates were receiving a reasonable and fair price for the leased real estate. (*Id.* at ¶ 5.) He also stated he believed the "spread" intended to cover the Debtors expenses were paid directly by MSL. (*Id.* at ¶ 7.) He further avers that he was unaware that MFG and MSL were profiting from their leasing arrangements with TMT and their subsidiaries and affiliates. (*Id.* at ¶ 6.)

Mr. Blount became a member of the pre-confirmation unsecured creditors' committee after the Debtors' 2011 bankruptcy filing. (*Id.* at ¶ 9.) The pre-confirmation committee directed its counsel to investigate the Debtors' prepetition financial affairs. (*Id.* at ¶ 10.) After the Chapter 11 trustee was appointed on or about May 1, 2012, the pre-confirmation committee had full access to the Debtors' financial records. (*Id.* at ¶¶ 11-12.) Mr. Blount avers that prior to obtaining the Debtors' financial records post-bankruptcy, the pre-confirmation committee did not have sufficient information to ascertain the amount,

---

[3] The Committee also submits that some investors did not receive a prospectus at the time of their investment. (Doc. 198-1 at ¶ 23.)

extent, and nature of the various transfers made by the Debtors and the Defendants.  (*Id.* at ¶ 13.)

The Committee submits the expert opinion of Michael L. Hunter, a certified real estate appraiser, to counter the Debtors' representations that the rents obtained were similar to what could be obtained on the open market.  (Doc. 198-1 at ¶ 15.)  Hunter evaluated the MSL and MFG leases and opined that they were not fair market leases.  (*See* Docs. 175-2, 175-3.)  The Committee also contends that the above language from the Debtors' Form S-1 was incomplete because there was no disclosure of the amount of profit Rudy Martin was making from the subleasing arrangement.  (Doc. 198-1 at ¶ 18.)  They further assert that creditors had no ability to learn of the amounts of the markup over fair market rents due to the purportedly misleading language regarding the rental levels being at comparable fair market values.  (*Id.* at ¶ 19.)  MSL's financial records show that between January 1, 2001 and the Petition Date, Rudy Martin and MSL collected approximately $11,110,501.12 in rent from the Debtors and its affiliates and paid approximately $8,894,176.98 in expenses.  (*Id.* at ¶¶ 24-26.)  The Committee asserts that this resulted in Rudy Martin and MSL profiting not less than $2,216,324.14 under the arrangement.  (*Id.* at ¶ 26.)  The Committee also points to the financial records of Vance R. Martin Holdings, LLLP, which shows that between December 2006 and September 2011, $1,071,400.00 was paid to Martin Investments, Inc. and to the various trusts of Derek Martin, Jeff Martin, and Grace Johnston.  (*Id.* at ¶ 28.)  Vance R. Martin Holdings, LLLP is the sole member and equity owner of MSL.  (Doc. 193-1 at ¶ 53.)

The Committee further asserts that approximately 82% of the spread was being pocketed by Rudy Martin, which is incongruent with the Debtors' representations that the spread was generally used to pay expenses and improvement.  (Doc. 198-1 at ¶ 27.)  These profit amounts, the Committee contends, were not disclosed to investors in public filings; instead investors were informed that the Debtors were paying fair market rental amounts while Rudy Martin and MSL paid the Debtors' expenses.  (*Id.* at ¶ 29.)  The Committee also submit the sworn testimony of Jennifer Ard, the corporate representative of MSL, who handled leasing for the Debtors from about 2003 through 2012.  (*Id.* at ¶ 30-31.)  She testified that she did not believe the Debtors made any improvements to the leased space,

and if they did make improvements, the Debtors would have to pay for those improvements by paying the contractor directly. (*Id.* at ¶¶ 30, 32.) Her testimony comports with the terms of the leases between the Debtors and MSL, which expressly required the Debtors to pay insurance, taxes, and improvements in addition to the rental amounts. (*Id.* at 34.) The Committee submits to this Court that this arrangement was incompatible to the public disclosures of the Debtors and asserts that no creditors, whether investing or non-investing, could have understood the true nature of the leasing scheme just by virtue of the Debtors' public filings with the SEC.

## STANDARDS OF REVIEW

### I. Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323; *Chapman*, 229 F.3d at 1023. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the

ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted). Instead, the nonmovant must point to competent record evidence that would be admissible at trial. *See also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form."). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c).

**II. Local Rule 56**

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56. As stated above, the Parties complied with the Federal Rules of Civil Procedure and the Local Rules by filing timely motion for summary judgment, response and reply thereto, and attached a separate and concise statement of material facts. The Court will now address this ripe motion.

## ANALYSIS

The Martin Defendants seek summary judgment on Counts VI, VII, IX, XIII, and XIX of the Amended Complaint. (*See* Doc. 162.) They argue O.C.G.A. § 18-2-79 acts as a statute of repose with respect to the alleged constructive fraudulent transfers made or incurred before December 16, 2007 and the alleged actual fraudulent transfers made or incurred before December 16, 2007, which they maintain were all reasonably discoverable before December 16, 2010. (*See id.*) To the contrary, the Committee contends Georgia state and federal courts construing the same statue "universally describe" § 18-2-79 as a statute of limitations, which subjects their claims to equitable tolling. (*See* Doc. 198 at 17-18.)

### I. Whether O.C.G.A. § 18-2-79 Operates as a Statute of Repose

The threshold question is whether O.C.G.A. § 18-2-79 operates as a statute of limitation or statute of repose under Georgia law. Section 18-2-79 states,

> A cause of action with respect to a fraudulent transfer or obligation under this article is extinguished unless action is brought:
>
> (1) Under paragraph (1) of subsection (a) of Code Section 18-2-74, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;
> (2) Under paragraph (2) of subsection (a) of Code Section 18-2-74 or subsection (a) of Code Section 18-2-75, within four years after the transfer was made or the obligation was incurred; or
> (3) Under subsection (b) of Code Section 18-2-75, within one year after the transfer was made or the obligation was incurred.

The distinction between statutes of limitation and statutes of ultimate repose is well-settled. *See Simmons v. Sonyika*, 614 S.E.2d 27, 29 (Ga. 2005); *Craven v. Lowndes Cty. Hosp. Auth.*, 437 S.E.2d 308, 310 (Ga. 1993); *Trax-Fax, Inc. v. Hobba*, 627 S.E.2d 90, 94 (Ga Ct. App. 2006). Georgia case law has both determined and distinguished the line that separates these limitations on actions as this,

> A statute of limitation is a procedural rule limiting the time in which a party may bring an action for a right which has already accrued. A statute of ultimate repose delineates a time period in which a right may accrue. If the injury occurs outside that period, it is not actionable.

*Hill v. Fordham*, 367 S.E.2d 128, 131 (Ga. Ct. App. 1988).

While citing *Trax-Fax*, the Martin Defendants argue "GUFTA's use of the phrase 'is extinguished unless' means that a claim simply ceases to exist after a certain date," which they conclude makes it "clear" § 18-2-79 is "a statute of repose, not a mere statute of limitations." (Doc. 162-8 at 7.) In *Trax-Fax*, the Court of Appeals of Georgia found that O.C.G.A. § 34-9-245 (repayment of overpayment of income benefits) constituted a statute of repose because its language shared the "distinctive hallmarks of a statute of repose in that it is prohibitive and contemplates an absolute barrier" to a plaintiff's right of action. 627 S.E.2d at 94. Aside from the statute's use of the term "extinguished," which derives directly from the original UFTA, *see* UNIF. FRAUDULENT TRANSFER ACT § 9, this Court cannot say O.C.G.A. § 18-2-79 bears the "distinctive hallmarks" of a statute of repose.

Upon review of other Georgia statues of repose, O.C.G.A. § 18-2-79 does not reflect comparable prohibitive language. *See, e.g.*, O.C.G.A. § 9-3-51(a) ("*No action* to recover damages . . . shall be brought against any person performing . . . construction of such an improvement more than eight years after substantial completion of such an improvement."); O.C.G.A. § 9-3-71(b) (". . . *in no event* may an action for medical malpractice be brought more than five years after the date on which the negligent or wrongful act or omission occurred."); O.C.G.A. § 34-9-245 ("*No claim* for reimbursement shall be allowed where the application for reimbursement is filed more than two years from the date such overpayment was made."); O.C.G.A. § 51-1-11(b)(2) ("*No action* shall be commenced pursuant to this subsection with respect to an injury after ten years from the date of the first sale for use or consumption of the personal property causing or otherwise bringing about the injury.") (emphasis added). Instead, O.C.G.A. § 18-2-79 sets out four- or one-year periods for a "cause of action with respect to a fraudulent transfer or obligation," which has already accrued, and the action is extinguished, or time-barred, if it is brought outside of that time period.

Furthermore, the Committee is correct in that Georgia courts have consistently treated O.C.G.A. § 18-2-79 as a statute of limitation. *See, e.g.*, *Huggins v. Powell*, 726 S.E.2d 730 (Ga. Ct. App. 2012); *Cunningham v. Gage*; 686 S.E.2d 800 (Ga. Ct. App. 2009); *Kent v. White*, 631 S.E.2d 782 (Ga. Ct. App. 2006). Within this Circuit, federal courts have also adhered to the legal framework shaped by Georgia law and applied § 18-2-79 strictly as a

10

statute of limitation. *See Edgefield Holdings, LLC v. Mason*, No. 1:15-CV-2481-WSD, 2015 WL 4394908, at *3 n.6 (N.D. Ga. July 15, 2015); *First State Bank of N.W. Ark. v. McClelland Qualified Personal Residence Tr.*, No. 5:14-CV-130 (MTT), 2014 WL 6801803, at *5 n.7 (M.D. Ga. Dec. 2, 2014) (citing *Cunningham*, 686 S.E.2d at 801); *Tindall v. H & S Homes, LLC*, No. 5:10-CV-44 (CAR), 2011 WL 5419454, at *2 (M.D. Ga. Nov. 9, 2011); *Kelley v. Speciale (In re Gregg)*, No. 11-40125-JTL, 2013 WL 3989061, at *9 (Bankr. M.D. Ga. July 2, 2013); *Watts v. Peachtree Tech. Partners, LLC (In re Palisades at W. Paces Imaging Ctr., LLC)*, No. 09-87600-WLH, 2011 WL 4459778, at *3-4 (Bankr. N.D. Sept. 13, 2011). *But see Alliant Tax Credit Fund 31-A, Ltd. v. Murphy*, No. 1:11-CV-832-RWS, 2014 WL 3955642 (N.D. Ga. Aug. 12, 2014) (district court finding O.C.G.A. § 18-2-79(3) functioned as a statute of repose because it lacked the "discovery provision" of O.C.G.A. § 18-2-79(1)).[4]

Lastly, "[w]here the language of a statute is capable of more than one meaning," Georgia courts should "interpret the statute so as to carry out the legislative intent." *Aldrich v. City of Lumber City*, 542 S.E.2d 102, 105 (Ga. 2001). Prior to the enactment of GUFTA, actions for fraudulent conveyances were brought under O.C.G.A. § 18-2-22. Section 18-2-22 did not have any statutes of limitation or repose explicitly spelled out within the statute. *See Broadfoot v. Hunerwadel (In re Dulock)*, 282 B.R. 54, 57-58 (Bankr. N.D. Ga. 2002). Instead, Georgia courts "generally found the limitations period [was] governed by § 9-3-32, that being four years" for fraudulent conveyances of personal property. *Perkins v. Wisneski (In re Int'l Mgmt. Assocs., LLC)*, No. A06-62966-PWB, 2010 WL 2026442, at *1 (Bankr. N.D. Ga. 2010); *see also In re Dulock*, 282 B.R. at 59. In 2002, the General Assembly of Georgia enacted the Uniform Fraudulent Transfers Act, which repealed the former § 18-2-22. One of the explicit purposes of the General Assembly in enacting the UFTA was "to provide for statutes of limitation," which remained at a period of four years. *See* H.B. 84, 146th Gen Assem., Reg. Sess. (Ga. 2002). Even if the statutory language of § 18-2-79 was ambiguous, the above shows Georgia legislators intended not only to make the limitation of actions

---

[4] It is also worth noting that the plaintiffs in *Alliant* made no response or comment to whether O.C.G.A. § 18-2-79(3) should be interpreted as a statute of repose. *Alliant Tax Credit Fund 31-A, Ltd. v. Murphy*, No. 1:11-CV-832-RWS, 2014 WL 3955642, at *8 (N.D. Ga. Aug. 12, 2014).

11

clear, but they also intended to keep the UFTA a statute of limitation, rather than create a new statute of repose.[5]

Georgia law requires this Court to treat § 18-2-79 as a statute of limitations, rather than a statute of repose. Thus, the Court must reject the Martin Defendants' argument that § 18-2-79 operates as a statute of repose and reasons that the Georgia Supreme Court would hold § 18-2-79 functions as a statute of limitations under Georgia law.

## II. Whether the Actual-Fraud Claims were Reasonably Discoverable

Irrespective of this Court finding that O.C.G.A. § 18-2-79 operates as a statute of limitation, the Martin Defendants urge this Court to focus on the discoverability of the transfer itself and disregard any arguments interpreting O.C.G.A. § 18-2-79 to require reasonable discovery of the fraudulent nature of the transfers. (Doc. 162-8 at 9-11.) The Martin Defendants argue that the Committee's actual fraudulent transfer claims regarding Debtors' lease payments and executive compensation to Debtors' insiders were all reasonably discoverable as early as February 4, 2005 through publicly filed documents with the SEC.[6] (*See* Doc. 162-8 at 9-16.) Specifically, the Martin Defendants cite *Hamilton v. Deloitte, Haskins & Sellis*, 417 S.E.2d 713 (Ga. Ct. App. 1992) for the proposition that publicly-filed documents with the SEC puts the investing public on constructive notice of the contents of the document. (Doc. 16-8 at 13.)

The Committee instead argues that even if the SEC filings gave constructive notice to the investing public, it did not give notice to all non-investor creditors of Debtors.[7] (*See* Doc. 198 at 4-6.) In support of their argument, the Committee submits the sworn affidavit of Behzad Ghazvini, a non-investor creditor of Debtors, to show how creditors like Mr.

---

[5] Moreover, the General Assembly of Georgia is carefully aware of the difference between statutes of limitation and statutes of ultimate repose and do not use the terms interchangeably. *See, e.g.*, O.C.G.A. § 9-3-71(c) (specifically delineating a two-year statute of limitations and five-year statue of ultimate repose and abrogation for medical malpractice actions).

[6] The Martin Defendants ask this Court to take judicial notice of all SEC filings referenced in their briefing. Finding it reasonable and appropriate to do so, the Court takes judicial notice of Debtors' SEC filings found in Docs. 162-1 through 162-6 under Federal Rule of Evidence 201.

[7] In footnote 3 of their Response, the Committee requests this Court to take judicial notice of the Schedules of Assets and Liabilities and amendments thereto filed in the Debtors' bankruptcy cases, which illustrates Debtors' non-investing creditors. *See In re Small Loans, Inc., et al.*, Bankr. M.D. Ala., Case No. 11-12254, Docs. 131, 243, 246, 289, 559; Case No. 11-12255, Doc. 25; Case No. 11-12256, Doc. 25; Case No. 11-12257, Doc. 25; and Case No. 11-12258, Doc. 25. For the same reason, the Committee additionally requests this Court to take judicial notice of the proofs of claims filed on the claims register in Case No. 11-12254. Under Federal Rule of Evidence 201, the Court finds judicial notice to be appropriate, and so notices the foregoing here.

Ghazvini could not have known that the Debtors were selling debt to the public, were registrants with the SEC, or of the Debtors' operations or affairs through their public filings. (*See id.* at 4-5; *see also* Doc. 162-2.)  Similarly, the Committee references the proof of claims filed in the Debtors' bankruptcy cases, which reflect the unsecured claims of the Debtors' creditors.  Many of those creditors, such as City of Alexander, Alabama and Alabama Power, were also non-investor creditors.  (Doc. 198 at 3-4 & n.3.)

Georgia's appellate courts have not reached the "reasonable discovery" issue.  *See First State Bank*, 2014 WL 6801803, at *5 n.7.  However, the majority of courts interpreting similar provisions similar to GUFTA hold that the one-year period runs upon the discovery of the fraudulent nature of the transfer.  *See, e.g.*, *Fid. Nat'l Title Ins. Co. of N.Y. v. Howard Sav. Bank*, 436 F.3d 836, 839 (7th Cir. 2006) (interpreting Illinois law, the discovery period runs upon discovery of the wrongful injury); *Belfance v. Bushey (In re Bushey)*, 210 B.R. 95, 99 n.5 (B.A.P. 6th Cir. 1997) (Ohio "applies a discovery-of-the-fraud rule"); *Fid. Nat'l Fin., Inc. v. Friedman*, No. CV 06-4271 CAS (JWJx), 2009 WL 2410829, at *2 (C.D. Cal. 2009); *Schmidt v. HSC, Inc.*, 319 P.3d 416, 424-29 (Haw. 2014); *Rappleye v. Rappleye*, 99 P.3d 348, 356 (Utah Ct. App. 2004); *Duran v. Henderson*, 71 S.W.3d 833, 839 (Tex. Ct. App. 2002); *Freitag v. McGhie*, 947 P.2d 1186, 1189-90 (Wash. 1997).  The purpose of the UFTA is to prevent and deter fraud, while providing a remedy to innocent creditors.  *See Freitag*, 947 P.2d at 1189 ("Common sense and the statutory purpose of the UFTA necessitate a finding that the statute begins to run with the discovery of the fraudulent nature of the conveyance.")  Furthermore, it is untenable to interpret O.C.G.A. § 18-2-79 in such a way that would encourage defendants to craftily conceal the fraudulent nature of their transfers long enough to escape liability under GUFTA.  *See* O.C.G.A. 18-2-80(a) (2002) (now codified at O.C.G.A. § 18-2-82) ("Unless displaced by the provisions of this article, the principles of law and equity, . . . supplement its provisions.").

The Martin Defendants cite numerous cases interpreting similar UFTA provisions for the proposition that "the clear text of the statute commands . . . tying the 1-year period to the discovery of 'the transfer or obligation.'" (Doc. 162-8 at 10.)  However, a great number of those cases have been distinguished in a single footnote in *Schmidt v. HSC, Inc.* because the parties did not raise the issue "that the one year period did not begin until they discovered

13

the 'fraudulent nature' of the transfer." *See* 319 P.3d at 509 & n.20. In some instances, the plaintiff did not dispute their awareness of the challenged transfers when they filed their actions long after the expiration of the limitations period. *See e.g.*, *Blesh v. Johnson*, No. 2005-508, 2006 WL 5838212, at *1 (Vt. Aug. 1, 2006); *Gulf Ins. Co. v. Clark*, 20 P.3d 780, 784 (Mont. 2001).

The text of O.C.G.A. § 18-2-79 is as clear; it allows certain actions so long as they are brought within the applicable time frames. The statute begins, "A cause of action with respect to a *fraudulent* transfer . . . ," and goes on to describe each of the limitation periods. O.C.G.A. § 18-2-79 (emphasis added). Georgia statutory interpretation requires this Court to "give sensible and intelligent effect to all of [its] provisions and to refrain from any interpretation which renders any part of the statute meaningless." *R.D. Brown Contractors v. Bd. of Educ. Of Columbia Cty.*, 626 S.E.2d 471, 474 (Ga. 2006) (citation and punctuation omitted). To read O.C.G.A. § 18-2-79 to require plaintiff to file suit at the time the transfer or obligation itself occurred without regard to the "fraudulent" nature and circumstances surrounding the transfer or obligation would render the statute meaningless. *See also IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs.)*, 408 F.3d 689, 709 (11th Cir. 2005) ("In such a case, avoidance actions may be brought for one year from the time the plaintiff discovers or reasonably could have discovered the *fraudulent* transfers.") (emphasis added).

Upon review of the relevant authority, the Court is persuaded by the majority view and predicts the Georgia Supreme Court and Court of Appeals would also interpret the discovery provision of 18-2-79(1) in line with the majority view. Thus, applying this framework to the case at hand, there exists a genuine dispute of material fact as to whether the alleged fraudulent nature of the lease payments and compensation payments to the Debtors' insiders were reasonably discoverable as early as February 4, 2005. The Committee is correct in that this Court must take into consideration whether all creditors of the Debtors were able to reasonably discover the alleged fraudulent nature of the lease payments and compensation payments. *See* 11 U.S.C. § 544(b)(1) ("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."). These

individual creditors need not necessarily be investors of the Debtors in order to have a claim. *See Field v. Estate of Rose Kepoikai (In re Maui Indus. Loan & Fin. Co.)*, 454 B.R. 133, 138 (Bankr. D. Haw. 2011) ("[T]he period for the trustee [begins] to run when the *last* creditor could reasonably have discovered the fraudulent nature of a particular transfer.") (citing *Picard v. Chais (In re Madoff)*, 445 B.R. 206, 219 (Bankr. S.D.N.Y 2011); *G-I Holdings Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings)*, 313 B.R. 612, 639 (Bankr. D. N.J. 2004) (emphasis in original)). This is true, even if the amount of non-investor claims only amounts to 0.01%, as pointed out by the Martin Defendants.

As shown from the record, Mr. Ghazvini was a non-investor creditor of TMF, and he holds an allowed claim in the bankruptcy cases of the Debtors in the amount of $7,189.26. His sworn testimony indicates that he had no knowledge that the Debtors were selling debt securities to the public. Similarly, he stated that he had no knowledge that the Debtors were registrants with the SEC, or that their security filings and prospectuses contained relevant information relating to the Debtors' operations and affairs. While a reasonable juror need not accept Mr. Ghazvini's statements as conclusively true at trial, the Martin Defendants failed to put forth any competing evidence to suggest otherwise. Likewise, as the Committee noted, non-investing creditors of TMT's subsidiaries, such as SLI, could not have been put on notice the disclosures of the public filings under TMT's name.

Furthermore, the Court also finds that a genuine issue of material fact exists as to whether public filings with the SEC are sufficient to put the Debtors' investing creditors on notice of the alleged fraudulent nature of the lease payments and executive compensation. In *Hamilton v. Deloitte, Haskins & Sellis*, the SEC registrant disclosed in their Form 8-K that their prior financial statements required revision and should not be relied upon. 417 S.E.2d at 714. Even after the disclosures, the appellant, a recent investor, purchased additional shares in hopes to break even if the stock price bounced back from its post-disclosure plummet. *Id.* In affirming the trial court's grant of summary judgment, the Court of Appeals of Georgia found that the Form 8-K disclosures were sufficient to put a potential investor on constructive notice that their prior filings should not be relied upon. *Id.* at 715.

The Martin Defendants' reliance on *Hamilton* is misplaced as the Debtors' public filings were not as direct and unambiguous as the public filings in *Hamilton*. With respect to

15

the lease payments, the record reflects a conflict as to whether the leases were "comparable to those obtainable from independent third parties," as assured by the Martin Defendants through their public filings. Michael L. Hunter opined that market rents for the Debtors' subleased properties is best reflected by those lease terms and rents of the underlying leases with the unrelated third parties. (Doc. 175-1 at 2.) Mr. Blount, investor of TMT, averred that upon review of the prospectus, he believed the "spread" associated with the increased rental rates was intended to cover the Debtors' expenses and paid directly by MSL. However, many of the MSL subleases required that expenses, such as insurance, taxes, and improvements, be paid by the Debtors directly. (*See* Doc. 172-8.) This was verified by the testimony of Jennifer Ard, corporate representative of MSL. Mr. Blount also believed that the Debtors were receiving a reasonable and fair price for the leased real estate, but Hunter, further opined that there was "no market support of the increased rents or the shift of expense responsibility reflected in the sublease." (Doc. 172-2 at 2.) Additionally, Hunter stated that the initial or underlying leases, unlike the subsequent subleases, were all negotiated as arms-length transactions and should be reflective of a market transaction. (*Id.*) He concluded that the "sublease terms and rents cannot be supported" by the market. (*Id.*)

Moreover, the record also shows that from January 1, 2001 through the Petition Date, Debtors paid $11,110,501.12 in rental income to Rudy Martin and MSL, and Rudy Martin and MSL paid $8,894,176.98 in expenses. (*See* Docs. 198-5 to 198-7.) Likewise, Mr. Blount did not glean from the prospectus that Rudy Martin and MSL were making a profit from the leasing arrangement. Viewing the evidence in a light most favorably to the Committee, a reasonable fact finder could find that information provided in the Debtors' public filings was insufficient for a potential investor to understand or discover the true nature of the Debtors' leasing arrangements. Unlike the appellant in *Hamilton*, the record shows that investors like Mr. Blount were not fully apprised of how "comparable" the Debtors' leases were to independent third parties or how much of the "spread" was utilized to cover expenses.

Similarly, a reasonable fact finder could conclude that the alleged fraudulent nature of the compensation payments to the Debtors' corporate officers was not reasonably discoverable by February 4, 2005. The record is devoid of any reference to the

compensation payments to Jeff Martin. As for the Debtors' investing creditors, mere disclosure of executive compensation is insufficient to inform creditors of the alleged fraudulent nature of the Martin Defendants' compensation. As shown through the record, $1,071,400.00 was paid to Martin Investments, Inc. and to the various trusts of Derek Martin and Jeff Martin, as well as to the Grace Johnston Trust. If a reasonable jury concludes that these payments derived from a disguised dividend scheme funded though the Debtors' leasing arrangements, they could also conclude that the Martin Defendants' lack of disclosure could not have put investing creditors on notice of the nature of how the Martin Defendants were compensated by the Debtors. Likewise, as stated above, none of the Debtors' non-investing creditors could have been put on notice regarding executive compensation through the Debtors' public filings. Thus, viewing the evidence most favorably to the Committee, the Court finds that there is a genuine dispute of material fact as to whether the Debtors' lease payments and compensation payments were reasonably discoverable by February 4, 2005. Accordingly, the Martin Defendants are not entitled to judgment as a matter of law.

### III. Whether the Remaining Claims are Tolled

The Committee's constructive fraudulent transfer and insider claims, brought pursuant O.C.G.A. §§ 18-2-74(a), 18-2-75(a) and (b), do not contain reasonable-discovery clauses under O.C.G.A. § 18-2-79(2) and (3). Having found that O.C.G.A. § 18-2-79 operates as a statute of limitation, the question here is whether these claims are subject to equitable tolling. The former O.C.G.A. § 18-2-80(a), now codified at O.C.G.A. § 18-2-82, allowed "principles of law and equity" to supplement GUFTA's provisions so long as it is not inconsistent with the Act; this includes equitable tolling.

The purpose of equitable tolling is to "prevent 'bad acts' that may have gone undiscovered from going unremedied merely due to the passage of time." *In re Int'l Mgmt. Assocs., LLC*, 2010 WL 2026442, at *5. The Committee argues that this Court should apply the common law doctrine of adverse domination, while citing to nonbinding authority outside of this Circuit, to toll the statute of limitations because the Debtors were "controlled or dominated by individuals engaged in conduct harmful to the entity." (Doc. 198 at 20.) The Martin Defendants contend that adverse domination is inapplicable here because the

17

doctrine has never been adopted in Georgia and provides no basis for tolling any limitations period under Georgia law. Upon review of the relevant authority, the Court will decline to apply the adverse-domination doctrine as it is not a recognized theory under Georgia law. *See, e.g., Brandt v. Bassett (In re Se. Banking Corp.)*, 855 F. Supp. 353, 358 (S.D. Fla. 1994) (district court declining to apply adverse domination when neither Florida statute nor Florida case law recognized its application).

It is well-recognized under Georgia law that statutes of limitation, unlike statutes of repose, are subject to equitable doctrines such as tolling. *Simmons*, 614 S.E.2d at 30. "Although a court may equitably toll a limitations period, the plaintiff[] must establish that tolling is warranted." *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004). Here, the above discussion shows that the Committee has sufficiently established that tolling is warranted in this case. A reasonable juror, viewing the same record before this Court, could conclude that the Debtors' creditors were not apprised with sufficient information through the Debtors' public securities filings to inform them of a cause of action against the Martin Defendants under GUFTA. In that event, their cause of action did not begin to accrue until December 16, 2011, when the Debtors petitioned for Chapter 11 relief in the United States Bankruptcy Court for the Middle District of Alabama. Thus, the Court finds that the Committee's claims against the Martin Defendants were not time-barred by O.C.G.A. § 18-2-79's statute of limitation. Accordingly, the Martin Defendants' motion for summary judgment must be denied.

## **CONCLUSION**

For the reasons stated above, Defendants W. Derek Martin, as Executor of the Estate of Vance R. Martin, W. Derek Martin, Martin Family Group, LLLP, Martin Sublease, LLC, W. Derek Martin, as Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O W. Derek Martin, and Jefferey V. Martin's Motion for Summary Judgment (Doc. 162) is **DENIED.**

**SO ORDERED**, this   31st   day of March, 2016.

/s/ W. Louis Sands  
**W. LOUIS SANDS, SR. JUDGE**  
**UNITED STATES DISTRICT COURT**