## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | | |
|---|---|---|
| POST-CONFIRMATION COMMITTEE FOR SMALL LOANS, INC., *et al.*, | : : : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 1:13-CV-195 (WLS) |
| | : | |
| W. DEREK MARTIN, as Executor of the Estate of Vance R. Martin, *et al.*, | : : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER

Present before the Court is Plaintiff Post-Confirmation Committee for Small Loans, Inc., *et al.*'s Motion for Partial Summary Judgment. (Doc. 166.) Plaintiff requests partial summary judgment as to Counts XVI, XIX, and XXII against Defendants Martin Sublease, LLC, Martin Investments, Inc., W. Derek Martin, Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O W. Derek Martin, Jefferey V. Martin, as Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O Jefferey V. Martin, Grace Elizabeth Martin Johnston, as Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O Grace Elizabeth Martin Johnston, W. Derek Martin, as Executor of the Estate of Vance R. Martin, Shana Shockley Martin, Kimala B. Martin, and James Patrick Johnston. (*See* Doc. 166.) Plaintiff additionally seeks immediate, final judgment on the various amounts outlined in their motion and accompanying brief. (*See id.*) For the reasons stated herein, Plaintiff's Partial Motion Summary Judgment (Doc. 166) is **DENIED.**

## PROCEDURAL HISTORY

The Post-Confirmation Committee for Small Loans, Inc., *et al.* ("the Committee") filed suit against the above-captioned Defendants on December 14, 2013. (Doc. 1.) Among the Defendants are Martin Sublease, LLC ("Martin Sublease"), Martin Investments, Inc. ('Martin Investments"), W. Derek Martin, Trustee for the Vance R. Martin GST Exempt

Family Trust F/B/O W. Derek Martin ("Derek Martin Trust"), W. Derek Martin ("Derek Martin"), Jefferey V. Martin, as Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O Jefferey V. Martin ("Jeff Martin Trust"), Jefferey V. Martin ("Jeff Martin"), Grace Elizabeth Martin Johnston, as Trustee for the Vance R. Martin GST Exempt Family Trust F/B/O Grace Elizabeth Martin Johnston ("Johnston Trust"), W. Derek Martin, as Executor of the Estate of Vance R. Martin ("the Estate of Rudy Martin"), Shana Shockley Martin ("Shana Martin"), Kimala B. Martin ("Kim Martin"), and James Patrick Johnston ("Patrick Johnston," collectively "the Martin Defendants"). The Martin Defendants, with exception of Patrick Johnston, answered separately on January 29, 2014. (Docs. 37, 38, 39, 40, 42.) After this Court granted leave to amend (*see* Doc. 112), the Committee filed their Amended Complaint on November 7, 2014. (Doc. 113.) The Martin Defendants, including Patrick Johnston, answered the Amended Complaint separately on November 21, 2014. (Docs. 119, 120, 121, 122, 123, 149.)

On May 15, 2015, the Committee filed the instant motion for partial summary judgment as to Counts XVI,[1] XIX, and XXII of the Amended Complaint, as well as to the Martin Defendants' purported defenses. (Doc. 166.) After receiving an extension of time to respond (*see* Doc. 187), Defendants timely responded on June 12, 2015. (Doc. 193.) The Committee timely replied thereto on June 26, 2015. (Doc. 208.) As the movants for summary judgment, the Committee has complied with M.D. Ga. L.R. 56 by attaching separate and concise statements of material fact to their motion (*see* Doc. 167), and Defendants have complied as well by responding to each statement of material fact. (*See* Doc. 193-1.) As such, the Court finds that the Committee's Motion for Summary Judgment (Doc. 166) is ripe for review.

---

[1] Count XVI of the Amended Complaint pertains to an avoidance and recovery of preferential transfers claim, pursuant to 11 U.S.C. § 547 and § 550, against Defendants Derek Martin and Martin Family Group, LLLP. While some of the Committee's arguments do pertain to Derek Martin, the instant motion and reply make no mention of Martin Family Group, LLLP. The Committee also makes no legal argument under 11 U.S.C. § 547. The Martin Defendants made mention of this discrepancy in their response. (Doc. 193 at 4 n.3.) However, the Committee did not attempt to correct or clarify this issue in their reply. (*See* Doc. 208.) Thus, the Court will presume the Committee did not intend to move for summary judgment as to Count XVI and will make no findings of fact or law on this particular count.

## FACTUAL HISTORY

### I.  Introduction

The following facts are derived from the Complaint (Doc. 1), as amended (Doc. 113), the Amended Answers (Docs. 119, 120, 121, 122, 123, 149), the Committee's Statement of Undisputed Material Facts (Doc. 167), and the Martin Defendants' Response to the Committee's Statement of Undisputed Material Facts (Doc. 193-1), all of which were submitted in compliance with M.D. Ga. L.R. 56, and the record in this case.  Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits submitted, all of which are construed in a light most favorable to the nonmoving party.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### II.  Relevant Facts

#### A.  Founding of the Money Tree

Headquartered in Bainbridge, Georgia, the Money Tree of Georgia, Inc. ("TMG"), Small Loans, Inc. ("SLI"), The Money Tree, Inc. ("TMT"), The Money Tree of Florida, Inc. ("TMF"), and The Money Tree of Louisiana, Inc. ("TML", collectively "the Debtors" or "The Money Tree"), were engaged in the consumer finance business in Georgia, Alabama, Florida, and Louisiana, respectively.  (Doc. 167 at ¶ 5.)  Specifically, TMT and TMG raised money by selling debt instruments to the public.  (Doc. 167 at ¶ 2.)  TMG was founded by Vance "Rudy" Martin in 1987 originally under the name "The Money Tree, Inc."  (Doc. 193-1 at ¶ 4.)  By 1995, the name was changed to "The Money Tree of Georgia, Inc." and the present company named "The Money Tree, Inc." was formed.  (Doc. 113 at ¶ 44 n.2.)  Over time, Rudy Martin organized various affiliates of the Debtors as their corporate operations expanded throughout the Southeast.  (*Id.* at ¶ 44.)  Those affiliates included Martin Family Group, LLLP, Martin Sublease, Martin Investments, and the Interstate Motor Club.  (Doc. 113 at ¶ 65.) Rudy Martin ran the Money Tree alongside his sons, Derek and Jeff Martin, from its founding until his resignation in 2006.  (Docs. 113 at ¶ 51; 167 at ¶¶ 9, 13.)

#### B.  The Martin Family

Derek Martin was an officer of TMT from 1997 through 2007 and a director from April 16, 2006 until February 21, 2008.  (Doc. 167 at ¶¶ 9-10.)  He was ultimately named

President of TMT in December 2005.  (*Id.* at ¶ 10.)  Derek Martin later resigned from his position as President in August 2007 and selected Bradley Bellville as his successor.  (*Id.* at ¶ 25.)  Jeff Martin was a director of the Debtors from February 2008 through April 2012, and was employed by TMT as a loan approver from October 19, 1998 until September 28, 2012.  (Doc. 167 at ¶ 14.)  Kim Martin is the spouse of Jeff Martin.  (*Id.* at ¶ 16.)  Grace Elizabeth Martin Johnston ("Grace Johnston") is the daughter of Rudy Martin and sister of Derek and Jeff Martin.  (*Id.* at ¶ 17.)  Patrick Johnston is the spouse of Grace Johnston.  (*Id.* at ¶ 18.)  The record does not reflect Kim Martin, Grace Johnston, or Patrick Johnston serving in any role or capacity for the Debtors or their affiliates.

Shana Martin is the spouse of Derek Martin.  (*Id.* at ¶ 12.)  Similarly, the record does not reflect Shana Martin serving in any role or capacity for the Debtors or their affiliates.  Shana Martin did, however, receive not less than $88,300 in cash and other assets from Derek Martin or the Derek Martin Trust.  (*Id.* at ¶ 79.)  These assets include, among other things, not less than $88,300 in cash received in 2012, 2013, and 2014 from Derek Martin, an $86,000 diamond ring in 2013 paid for in cash by the Derek Martin Trust, a $14,000 diamond Rolex watch received in May 2013 from Derek Martin, and two Louis Vuitton purses received in December 2008 and February 2011 from Derek Martin.  (*Id.* at ¶ 80.)  It is undisputed that Shana Martin provided no value to Derek Martin for the transfer of the ring.  (*Id.* at ¶ 81.)

### C. The Martin Siblings' Trusts

Rudy Martin was diagnosed with cancer in 2000 and ultimately died on June 28, 2006.  (Doc. 167 at ¶ 8.)  Prior to his death, Rudy Martin formed trusts for each of his three children, Derek Martin, Jeff Martin, and Grace Johnston.  (*Id.* at ¶¶ 8, 19.)  These trusts are known as the Vance R. Martin GST Exempt Family Trust F/B/O W. Derek Martin, the Vance R. Martin GST Exempt Family Trust F/B/O Jefferey V. Martin, and the Vance R. Martin GST Exempt Family Trust F/B/O Grace Elizabeth Martin Johnston.  (*Id.* at ¶ 20.)  Rudy Martin was the original trustee of all three trusts, and upon his death, Derek Martin and John Dowdy[2] served as co-trustees of all three trusts.  (Doc. 193-1 at ¶ 22.)  Derek

---

[2] John Dowdy provided accounting services to Debtors, its affiliates, and to the Martin Family through his accounting firm, Dowdy & Whittaker.  (*See* Docs. 164-2 at 60; 164-5 at 26; 164-6 at 78-79.)

Martin, Jeff Martin, and Grace Johnston later became trustees of their own respective trusts. (Doc. 167 at ¶ 23.)

The Committee contends that the Martin Siblings' Trusts, as well as the Estate of Rudy Martin and Martin Investments, received Martin Sublease dividends through Vance R. Martin Holdings, LLLP ("VRM Holdings") between January 1, 2008 and December 16, 2011 ("the Petition Date"). (Doc. 167 at ¶¶ 76-77.) However, the Parties dispute the amount. VRM Holdings' records show the Martin Siblings' Trusts purportedly receiving approximately $208,950.63[3] each, the Estate of Rudy Martin purportedly received $98,988.22, and Martin Investments, Inc. purportedly received $14,559.86. (Doc. 167 at ¶ 77.) The Martin Defendants refute any indication that all checks drawn on VRM Holdings were distributions to partners. (Doc. 193-1 at ¶ 77.) They also reference a different portion of the record, which breaks down distributions to the Rudy Martin Family Trusts from December 2005 to March 2013. (*See* Doc. 188-8 at 47-67.) There, the Martin Defendants contend that the Martin Siblings' Trust purportedly received $98,148.77 each, the Estate of Rudy Martin purportedly received $75,381.52, and Martin Investments purportedly received $2,629.56. (Doc. 193-1 at ¶ 77.)

**D. Martin Sublease, LLC**

Martin Sublease is a Georgia limited liability company with VRM Holdings, a limited liability limited partnership, as its sole member and equity owner. (Doc. 167 at ¶¶ 52-53.) Martin Investments serves as managing general partner of VRM Holdings, while the Derek Martin Trust, Jeff Martin Trust, and the Johnston Trust all serve as VRM Holdings' limited partners. (*Id.* at ¶¶ 54-55.) Martin Investments is a Georgia corporation whose shareholders are Derek Martin, who owns 51%, and the Derek Martin Trust, which owns 49%. (*Id.* at ¶ 56.)

Martin Sublease leased from third-party landlords, and then subleased to the Money Tree or its affiliates, fifty-four (54) branch office locations and two (2) used car lots for amounts greater than were paid to the third-party landlords under the underlying leases. (*Id.* at ¶ 62.) This subleasing arrangement was started by Rudy Martin, who originally leased properties under his name. (*Id.* at ¶ 69.) He would later sublease to the Money Tree or its

---

[3] The Johnston Trust purportedly received $208,950.65. (Doc. 167 at ¶ 77.)

affiliates many properties for amounts greater than were paid under the underlying leases. (*Id.*)  The Debtors and their subsidiaries were paying between 12.5% and 100% more than required under the initial leases with the landlords.  (Doc. 193-1 at ¶ 70.)

Jennifer Ard was an employee of TMT from late 1999 through early 2012, an officer of TMT from 2000 through early 2012, and corporate secretary of Martin Investments from 2007 through the Petition Date.  (Doc. 193-1 at ¶¶ 58, 61.)  In addition to her role as an officer and employee of TMT and Martin Investments, she also worked for Rudy Martin and Derek Martin.  (*Id.* at ¶ 60.)  As part of her job duties with the Debtors and its affiliates, Jennifer Ard handled the subleases entered into or renewed with Martin Sublease.  (*Id.* at ¶ 59.)  She categorized the difference between the rent charged by the landlords and the rent charged by Martin Sublease as "profit."  (Doc. 167 at ¶ 73.)  However, the Martin Defendants dispute that the difference represented profit in its entirety.  (Doc. 193-1 at ¶ 73.)

According to Derek Martin and Jennifer Ard, Martin Sublease paid Martin Investments a property-management fee, which covered certain services such as communicating with landlords and setting up repairs.  (Docs. 188-3 at 7, 9; 188-8 at 9-10.)  Derek Martin further stated that Martin Sublease also kept up with the terms and renewals, gave notice of renewals and terminations, and paid bills.  (Doc. 188-3 at 7, 9.)  Jennifer Ard also stated that of the expenses Martin Sublease paid out on behalf of the Debtors and its affiliates, only some of those expenses were reimbursed.  (Doc. 188-9 at 3-4.)  However, the Debtors' public filings with the Securities and Exchange Commission indicated that the "spread" associated with the increased rents were intended "generally to cover property operating cost or improvements made directly by these entities."  (Docs. 174-1 at 55; 174-2 at 73; 174-3 at 55)

Twenty-four (24) of the subleases (the "Subject Leases") of real property were either entered into or renewed between January 1, 2008 and the Petition Date.  (Doc. 193-1 at ¶ 72.)  The Committee states that, between January 1, 2008 and the Petition Date, the Debtors (specifically, TMG, TML, and SLI) made payments (the "Subject Transfers") of not less than $1,899,010.82 under the Subject Leases.  (Doc. 167 at ¶ 75.)  The Martin Defendants agree that the record shows those payments on the Subject Leases by TMG, TML, and SLI, but

contend that the above figure does not represent the total amount paid by each Debtor. (Doc. 193-1 at ¶ 75.)  The Parties also dispute whether Martin Sublease transferred not less than $740,399.99 in dividends to VRM Holdings from January 1, 2008 through the present date.  (*Id.* at ¶ 76.)    Yet the Parties agree that, in September 2011, when the Debtors were on the verge of bankruptcy, the sublease arrangement ended at Bradley Bellville's request. (Doc. 167 at ¶ 74.)

### E.  The Money Tree's Financial Condition

Steven Morrison, the Debtors' former Chief Financial Officer, has authenticated the Debtors' business records, including their consolidated balances sheets, which establish that each Debtor's assets were outweighed by its liabilities from at least 2008 forward.  (Doc. 167 at ¶ 97.)  However, the Martin Defendants dispute whether the balance sheets include all assets of the Debtors and deny that the assets have been valued at fair market value.  (Doc. 193-1 at ¶ 97.)  James Hart, solvency expert for the Committee, has opined that TMT, TMG, SLI, and TMF were each insolvent no later than September 25, 2004, which insolvency lasted through the Petition Date.  (Doc. 167 at ¶ 98.)  Hart also opined that TML became insolvent on June 25, 2008, which insolvency lasted through the Petition Date.  (*Id.* at ¶ 99.) Christopher Edwards, solvency expert for the Martin Defendants, opined that the Debtors became insolvent on a consolidated basis sometime between September 25, 2007 and September 25, 2008.  (Doc. 193-1 at ¶ 100.)

While serving as director of TMT, Derek Martin executed and filed a 10-K Annual Report for fiscal year ending September 25, 2007 with the Securities and Exchange Commission ("SEC"), which contained the following language:

> Our shareholders' deficit balance may limit our ability to obtain future financing, which could have a negative effect on our operations and our liquidity.   As of September 25, 2007, we had a shareholders' deficit of $(929,700), which means our total liabilities exceed our total assets. Bankruptcy law defines this state of a company's liabilities exceeding its assets as balance-sheet insolvency. The existence of a shareholders' deficit may limit our ability to obtain future debt or equity financing. If we are unable to obtain financing in the future, it could have a negative effect on our operations and our liquidity.

(Doc. 167 at ¶ 101-102; *see also* Doc. 172-12 at 15.)  Jeff Martin, as director of the Debtors, executed 10-Ks for 2009 and 2010 containing similar statements, and the Debtors filed a 10-K for 2008 containing a similar statement.  (Doc. 167 at ¶ 103.)  The Martin Defendants refute any implication that these referenced documents reflect insolvency of the Debtors or Derek and Jeff Martin's knowledge of the Debtors' alleged insolvency.  (Doc. 193-1 at ¶¶ 101, 103.)

### F.  The Money Tree's Bankruptcy and Creation of the Committee

The Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code on December 16, 2011, in the United States Bankruptcy Court for the Middle District of Alabama.[4]  (Doc. 167 at ¶ 3.)  After confirmation of the Amended Joint Plan of Liquidation, the Committee was formed to represent the Debtors' Estate.  (Docs. 167 at ¶ 1; 172-1 at 22-23.)  The Plan provides the Committee exclusive standing to retain and enforce all causes of action of the Debtors, their Affiliates and subsidiaries, and the Estate.  (Doc. 172-1 at 22-23.)

Under Count XIX[5] of the Amended Complaint, the Committee alleges that the Debtors transferred $8,323,129.91 to Martin Sublease for payments made under the sublease arrangement and incurred obligations under the subleases for Martin Sublease's benefit. (Doc. 113 at ¶ 204.)  The Committee asserts that the Debtors did not receive reasonably equivalent value because "the property was leased or subleased to the Debtors at inflated rates."  (*Id.* at ¶ 205.)  They further assert that, "[a]t the time the transfers were made, the Debtors (a) [were] engaged in a business or a transaction, or [were] about to engage in a business or transaction, for which the assets remaining with the Debtors were unreasonably small in relation to the business or transaction and/or (b) intended to incur, or believed that

---

[4] *See* Bankruptcy Case Nos. 11-12254, 11-12255, 11-12256, 11-2257 and 11-2258, United States Bankruptcy Court for the Middle District of Alabama, Southern Division.  The bankruptcy cases were jointly administered and proceeded under *In re Small Loans, Inc., et al.*, Chapter 11 Case No. 11-12254.  The Committee requests that this Court take judicial notice of the Schedules of Assets and Liabilities and amendments thereto filed in the Debtors' bankruptcy cases.  *See id.*, Case No. 11-12254, Docs. 131, 243, 246, 289, 559; Case No. 11-12255, Doc. 5; Case No. 11-12256, Doc. 25; Case No. 11-12257, Doc. 25; and Case No. 11-12258, Doc. 25.  Finding it reasonable and appropriate to do so, the Court accordingly takes judicial notice of the same.  Fed. R. Evid. 201.

[5] Also under Count XIX, the Committee makes other allegations of actual and constructive fraudulent transfers against the Estate of Rudy Martin and Martin Family Group, LLLP.  However, because these claims are not pertinent to the instant motion, the Court will not outline those claims here.

it would incur, debts that would be beyond its ability to pay as such debts matured and/or (c) was insolvent or became insolvent as a result of the transfer." (*Id.*)  The Committee seeks to avoid, preserve, and set aside each of the Martin Sublease transfers, and recover those transfers, or the value thereof, from Martin Sublease, and any mediate and immediate transferee of the same, pursuant to 11 U.S.C. § 550.  (*Id.* at ¶ 207.)

Count XXII alleges that some or all of the Defendants were initial transferees of the transfers at issue, the immediate or mediate transferee of such initial transferees, or persons for whose benefit the transfers were made.  (*Id.* at ¶ 221.)  The Committee seeks to recover the value of the avoided transfers from the transferees, along with interests, pursuant to 11 U.S.C. 550(a).  (*Id.* at ¶¶ 222.)

## STANDARDS OF REVIEW

### I.  Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).  "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact.  *See Celotex*, 477 U.S. at 323; *Chapman*, 229 F.3d at 1023. The movant can meet this burden by presenting evidence showing that there is no genuine

dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted). Instead, the nonmovant must point to competent record evidence that would be admissible at trial. *See also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form."). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c).

**II. Local Rule 56**

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56. As stated above, the Parties complied with the Federal Rules of Civil Procedure and the Local Rules by filing timely motion for summary judgment, response and

reply thereto, and attached a separate and concise statement of material facts.  The Court will now address this ripe motion.

**ANALYSIS**

**I.   Constructive Fraudulent Transfers Claims**

Section 544 of the Bankruptcy Code allows for the trustee[6] to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim."  11 U.S.C. § 544(b).  In this case, the applicable law is Georgia's Fraudulent Transfers Act ("GUFTA"),[7] pursuant to O.C.G.A. §§ 18-2-70, *et seq.*  Under the Act, constructive fraudulent transfers will be set aside if the elements of O.C.G.A. § 18-2-75(a) are met.

Section 18-2-75(a) provides,

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

O.C.G.A. § 18-2-75(a).  Similarly, 11 U.S.C. § 548(a)(1)(B) allows the trustee to avoid any transfer if the debtor "received less than a reasonably equivalent value in exchange" and was insolvent on the date of transfer or "became insolvent as a result of such transfer."[8]  Thus,

---

[6] Pursuant to the Amended Plan and Confirmation Order in Debtors' bankruptcy cases, and in accordance with 11 U.S.C. § 1123(b)(3), the Committee acts as representative of the Debtors' Estates and has exclusive standing to pursue, retain, and enforce all claims and causes of actions of the Debtors, their Affiliates and subsidiaries, and the Estate.  (Doc. 172-1 at 22-23, 52-53.)  Thus, when the term "trustee" is referenced, this includes the Committee's representative capacity as outlined in the Plan and Confirmation Order.  *See* 11 U.S.C. § 1123(b)(3); *see also Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1180 n.1 (11th Cir. 1987).

[7] Georgia's Uniform Fraudulent Transfers Act has been amended to reflect the new "Uniform Voidable Transactions Act."  *See* S.B. No. 65, 2015 Gen. Assemb., Reg. Sess. (Ga. 2015).  The Court recognizes that these new amendments are inapplicable to this case as the alleged conduct as well as the commencement of this action occurred well before the new Act's effective July 1, 2015 date.  Thus, the Court will continue to refer to the Act as GUFTA.

[8] In construing GUFTA, the Court finds it appropriate to con-sider similarly worded statutes under other statutory provisions, such as the Bankruptcy Code. *See, e.g., Kipperman v. Onex Corp.*, 411 B.R. 805, 828 (N.D. Ga. 2009) (analyzing "reasonably equivalent value" standard under both 11 U.S.C. § 548 and O.C.G.A. § 18-2-75); *Pettie v. Bonertz (In re LendXFinancial, LLC)*, No. 10-76803-MGD, 2012 WL 1597394, at *7 (Bankr. N.D. Ga. Mar. 19, 2012) (similarly analyzing Georgia's UFTA under 11 U.S.C. § 548 because the statutes "substantially mirror[]" one another).

in order to prevail on a constructive fraudulent transfer claim on motion for summary judgment, the Committee must show that no genuine dispute of material fact exists that "(1) a transfer made or an obligation incurred, (2) for less than reasonably equivalent value, (3) while the debtor was insolvent or likely to become insolvent." *Kipperman v. Onex Corp.*, 411 B.R. 805, 834 (N.D. Ga. 2009) (citing O.C.G.A. § 18-2-75); *see also Atlanta Fiberglass USA, LLC v. KPI, Co., Ltd.*, 911 F. Supp. 2d 1247, 1264-65 (N.D. Ga. 2012); *CSX Transp., Inc. v. Leggett*, No. 1:07-CV-1152-WSD, 2010 WL 3210841, at *4 (N.D. Ga. Aug. 12, 2010).

Determining whether a debtor received reasonably equivalent value is "largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593 (11th Cir. 1990) (quoting *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829-30 (5th Cir. 1959)) (internal quotation marks omitted).[9]  Thus, the court is unauthorized to void any transfer that either directly or indirectly "confers an economic benefit upon the debtor." *Gen. Elec. Credit Corp. of Tenn. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990) (construing 11 U.S.C. § 548).  However, in reviewing the transfer, the debtor must in the very least have received "value" in the exchange. *See Kipperman*, 411 B.R. at 837.

"The purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of a bankrupt's estate." *In re Rodriguez*, 895 F.2d at 727 (quoting *Mayo*, 270 F.2d at 829-30).  "In order to determine whether a debtor received 'reasonably equivalent value,' the court must look at what 'value' the debtor received in return for the transfer.  The court must then determine whether the value received is reasonably equivalent; this will depend on the facts of each case." *Kipperman*, 411 B.R. at 837 (citing *In re Chase & Sanborn Corp.*, 904 F.2d at 593).  This is a two-step inquiry. *See Anderson v. Patel (In re Diplomat Constr., Inc.)*, No. 09-68613-MGD, 2013 WL 5591918, at *5 (Bankr. N.D. Ga. Aug. 6, 2013).  Under GUFTA, "value" is given for a transfer or an obligation if, "in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." O.C.G.A. § 18-2-73(a).  In considering whether reasonably equivalent value was exchanged, a court must consider "all aspects of the transaction and

---

[9] The Eleventh Circuit has adopted as binding precedent all decisions issued by the former Fifth Circuit prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F. 2d 1206, 1209 (11th Cir. 1981) (en banc).

carefully measure the value of all benefits and burdens to the debtor, direct or indirect." *Pembroke Dev. Corp. v. Commonwealth Savings & Loan Ass'n (In re Pembroke Dev, Corp.)*, 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991). The party challenging the transfer or obligation must show that the debtor did not receive reasonably equivalent value by a preponderance of the evidence.[10]  *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001) (construing 11 U.S.C. § 548).

Under O.C.G.A. § 18-2-72(a), "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."  Similar to GUFTA's definition, the Bankruptcy Code defines insolvency as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."  11 U.S.C. § 101(32).

### A.  Subject Leases and Subject Transfers

With respect to the Martin Defendants, the Committee asserts that there is no genuine dispute as to any material fact that the Subject Leases and Subject Transfers were constructive fraudulent transfers under federal and state laws.  (*See* Doc. 166-1.)  The Parties are not in dispute as to whether there were transfers made or obligations incurred between the Debtors and Martin Sublease or whether the Committee may assert these claims.  Rather, the dispute between the Parties is whether the Debtors were insolvent at the time Subject Leases and Subject Transfers and whether the Debtors received reasonably equivalent value for the obligations and transfers to the Martin Sublease.

### 1.  Insolvency Dispute

With respect to the issue of insolvency, the Court has determined that James Hart may opine on the solvency of the Debtors on a standalone basis.  (*See* Doc. 217 at 16.)  Hart concluded that Debtors, with exception to TML,[11] were continuously insolvent from at least fiscal year ending September 25, 2004 through the Petition Date.   (Doc. 153 at 17.)  However, the Court also decided that Christopher Edwards may rebut Hart's expert testimony and opine on why Hart's standalone-basis conclusions should not be relied upon.  (*See* Doc. 217 at 10.)  Moreover, the experts are in dispute as to whether the Debtors

---

[10] In their recent amendments, the Georgia legislature codified the preponderance of the evidence standard at O.C.G.A. 18-2-75(d) (2015).
[11] James Hart opined TML became insolvent on June 25, 2008.  (*See* Doc. 153 at 17.)

operated as a going concern through the Petition Date. Assessing a debtor's assets and liabilities "at fair valuation" is a two-part test. In *In re DAK Industries, Inc.*, the United States Court of Appeals for the Ninth Circuit identified the first step as determining "whether a debtor was a 'going concern' or was 'on its deathbed.'" 170 F.3d 1197, 1199 (9th Cir. 1999). Next, depending on the outcome of the first step, the court must "apply a simple balance sheet test to determine whether the debtor was solvent." *Id.* In this case, Hart opined that adding a going concern value was not warranted because of the consistent and substantial losses of Debtors. (Doc. 168-1 at 94.) Edwards, however, concluded that Debtors remained a going concern "at all points through 2010." (Doc. 151 at 28.) While the experts do not appear to be in dispute that the Debtors, whether on a consolidated or standalone basis, were insolvent from fiscal year ending September 25, 2008 through the Petition Date (*See* Docs. 151 at 28; 153 at 17), the Court finds that the above factual disputes between experts are best to be resolved in before a jury.

The Committee also reference business records, authenticated by Debtors' former Chief Financial Officer, Steven Morrison, which purportedly reflects Debtors' liabilities exceeding its assets from at least fiscal year ending September 25, 2008 forward. (*See* Docs. 156-1; 153.) Additionally, the Committee point to the Debtors public securities filings with the SEC,[12] which acknowledged their "balance-sheet insolvency." Specifically, the language from the Form 10-K for fiscal year ending September 25, 2007 contained the following statement:

> As of September 25, 2007, we had a shareholders' deficit of $(929,700), which means our total liabilities exceed our total assets. *Bankruptcy law defines this state of a company's liabilities exceeding its assets as balance-sheet insolvency.* The existence of a shareholders' deficit may limit our ability to obtain future debt or equity financing. If we are unable to obtain financing in the future, it could have a negative effect on our operations and our liquidity.

(Doc. 172-12 at 15) (emphasis added). This language was executed by Derek Martin as Debtors' sole director. (*Id.* at 70.) Similar language appeared in Debtors subsequent filings through fiscal year ending September 25, 2010. (*See* Docs. 174-1 to 174-3.) Jeff Martin also

---

[12] The Committee requests that this Court take judicial notice of Debtors' public filings with the SEC under Federal Rule of Evidence 201. Finding it reasonable and appropriate, the Court takes such judicial notice here.

acknowledged executing those filings as Debtors' director in 2009 and 2010 respectively. (Docs. 174-2 at 104; 172-3 at 68.)  The Martin Defendants assert that reliance on Debtors' balance sheets and public filings are inappropriate for determining Debtors' insolvency because they were not prepared in accordance with generally accepted accounting principles. The Court notes that whether measuring Debtors' insolvency under generally accepted accounting principles is the appropriate standard for determining insolvency is yet another factual dispute between the Parties and their experts.  Again, as noted above, there is a genuine factual dispute as to when the Debtors became insolvent.

Viewing the evidence in a light most favorably to the nonmoving parties, the Court cannot find that a reasonable jury would indisputably find in favor of the Committee.  For this reason, the Committee's motion for summary judgement on their constructive fraudulent transfer claims should be denied.[13]  Yet, as previously found, because the experts do not appear to dispute insolvency from September 25, 2008 through the Petition Date, there is "sufficient evidence, if believed by the jury, to find that the Debtors were insolvent from September 25, 2008 through the Petition Date."  (*See* Docs. 219 at 10; 220 at 16.) However, in order to reach a full decision, the Court will address the reasonably equivalent value element.

   2.  *Reasonably Equivalent Value—Subject Leases*

The Committee asserts that there is no genuine dispute as to any material fact that the twenty-four (24) Subject Leases between Martin Sublease and the Debtors were constructively fraudulent.  Whether the Debtors received "value" does not seem to be in dispute because, in exchange for the rental payments, the Debtors were able to operate their business at their various locations.  Instead, the Parties dispute whether the Debtors received reasonably equivalent value in exchange for those rental payments.  Relying on *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1313 (11th Cir. 2012), the Committee argues that Debtors had no chance to generate

---

[13] The Committee wishes to estop Derek and Jeff Martin, under a theory of promissory estoppel, from arguing that the Debtors were not insolvent from September 25, 2007 through the Petition Date, due to their execution of public filings indicating balance-sheet insolvency.  *See* O.C.G.A. § 13-3-44(a).  Because the insolvency issue is best reserved for a jury, the question of promissory estoppel is not determinative. Furthermore, the Committee has not shown what detriment, if any, they suffered due to their alleged actual reliance on these public filings.

positive return while under the subleasing arrangement because Debtors were forced to enter into subleases at purportedly above-market rental rates. The Committee urges this Court to apply a fair-market-value standard, *see BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994), and determine that the Debtors received less than reasonably equivalent value under the Martin Sublease arrangement as a matter of law.

The Committee's reliance on *In re TOUSA, Inc.* is slightly misplaced. Whether a debtor had a chance to generate a positive return is a standard used to determine whether the debtor received any value at all. The language quoted in *In re TOUSA, Inc.* comes from *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139 (3d Cir. 1996). There, the United States Court of Appeals for the Third Circuit posed the question of "how to determine whether an investment that failed to generate a positive return nevertheless *conferred value* on the debtor," under an 11 U.S.C. § 548 analysis. *Id.* at 152 (emphasis added). The court held that losing investments could confer value if, at the time of the transfer, "there is some chance that a contemplated investment will generate a positive return." *Id.* Here, the issue of whether the Debtors were conferred value is not in dispute. Thus, determining whether the Debtors received reasonably equivalent value based on whether they had a chance to generate a positive return is an improper standard to evaluate the exchange value between the Debtors and Martin Sublease.

The Committee further relies on the opinion of Michael Hunter to show that the rental rates paid by the Debtors under the Martin Sublease arrangement were both unreasonable and lacking in reasonably equivalent value. Hunter found that the subleases had base rent increases ranging from 13% to 100% above the rental rates of the underlying leases with non-related parties. (*See* Doc. 175-2 at 1.) He opined that the underlying leases made between Martin Sublease and non-related parties were negotiated as arms-length transactions and best reflected market rent, while the subsequent sublease terms and rents could not be supported. (*Id.* at 2.) Based on Hunter's findings, the Committee asserts that the subleasing arrangement between Martin Sublease and the Debtors should never have existed and the Debtors should have been direct tenants of the landlords under the original, underlying leases. The Committee argues that Martin Sublease were no more creditworthy

16

than the Debtors and the subleasing arrangement was no more than a disguised dividend to ensure the Debtors' insiders reap an unfair and unlawful benefit.

The Martin Defendants, on the contrary, contest the grant of summary judgment and call attention to record evidence in an effort to establish the Debtors purported receipt of reasonably equivalent value from Martin Sublease in exchange for increased rental rates. First, with respect to creditworthiness, the Martin Defendants assert that Martin Sublease was not even formed at the time of the initial subleases between Rudy Martin and the Debtors and its affiliates.   Furthermore, Bradley Bellville stated that the Money Tree attempted to rent directly from landlords.  (Doc. 188-12 at 4-5.)  However, the landlords would refuse to rent to the company but would rent to an individual.  (*Id.* at 5.)  At the time, that individual was Rudy Martin, and Rudy Martin later assigned those subleases to Martin Sublease.   Steven Morrison stated, however, that not every property was subsequently subleased and some properties held direct leases with landlords.  (Doc. 188-14 at 3.)

The Martin Defendants also disagree that the question of reasonably equivalent value should begin and end with the fact the Debtors and its affiliates paid rents above those charged in the underlying leases.  The Court agrees.  While fair market value is a useful starting point, there is a factual dispute regarding whether the Debtors solely received value from the subleases alone.  According to the record, Martin Sublease paid Martin Investments a fee for its property-management services.  Both Derek Martin and Jennifer Ard described these services as corresponding with landlords and setting up repairs.  (Docs. 188-3 at 7, 9; 188-8 at 9-10.)  Derek Martin further stated that Martin Sublease also kept up with the terms and renewals, gave notice of renewals and terminations, and paid bills.  (Doc. 188-3 at 7, 9.) Jennifer Ard also stated that of the expenses Martin Sublease paid out on behalf of the Debtors and its affiliates, only some of those expenses were reimbursed.  (Doc. 188-9 at 3-4.)  However, as the Committee points out, the Debtors public filings indicated that the "spread" associated with the increased rents were intended "generally to cover property operating cost or improvements *made directly by these entities.*"  (Docs. 174-1 at 55; 174-2 at 73; 174-3 at 55) (emphasis added).  The Martin Defendants have created a factual dispute on whether the Debtors and its affiliates received reasonably equivalent value for the increased rental rates under Martin Sublease's management.  While the Committee made some rebuttal

argument, the Parties' numerous factual disputes regarding the Subject Leases are issues best to be resolved by a jury. Thus, the Committee's motion for summary judgment with respect to the Subject Leases is denied on this ground.

Notwithstanding the opinions of Hunter, Derek Martin and Bradley Bellville stated that the subleases were good, fair, and reasonable for the Debtors and their affiliates. (Docs. 188-1 at 11-12; 188-12 at 15, 17.) In addition to attacking Hunter's credibility, the Martin Defendants argue that Hunter himself did not opine that the underlying leases were market rents but that they were "reasonable." They further assert that Hunter's opinions are not dispositive because a fact finder is not bound to unimpeached expert opinion evidence. The Martin Defendants are correct in that Hunter's uncontradicted expert opinion testimony is not conclusive on the issue of value nor need it be unequivocally accepted by this Court or a jury at trial. *See Belcher v. Birmingham Tr. Nat'l Bank.*, 348 F. Supp. 61, 104 (N.D. Ala. 1968) ("Expert testimony as to value, though not of conclusive force, may be accorded some weight . . . , in determining the value of property, and although the testimony may be uncontradicted . . . the Court can exercise its independent judgment.") (internal citations omitted). While the statements by Derek Martin and Bradley Bellville appear to be self-serving, at least to some extent, the Court is not permitted to make credibility determinations on summary judgment. *See Anderson*, 477 U.S. at 255. Those considerations are best reserved for the jury.

### 3. *Reasonably Equivalent Value—Subject Transfers*

The Committee similarly seeks summary judgment on the issue of reasonably equivalent value with respect to the Subject Transfers, *i.e.*, monthly rental payments paid by the Debtors to Martin Sublease between January 1, 2008 and the Petition Date, and avoid approximately $1,899,010.82 in rental payments. They reference the insider nature of the transfers, including how Jennifer Ard facilitated the leasing arrangements, as well as how Derek and Jeff Martin had reason to know of the Debtors' financial condition and alleged insolvency.[14] The Committee cites *Jacoway v. Anderson (In re Ozark Rest. Equip. Co., Inc.)*, 77

---

[14] The Court notes, but does not find, that these factors resemble the enumerated considerations found at O.C.G.A. § 18-2-74(b), which permits a fact finder to determine "actual intent to hinder, delay, or defraud any creditor of the debtor." The Court also notes that the Committee is not seeking summary judgment under theories of actual fraudulent transfers.

B.R. 686 (W.D. Ark. 1987) *aff'd in part, rev'd in part*, 850 F.2d 342 (8th Cir. 1988).  There, the debtor sold equipment to related entities at a severely low markup of 7% when the debtor needed to sell at a markup at an average of 30% to make a profit.  *Id.* at 688.  The district court affirmed the bankruptcy court's finding that the debtor did not receive reasonably equivalent value, pursuant to 11 U.S.C. § 548, and award of an additional 23% markup on the amount of sales made to the related entities.  *Id.* at 692, 694.  The Committee encourages this Court to similarly find that the Debtors did not receive reasonably equivalent value from the subleasing arrangement due to the above-market rental rates.

However, the Court finds no reason to view the Subject Transfers any differently from the Subject Leases because basis of each argument is the same: the Debtors did not receive reasonably equivalent value both because the subleases were inflated or above market rates and payment under the subleases were inflated or above market rates.  Thus, for the same reasons reached above, summary judgment must also be denied here.

### 4. *Good Faith*

While a complete good-faith defense against constructive fraudulent transfer claims is unavailable under GUFTA, a good-faith transferee or obligee may still incur reduced or lessened liability despite the voidability of a transfer or an obligation.  *Compare* O.C.G.A. § 18-2-78(a) *with* O.C.G.A. § 18-2-78(d); *see also Alexander v. Delong, Caldwell, Novotny, & Bridgers, L.L.C. (In re Terry Mfg. Co., Inc.)*, No. 2:07-CV-620-WKW, 2008 WL 4493240, at *7 (M.D. Ala. Sept. 30, 2008) ("[G]ood faith alone will not prevent a transfer from being constructively fraudulent.  A good faith transferee is instead protected up to the amount of value it transferred[.]").  Because the Court has not granted summary judgment with respect the Subject Leases or the Subject Transfers, the Court does not reach the question of whether the Martin Defendants acted as good-faith transferees because there has been no finding of voidability.

Moreover, good faith "customarily requires a consideration of the totality of circumstances to determine whether a party's conduct accords with notions of fair dealing and reasonableness." *Perkins v. Crown Fin., LLC (In re Int'l Mgmt. Assocs., LLC)*, No. 06-62966-PWB, 2016 WL 552491, at *12 (Bankr. N.D. Ga. Feb. 10, 2016).  To determine whether a transferee acted in good faith, courts generally engage in a two-part inquiry:  (1)

whether the transferee had sufficient information to put it on inquiry notice that "the transferor was insolvent or that the transfer might be made with a fraudulent purpose"; and (2) whether the transferee, after being put on inquiry notice, made an diligent effort to investigate the facts that put them on inquiry notice. *Id.* (quoting *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 310-314 (S.D.N.Y. 2010)). The Debtors' insolvency remains a contested issue before the Court, which is to be resolved before a jury, and there is no conclusive record evidence establishing whether the Subject Leases and Subject Transfers were made with a fraudulent purpose. Because good faith is such a fact-sensitive inquiry, the Court finds that judgment on this issue is best reserved for a jury at trial.

## II.   Immediate or Mediate Transferee Claims

Pursuant to 11 U.S.C. § 550, the Committee wishes to obtain final, executable judgement against the Derek Martin Trust, the Jeff Martin Trust, the Johnston Trust, the Estate of Rudy Martin, and Martin Investments in the amount of $740,399.99. The Committee also seeks final judgment against Shana Martin for the value of a diamond ring, in the amount of $86,000, which they assert was obtained from the funds of the Derek Martin Trust. (*See id.*) Section 550[15] of the Bankruptcy Code allows the trustee to recover avoidable transfers from "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a)(2). Unlike an initial transferee, however, an immediate or mediate transferee may assert an affirmative defense to prevent the trustee from recovering. *See Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988). The trustee is exempt from recovering from a subsequent transferee that "takes for value . . . in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). The

---

[15] Section 550 provides in part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—
(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
(2) any immediate or mediate good faith transferee of such transferee.

burden of proving the affirmative defense rests squarely on the parties seeking to assert the defense. *See IRS v. Nordic Village, Inc. (In re Nordic Vill., Inc.)*, 915 F.2d 1049, 1055 (6th Cir. 1990) *rev'd on other grounds sub nom. United States v. Nordic Vill. Inc.*, 503 U.S. 30 (1992) ("The language of the statute clearly places the burden of showing value, good faith, and lack of knowledge, on the transferee as a defense."); *Dev. Specialists, Inc. v. Hamilton Bank. N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 797 (Bankr. S.D. Fla. 2000) (accord).

The Committee asserts that the Derek Martin Trust, the Jeff Martin Trust, the Johnston Trust, the Estate of Rudy Martin, and Martin Investments all received transfers from Martin Sublease through VRM Holdings, the sole member of Martin Sublease, and gave no value for those transfers, as they were acknowledged as dividends. Specifically, the Committee contends that the Derek Martin Trust, the Jeff Martin Trust, and the Johnston Trust each received distributions in the amount of $208,950.63, the Estate of Rudy Martin received distributions in the amount of $98,988.22, and Martin Investments received distributions in the amount of $14,559.86. The Committee relies on a spreadsheet outlining the distributions made from VRM Holdings. (*See* Doc. 172-10.)

In response, the Martin Defendants dispute the amounts transferred by Martin Sublease to the Derek Martin Trust, Jeff Martin Trust, Johnston Trust, the Estate of Rudy Martin, and Martin Investments. They argue that after January 1, 2008, the Derek Martin Trust, the Jeff Martin Trust, and the Johnston Trust each received distributions in the amount of $98,148.77, the Estate of Rudy Martin received distributions in the amount of $75,381.52, and Martin Investments received distributions in the amount of $2,629.56. The Martin Defendants contend that evidence relied upon by the Committee is insufficient in that it reflects all checks drawn on VRM Holdings and not all of those checks reflect Martin Sublease distributions to partners. The Martin Defendants rely on an exhibit from Jennifer Ard's October 22, 2014 deposition, which purportedly shows various distributions to the Martin Siblings' Trusts, the Estate of Rudy Martin, and Martin Investments. (*See* Doc. 188-8 at 47-67.)

Upon review of the record, the Court finds that a factual dispute exists with respect to the amount of distributions transferred from VRM Holdings to the Martin Siblings' Trusts, the Estate of Rudy Martin, and Martin Investments. The Court cannot find upon

the record whether one exhibit is more or less accurate than the other as a matter of law. However, the Court does note that the Committee's exhibit does not appear to show all checks drawn on VRM Holdings. (*See* Doc. 172-10, third column entitled "Num".)  Also, there are several transactions that appear to show transfers from Martin Family Group, LLLP to the Martin Siblings' Trusts, which is not the subject of the instant motion. (*See id.* at 2.)  Moreover, Jennifer Ard did not conclusively state whether or not the distributions she identified were some or all of the distributions made to the Trusts. (*See* Doc. 188-8 at 27 ("It appears it was distributions to the trust.").)  As such, this genuine, material dispute shows that a jury must decide the amounts the Martin Siblings' Trusts, the Estate of Rudy Martin, and Martin Investments received from VRM Holdings with respect to the purported Martin Sublease distributions.

With respect to Shana Martin, it is undisputed that she received an $86,000 ring.  It is also undisputed that she provided no value to Derek Martin for the diamond ring because it was a gift.  Therefore, she cannot seek shelter under the good-faith, subsequent-transferee defense.  Instead, she argues that it cannot be determined at this stage whether the ring, which was purchased by the Derek Martin Trust, was purchased with the funds transferred to it from the Martin Sublease or from another source.  She submits that Derek Martin's trust was funded from at least five sources, including distributions from Martin Family Group, LLLP, distributions from the Martin Sublease (through VRM Holdings), life insurance proceeds of approximately $930,000.00, *inter vivos* transfers from Rudy Martin, and transfers from the Estate of Rudy Martin.  Shana Martin submits that this commingling of funds within the Derek Martin Trust do not prohibit tracing, which she asserts the Committee failed to inform this Court of the necessary information to apply a method of tracing.

"In an action seeking recovery, the plaintiff has the burden of tracing funds it claims to be property of the estate." *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 708 (11th Cir. 2005).  "Commingling funds does not prohibit tracing." *Watts v. MTC Dev., LLC (In re Palisades at W. Paces Imaging Center, LLC)*, 501 B.R. 896, 917 (Bankr. N.D. Ga. 2013).  However, in this Circuit, tracing does not require a "dollar-for-dollar accounting." *In re Int'l Servs., Inc.*, 408 F.3d at 708.  So long as the transferred funds can be identified, "[i]t is

undeniable that equity will follow a fund through any number of transmutations, and preserve it for the owner[.]" *Id.* (quoting *Dery v. United States (In re Bridges)*, 90 B.R. 839, 848 (Bankr. E.D. Mich. 1988)). The Committee argues that it is not required to demonstrate that the actual amounts paid to the Derek Martin Trust from the Martin Sublease were the same funds used to purchase Shana Martin's diamond ring. The Committee relies on Shana Martin's undisputed deposition testimony to show that the diamond ring at issue was purchased through the Derek Martin Trust. However, as similarly determined in this Court's previous Order (*see* Doc. 219 at 16), a genuine factual dispute exists with respect to whether the funds from the Derek Martin Trust used to acquire the diamond ring can be traced to the Martin Sublease transfers. Furthermore, the Committee has not provided this Court with a method to identify these alleged fraudulent transfers. These are necessarily genuine questions of material fact appropriate for resolution by a jury at trial.

Moreover, the Court has not found and cannot conclusively find upon the record as a matter of law that the Subject Leases or Subject Transfers are voidable under 11 U.S.C. § 548 or GUFTA. Accordingly, the Committee has also failed to establish conclusively that it can recover $740,399.99 from the Derek Martin Trust, the Jeff Martin Trust, the Johnston Trust, the Estate of Rudy Martin, and Martin Investments or the value of the $86,000 ring from Shana Martin under 11 U.S.C. § 550. Thus, the Committee's motion based on immediate and mediate transferee claims against these Defendants is **DENIED.**

## CONCLUSION

For the above-stated reasons, Plaintiff Post-Confirmation Committee for Small Loans, Inc., *et al.*'s Motion for Partial Summary Judgment (Doc. 166) is **DENIED.**

**SO ORDERED,** this __13th__ day of June, 2016.


**/s/ W. Louis Sands**
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**