# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ALBANY DIVISION

| | | |
|---|---|---|
| POST-CONFIRMATION COMMITTEE FOR SMALL LOANS, INC., *et al.*, | : : : : | |
| Plaintiff, | : : | |
| v. | : : | CASE NO.: 1:13-CV-195 (WLS) |
| W. DEREK MARTIN, as Executor of the Estate of Vance R. Martin, *et al.*, | : : : | |
| Defendants. | : : | |

## ORDER

Present before the Court is Plaintiff Post-Confirmation Committee for Small Loans, Inc., *et al.*'s Motion for Summary Judgment. (Doc. 170.) Therein, the Committee requests summary judgment as to Count III of the Amended Complaint against Defendant Jefferey V. Martin and final, executable judgment in the amount of $8,923,188.68, or any lesser amount deemed appropriate by the Court, post-judgment interest at the legal rate, and such other and further relief deemed just and proper. For the reasons stated herein, Plaintiff's Motion for Summary Judgment (Doc. 170) is **DENIED.**

## PROCEDURAL HISTORY

The Post-Confirmation Committee for Small Loans, Inc., *et al.* ("the Committee") filed suit against the above-captioned Defendants on December 14, 2013. (Doc. 1.) Jefferey V. Martin ("Jeff Martin") is one of those Defendants. Jeff Martin answered the Complaint on January 29, 2014. (Doc. 38.) After this Court granted leave to amend (*see* Doc. 112), the Committee filed their Amended Complaint on November 7, 2014. (Doc. 113.) Jeff Martin answered the Amended Complaint on November 21, 2014. (Doc. 121.)

On May 15, 2015, the Committee filed the instant motion for summary judgment as to Count III of the Amended Complaint. (Doc. 170.) After receiving an extension of time to respond (*see* Doc. 187), Jeff Martin timely responded on June 12, 2015. (Doc. 195.) The

Committee timely replied thereto on June 26, 2015.  (Doc. 205.)  As the movants for summary judgment, the Committee have complied with M.D. Ga. L.R. 56 by attaching separate and concise statements of material fact to their motion (*see* Doc. 167), and Jeff Martin has complied as well by responding to each statement of material fact.  (*See* Doc. 193-1.)  As such, the Court finds that the Committee's Motion for Summary Judgment (Doc. 170) is ripe for review.

## FACTUAL HISTORY

### I.  Introduction

The following facts are derived from the Complaint (Doc. 1), as amended (Doc. 113), the Amended Answer (Doc. 121), the Committee's Statement of Undisputed Material Facts (Doc. 167), and Jeff Martin's Response to the Committee's Statement of Undisputed Material Facts (Doc. 193-1), all of which were submitted in compliance with M.D. Ga. L.R. 56, and the record in this case.  Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits submitted, all of which are construed in a light most favorable to the nonmoving party.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### II.  Relevant Facts

#### A.  The Money Tree and its Affiliates

The Money Tree of Georgia, Inc. ("TMG"), Small Loans, Inc. ("SLI"), The Money Tree, Inc. ("TMT"), The Money Tree of Florida, Inc. ("TMF"), and The Money Tree of Louisiana, Inc. ("TML", collectively "the Debtors" or "The Money Tree"), were engaged in the consumer finance business in Georgia, Alabama, Florida, and Louisiana, respectively. (Doc. 167 at ¶ 5.)  Specifically, TMT and TMG raised money by selling debt instruments to the public.  (Doc. 167 at ¶ 2.)  TMG was founded by Vance "Rudy" Martin in 1987 originally under the name "The Money Tree, Inc."  (Doc. 193-1 at ¶ 4.)  By 1995, its name was changed to "The Money Tree of Georgia, Inc." and the present company named "The Money Tree, Inc." was formed.  (Doc. 113 at ¶ 44 n.2.)  Over time, Rudy Martin organized various affiliates of the Debtors as their corporate operations expanded throughout the Southeast.  (*Id.* at ¶ 44.)  Those affiliates included Martin Family Group, LLLP ("Martin

Family Group"), Martin Sublease, LLC ("Martin Sublease"), Martin Investments, Inc., and the Interstate Motor Club ("the Motor Club").  (Doc. 113 at ¶ 65.)  Rudy Martin ran the Money Tree alongside his sons, W. Derek Martin ("Derek Martin") and Jeff Martin, until his resignation in 2006.  (Docs. 113 at ¶ 51; 167 at ¶¶ 9, 13.)

Martin Family Group is an entity formed prior to Rudy Martin's death in order to take title to various properties which had been owned by Rudy Martin.  (Doc. 167 at ¶ 63.) Martin Family Group leased properties to the Debtors from 2006 through December 16, 2011 ("the Petition Date").  (*Id.* at ¶¶ 64, 82.)   Martin Sublease was started by Rudy Martin, who originally leased properties in his name, and then subleased to the Money Tree or its affiliates, many properties for amounts greater than were paid under the underlying leases. (*Id.* at ¶ 69.)  Similarly, Martin Sublease leased from third-party landlords, and then subleased to the Money Tree or its affiliates, 54 branch office locations and two used car lots for amounts greater than were paid to the landlords under the underlying leases.  (*Id.* at ¶ 62.) The Motor Club was created in 1990 by Rudy Martin to provide membership services to consumer loan customers of the Debtors.  (Doc. 113 at ¶ 79.)  These services included "bail bonds, emergency road service, wrecker service, emergency ambulance expense, lock and key service, emergency travel expenses, and legal fees."  (*Id.*)

**B.  Jeff Martin**

Jeff Martin was employed by TMT as a loan approver from October 19, 1998 until September 28, 2012.  (Doc. 167 at ¶ 14.)   He eventually became director of the Debtors from February 2008 through April 2012.  (*Id.*)  Prior to Rudy Martin's death, he organized trusts for each of his three children, Derek Martin, Jeff Martin, and Grace Elizabeth Martin Johnston.  (*Id.* at ¶¶ 8, 19.)  These trusts are known as the Vance R. Martin GST Exempt Family Trust F/B/O W. Derek Martin, the Vance R. Martin GST Exempt Family Trust F/B/O Jefferey V. Martin ("Jeff Martin Trust"), and the Vance R. Martin GST Exempt Family Trust F/B/O Grace Elizabeth Martin Johnston (collectively, "Martin Siblings' Trusts").  (*Id.* at ¶ 20.)  Among other assets owned by the Martin Siblings' Trusts were the equity interests in TMT.  (*Id.* at ¶ 24.) Rudy Martin was the original trustee of all three trusts,

and upon his death, Derek Martin and John Dowdy[1] served as co-trustees of all three trusts. (Doc. 193-1 at ¶ 22.)  In 2010, Jeff Martin was named trustee of the Jeff Martin Trust and remains the named trustee to date.  (*Id.* at ¶ 15.)

The Jeff Martin Trust owned a 33% interest in Martin Family Group at all times relevant to this litigation.  (Doc. 193-1 at ¶ 65.)  However, Jeff Martin stated that the Jeff Martin Trust had no managerial voting interest or control as to Martin Family Group, which he contends were held instead by Martin Investments, Inc.  (*Id.*)  The Parties also dispute whether Jeff Martin was aware that he was receiving distributions from Martin Family Group while he was a director of the Debtors.  (*Id.* at ¶ 83.)  Jeff Martin stated that the Jeff Martin Trust received payments which he believed came from Martin Family Group.  (*Id.*)  However, Jeff Martin refutes any implication of his involvement or participation in connection with the initiation or transfer of any distributions from Martin Family Group to the Jeff Martin Trust or any implications that the Martin Family Group distributions were at any time improper, unreasonable, or otherwise contrary to Georgia law.  (*Id.*)

Martin Family Group purportedly received $2,351,150.00 in rental payments from the Debtors between January 1, 2008 and the Petition Date.  (Doc. 167 at ¶ 86.)  The Committee contends that not less than $980,799.75 was transferred to the Jeff Martin Trust during his directorship.  While he was a director of the Debtors, Jeff Martin was generally aware that TMT had leases with Martin Family Group.  (Doc. 193-1 at ¶ 84.)  However, Jeff Martin testified that he had no involvement in the operation, management or control of Martin Family Group, was never employed by Martin Family Group as an officer or director, nor was he involved with any of Martin Family Group's leasing arrangements with the Debtors. (*Id.*)  Martin Family Group also invested in TMT's debt instruments and received approximately $2,170,000.00 in withdrawal payments from TMT between May 2009 and January 2011.  (Docs. 164-7 at 35-38; 167 at ¶ 87.)  These payments were made at the direction of Derek Martin.  (Doc. 164-7 at 38.)  Similarly, Jeff Martin invested in TMT's debt instruments and received approximately $31,225.00 in withdrawal payments from TMT during his directorship.  (Doc. 188-6 at 209-213.)

---

[1] John Dowdy provided accounting services to Debtors, its affiliates, and to the Martin Family through his accounting firm, Dowdy & Whittaker.  (*See* Docs. 164-2 at 60; 164-5 at 26; 164-6 at 78-79.)

Martin Sublease purportedly received $4,264,225.68 in rental payments from the Debtors during Jeff Martin's tenure as director of the Debtors.  (See Doc. 172-3.)  The Committee contends that not less than $740,399.99 was later distributed to the Martin Siblings' Trusts, as well as the Estate of Rudy Martin and Martin Investments, Inc., and not less than $208,950.63 was transferred to the Jeff Martin Trust through Vance R. Martin Holdings, LLLP.   (Doc. 167 at ¶¶ 76, 77.)  Though not the subject of this motion, Jeff Martin (as well as other Defendants) disputes the amounts transferred to the Jeff Martin Trust.  (Doc. 193-1 at ¶ 77; *see also* Doc. 166.)  However, as noted above, Jeff Martin maintains that he had no involvement in the operation, management, or control of Martin Sublease, was never employed by Martin Sublease as an officer or director, nor did he have any involvement with Martin Sublease's subleasing arrangements with the Debtors.  (Doc. 193-1 at ¶ 84.)

Jeff Martin also served as a director of the Motor Club.  (Doc. 167 at ¶ 68 n.2.)  The Motor Club received various transfers from TMT which were in turn paid to members of the Martin family, including Jeff Martin, as shareholders of the Motor Club.  (*Id.* at ¶ 67.)  During his tenure, Jeff Martin received approximately $106,588.00 in distributions from the Motor Club.  (*Id.* at ¶ 68; *see also* Doc. 174-13.)  Jeff Martin disputed this assertion, but provided no rebuttal stating otherwise.  (Doc. 193-1 at ¶ 68.)

### C.  The Money Tree's Financial Condition

Steven Morrison, the Debtor's former Chief Financial Officer, has authenticated the Debtors' business records, including their consolidated balances sheets, which establish that each Debtor's assets were outweighed by its liabilities from at least 2008 forward.  (Doc. 167 at ¶ 97.)  However, Jeff Martin disputes whether the balance sheets include all assets of the Debtors and deny that the assets have been valued at fair market value.  (Doc. 193-1 at ¶ 97.) James Hart, solvency expert for the Committee, has opined that TMT, TMG, SLI, and TMF were each insolvent no later than September 25, 2004, which insolvency lasted through the Petition Date.  (Doc. 167 at ¶ 98.)  Hart also opined that TML became insolvent on June 25, 2008, which insolvency lasted through the Petition Date.  (*Id.* at ¶ 99.)  Christopher Edwards, solvency expert for Jeff Martin, opined that the Debtors became insolvent on a

consolidated basis sometime between September 25, 2007 and September 25, 2008.  (Doc. 193-1 at ¶ 100.)

While serving as director of the Debtors, Jeff Martin executed a 10-K Annual Report for fiscal year ending September 25, 2009 with the Securities and Exchange Commission ("SEC"), which contained the following language:

> Our shareholders' deficit balance may limit our ability to obtain future financing, which could have a negative effect on our operations and our liquidity.   As of September 25, 2009, we had a shareholders' deficit of $33,774,045, which means our total liabilities exceed our total assets. Bankruptcy law defines this as balance sheet insolvency. The existence of a shareholders' deficit may limit our ability to obtain future debt or equity financing.  If we are unable to obtain financing in the future, it will likely have a negative effect on our operations and our liquidity and our ability to continue as a going concern.

(Doc. 174-2 at 23, 104; *see also* Doc. 167 at ¶ 102.)  Jeff Martin executed another 10-K for 2010 containing similar language, and prior to Jeff Martin's directorship, the Debtors filed 10-Ks for 2007 and 2008 containing similar statements.  (Doc. 167 at ¶ 103.)

Jeff Martin refutes any implication that these referenced documents reflect insolvency of the Debtors or Jeff Martin's knowledge of the Debtors' alleged insolvency.  (Doc. 193-1 at ¶¶ 101, 103.)   Jeff Martin testified that he had no involvement in the preparation, formulation, revision and/or restatement of any of the Debtors' 10-K filings.  (*Id.* at ¶ 103.) He testified further that he relied upon the information, opinions, reports and statements presented to him by TMT's executive officers, legal counsel and public accounting and auditing firms, including Steven Morrison, Bradley Bellville, TMT's President, and Carr Riggs & Ingram, TMT's public accounting and auditing firm, all of whom he reasonably believed to be reliable and competent to prepare the information contained in the referenced reports based upon their educational background, knowledge, and professional experience. (*Id.*)  Jeff Martin stated that he had no reason to dispute, nor did he have knowledge of, the accuracy of any of the financial information contained in the public filings.  (*Id.*)  Jeff Martin stated that he believed the Debtors were operational and paying appropriate debts owed to their creditors while he served as director.   (*Id.*)   Jeff Martin also stated that he had no accounting or financial background, expertise, or training during the time he served as a

director of the Debtors, and therefore, he relied upon TMT's officers, legal counsel, and accountants to prepare the financial and accounting information for public filing.  (*Id.*)

### D. The Money Tree's Bankruptcy and Creation of the Committee

The Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code on December 16, 2011, in the United States Bankruptcy Court for the Middle District of Alabama.[2]  (Doc. 167 at ¶ 3.)  After confirmation of the Amended Joint Plan of Liquidation, the Committee was formed to represent the Debtors' Estate.  (Docs. 167 at ¶ 1; 172-1 at 22-23.)  The Plan provides the Committee exclusive standing to retain and enforce all causes of action of the Debtors, their Affiliates and subsidiaries, and the Estate.  (Doc. 172-1 at 22-23.)  The Committee brought the instant action on December 14, 2013.  (*See* Doc. 1.)

Under Count III of the Amended Complaint, the Committee alleges that Jeff Martin, among other directors and officers of the Debtors, owed a "duty to conserve and manage the remaining assets" of the allegedly insolvent Debtors and their affiliates in trust for the creditors of those entities.  (Doc. 113 at ¶ 119.)  The Committee asserts that this duty and relationship required Jeff Martin "to give preference to the debts owed to non-insider creditors who were not officers or directors, or entities owned or controlled by the officers and directors including" the Motor Club, Martin Family Group, Martin Sublease, and the Martin Siblings' Trusts.  (*Id.* at ¶ 120.)  The Committee alleges Jeff Martin breached this duty by paying himself and entities either owned or controlled by him in violation of Georgia law.  (*Id.* at ¶ 121.)

### <u>STANDARDS OF REVIEW</u>

### I.  Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

---

[2]  See Bankruptcy Case Nos. 11-12254, 11-12255, 11-12256, 11-2257 and 11-2258, United States Bankruptcy Court for the Middle District of Alabama, Southern Division.  The bankruptcy cases were jointly administered and proceeded under In re Small Loans, Inc., et al., Chapter 11 Case No. 11-12254

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323; *Chapman*, 229 F.3d at 1023. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted). Instead, the nonmovant must point to competent record evidence that would be admissible at trial. *See also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form."). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and

determine whether that evidence could reasonably sustain a jury verdict.  *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.  However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c).

### II. Local Rule 56

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56.  As stated above, the Parties complied with the Federal Rules of Civil Procedure and the Local Rules by filing timely motion for summary judgment, response and reply thereto, and attached a separate and concise statement of material facts.  The Court will now address this ripe motion.

<u>**ANALYSIS**</u>

The Committee asserts that there is no genuine issue of any material fact as to Jeff Martin's liability for breach of fiduciary duty and breach of trust under Georgia law.  They argue that while the Debtors were insolvent and during his directorship, Jeff Martin failed to conserve the remaining assets of the Debtors and their subsidiaries but preferred his personal interests over the interests of the non-insider creditors of the Debtors.  Moreover, the Committee further asserts that Jeff Martin may not avoid liability for breach of trust by claiming ignorance of both the Debtors' financial condition and the alleged fraudulent schemes to which he or his Trust directly and indirectly benefited.  The Committee also contends that the business judgment rule is equally inapplicable due to Jeff Martin's willful ignorance and numerous conflicts of interests between his role as director of the Debtors and his position as beneficiary of the Martin Family's additional businesses.

In contrast, Jeff Martin argues that summary judgment should not be granted in favor of the Committee because a factual dispute exists with regard to the insolvency of the

Debtors, the impropriety of the leasing or subleasing arrangements between the Debtors and Martin Family Group and Martin Sublease, and the impropriety of any payment or distributions made to Martin Family Group, Martin Sublease, or the Jeff Martin Trust. Jeff Martin also disputes his involvement with any alleged improper leasing or subleasing arrangements, with any alleged preferential payments or distributions, or with the preparation of any public filings with the SEC, namely the 10-K reports that purportedly reflect insolvency. Jeff Martin asserts lack of knowledge of any alleged insolvency, alleged impropriety of leasing or subleasing arrangements, or any alleged preferential payments or distributions. Lastly, he rejects any indication that he performed his fiduciary duties with gross negligence, and thus, argues that the business judgment rule is applicable to absolve him of liability for breach of trust or breach of fiduciary duties under Georgia law.

## I.   Breach of Trust under Georgia Common Law

Common law breach of trust claims are well recognized under Georgia law. *See, e.g.*, *Tindall v. H & S Homes, LLC*, No. 5:10-CV-44 (CAR), 2011 WL 5827227 (M.D. Ga. Nov. 18, 2011); *Smith Drug Co. v. Pharr-Luke (In re Pharr-Luke)*, 259 B.R. 426 (Bankr. S.D. Ga. 2000); *McEwen v. Kelly*, 79 S.E. 777 (Ga. 1913); *Lowry Banking Co. v. Empire Lumber Co.*, 17 S.E. 968 (Ga. 1893); *Fountain v. Burke*, 287 S.E.2d 39 (Ga. Ct. App. 1981); *Ware v. Rankin*, 104 S.E.2d 555 (Ga. Ct. App. 1958). "When a corporation becomes insolvent, its directors are 'bound to manage the remaining assets for the benefits of its creditors, and cannot in any manner use their powers for the purpose of obtaining a preference or advantage to themselves.'" *Hickman v. Hyzer*, 401 S.E.2d 738, 740 (Ga. 1991) (quoting *Ware*, 104 S.E.2d at 558). In this "quasi trust relationship" with creditors, managing officers and directors of an insolvent corporation have a duty to protect the corporate assets and "cannot misappropriate the corporate assets or give them away, so that creditors are prevented from collecting their debts." *McEwen*, 79 S.E.2d at 779.

This does not, however, prevent officers and directors from preferring "one creditor over another" in paying the insolvent corporation's existing debts; yet, they may not also use their status to position themselves as the preferred creditor through "any scheme or device" with the purpose of "indemnify[ing] themselves against loss, whether as creditors or as endorsers of notes given by the corporation or otherwise[.]" *Ware*, 104 S.E.2d at 558-59.

Such action "constitutes legal fraud." *Id.* When this type of misconduct occurs, the Georgia law provides creditors a right of action against directors and officers. *McEwen*, 79 S.E. at 779; *see also U.S. Capital Funding VI, Ltd. v. Patterson Bankshares, Inc.*, 137 F. Supp. 3d 1340, 1375 (S.D. Ga. 2015) (accord). "The abuse of this duty gives rise to an action against the directors to recover sums improperly paid out by the corporation." *Hickman*, 401 S.E.2d at 740 (citing *Ware*, 104 S.E.2d at 558)).

Hence, in order for this Court to grant summary judgment against Jeff Martin, the Committee must show that (1) the Debtors were insolvent, (2) Jeff Martin owed a duty to Debtors' creditors to protect remaining corporate assets, and (3) Jeff Martin breached that duty by preferring his interests over the Debtors' creditors. *See, e.g.*, *Tindall*, 2011 WL 5827227, at *6 n.3 ("Plaintiff only has to prove that Defendant[] breached their duty to conserve and manage the remaining assets in trust for her and other creditors when [the corporation] became insolvent. If Plaintiff is successful in proving that Defendants disposed of the assets, preferring their own interests over the rights of the [insolvent corporation's] creditors, Defendants may be required by law and/or equity to repay [the insolvent corporation] a sum sufficient to satisfy Plaintiff's judgment.").

### A. Whether the Debtors were Insolvent during Jeff Martin's Directorship

The Parties disagree as to when the Debtors became insolvent during Jeff Martin's tenure as director from February 2008 through April 2012. They also disagree as to which solvency standard applies within the context of breach of trust claims. Jeff Martin contends that this Court does not have sufficient evidence to make insolvency finding on motion for summary judgment due to the differing expert opinions of James Hart and Chris Edwards, who both assessed the Debtors' insolvency 11 U.S.C. § 101(32) and O.C.G.A. § 18-2-72(a). (*See* Docs. 151, 153.) However, the Committee suggests that the applicable solvency test for breach of trust differs from the solvency standard utilized for fraudulent transfer law. They rely on *Randall & Neder Lumber Co., Inc. v. Randall*, 414 S.E.2d 718 (Ga. Ct. App. 1992) to establish the proper insolvency standard for breach of trust claims under Georgia law. In

turn, the Committee summarily rejects the "fair valuation"[3] standards under 11 U.S.C. § 101(32) and O.C.G.A. § 18-2-72(a) when determining insolvency for a breach of trust claim.

In *Randall & Neder Lumber Co., Inc.*, the Court of Appeals of Georgia quoted language from another Georgia case defining insolvency as the following: "[I]f after the voluntary deed or conveyance, the property left or retained by the debtor is not ample to pay his existing debts." *Randall*, 414 S.E.2d at 499 (quoting *Chambers v. Citizens & S. Nat'l Bank*, 249 S.E.2d 214, 217 (Ga. 1978)). In *Chambers*, the Supreme Court of Georgia utilized this definition to give meaning the term "insolvent" under Georgia's former fraudulent conveyance statute found at GA. CODE § 28-201(3) (1933).[4] 249 S.E.2d at 217. Furthermore, aside from a brief recitation of the same above-stated quote in one other case, *see In re Pharr-Luke*, 259 B.R. at 431-32, no other Georgia common law breach of trust case subscribes to the above insolvency definition to determine whether a debtor corporation was insolvent at the time of the preferential transfers. Thus, the Court is unpersuaded that the solvency standard for breach of trust claims is so vastly dissimilar from the solvency standards under 11 U.S.C. § 101(32) and O.C.G.A. § 18-2-72(a) and in addressing the Parties' numerous motions regarding the same.

Moreover, the Committee's reliance on the affidavit of the Debtors' former Chief Financial Officer, Steven Morrison, expert opinion of James Hart, and the Debtors' public filings with the SEC does not comport with its above argument. Morrison averred that the Debtors' balance sheets represented "the valuation of the Debtors and their subsidiaries' assets and liabilities, *at a fair valuation* . . . [.]" (Doc. 156-1 at ¶ 9 (emphasis added).) Hart specifically stated that he assessed the Debtors' solvency in accordance with "the bankruptcy definition," which he recited as when "liabilities exceed the assets *at fair value*." (*See* Doc. 168-1 at 63 (emphasis added).) And the Committee acknowledges the shareholders' deficits found in the Debtors' 10-Ks for fiscal years ending September 25, 2008 through September 25, 2010 stated that "*[b]ankruptcy law* defines this as balance sheet insolvency." (*See* Docs. 174-1 at 15; 174-2 at 23; 174-3 at 15 (emphasis added).) Accordingly, the Court will decline

---

[3] The Committee asserts that even if the "fair valuation" insolvency standard were applicable, this standard has also been met.

[4] Section 28-201(3) from the Code of Georgia of 1933 stated, "Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor insolvent at the time of such conveyance."

to apply the insolvency standard proffered by the Committee when determining insolvency for its breach of trust claim.

As determined in this Court's previous Orders, insolvency of the Debtors is a factual dispute with regard to when the Debtors became insolvent in 2008. However, without repeating its previous findings, the Court found that there was "sufficient evidence, if believed by the jury, to find that the Debtors were insolvent from September 25, 2008 through the Petition Date." (*See* Docs. 219 at 10; 220 at 16.)

### B.  Whether Jeff Martin Breached a Duty Owed to Non-Insider Creditors

The Committee asserts that the uncontroverted facts establish that Jeff Martin breached his duty to non-insider creditors of the Debtors when he failed to conserve and manage the remaining assets of the Debtors[5] and preferred his interests over the interests of non-insider creditors. The Committee specifically references the amounts Jeff Martin received, either individually or through his Trust, during his tenure as director for the Debtors. Namely, the leasing and subleasing arrangement with Martin Family Group and Martin Sublease ($980,799.75 and $208,950.63, respectively) and the $106,588.00 in distributions derived from Jeff Martin's partial ownership in the Motor Club. They also refer to the Debtors' respective rental payment of $4,264,225.68 and $2,351,150.00 to Martin Sublease and Martin Family Group during Jeff Martin's tenure as director. Lastly, the Committee notes the payments of $2,170,000.00 and $31,225.00 Martin Family Group and Jeff Martin received respectively, which relate to debt instruments acquired from TMT during Jeff Martin's directorship.

Jeff Martin contends that summary judgment is unwarranted on this ground because the Committee failed to demonstrate a predicate showing of the impropriety or otherwise illegality of the leasing and subleasing arrangement or any of the payments or distributions from the leasing and subleasing arrangements to the Jeff Martin Trust. Jeff Martin also

---

[5] The duty to conserve and manage the remaining assets of a corporate entity arises when the entity becomes insolvent. *See Tindall v. H & S Homes, LLC*, No. 5:10-CV-44 (CAR), 2011 WL 5827227, at *2 (M.D. Ga. Nov. 18, 2011); *Smith Drug Co. v. Pharr-Luke (In re Pharr-Luke)*, 259 B.R. 426, 430 (Bankr. S.D. Ga. 2000). The Court is unable to reach a finding that Jeff Martin owed the Debtors a duty to conserve and manage their remaining assets prior to September 25, 2008 because the question of insolvency remains a factual dispute to be determined by a jury. However, if a reasonable jury believes the Debtors were insolvent from September 25, 2008 through the Petition Date, then Jeff Martin would have had a duty to conserve and manage the remaining assets of the Debtors in trust for its creditors.

argues that summary judgment is inappropriate when the Committee has not set forth any admissible evidence sufficient to establish Jeff Martin's involvement or participation with the Martin Family Group and Martin Sublease leasing and subleasing arrangements or his involvement or participation with initiating any transfers or distributions from Martin Family Group or the Motor Club to the Jeff Martin Trust. Jeff Martin further submits that he had no knowledge regarding the management, ownership, or control of Martin Family Group or Martin Sublease, no knowledge concerning the nature of the Martin Family Group or Martin Sublease leasing and subleasing arrangements with the Debtors, nor did he have knowledge of or ability to control the source of the profits allegedly used to fund any transfers or distributions to the Jeff Martin Trust.

As a threshold matter, the Committee is not required to demonstrate a predicate showing of the impropriety or illegality of the overall leasing and subleasing arrangements, or of any payments or distributions that derived therefrom, in order to establish a claim for breach of trust under common law. *Tindall* is instructive. There, the defendants attempted to move for summary judgment on the plaintiff's state-law preference claim and argued that Georgia law did not recognize a "preference claim." *Tindall*, 2011 WL 5827227, at *2. The defendants further assumed plaintiff improperly asserted a claim either under the Bankruptcy Code or Georgia's Uniform Fraudulent Transfers Act or a claim for unlawful distributions under Georgia law. *Id.* In denying the defendant's motion for summary judgment, the court agreed that plaintiff set forth a cognizable breach of trust claim under Georgia common law. *Id.* at *2-3. And as established above, the Committee "only has to prove that [Jeff Martin] breached [his] duty to conserve and manage the remaining assets in trust for . . . other creditors when [the Debtors] became insolvent." *Id.* at *6 n.3. The *Tindall* court further found that "Plaintiff's breach of trust claim is separate and distinct from any fraudulent transfer claim" under Georgia law. *Id.* at *4. This is an important distinction, because Jeff Martin makes specific reference to the Committee's Motion for Partial Summary Judgment (Doc. 166), which seeks to avoid all leases between the Debtors or their subsidiaries and Martin Sublease, as well as avoid and recover all payments made by Debtors or their subsidiaries to Martin Sublease, pursuant to O.C.G.A. § 18-2-75(a) (Georgia's constructive fraudulent transfer statute).

However, before summary judgment can be granted, the Committee must establish there is no dispute as to any material fact that Jeff Martin breached his duty to non-insider creditors by preferring his interests over the interests of non-insider creditors. In order to satisfy this burden, the Committee must establish that it was Jeff Martin's "intent or purpose" to prefer himself and his interests over the interests of non-creditor debtors. *See Ware*, 104 S.E.2d at 559. In other words, self-preference must be the vehicle "which induced the *making* of the payment or the *giving* of the security." *Id.* (emphasis added). In *Ware*, the Court of Appeals of Georgia determined that "[i]t thus becomes a jury question" whether certain alleged preferential payments were "in fact a mere scheme and device on the part of the defendants to indemnify themselves against loss and as such constituted a legal fraud." *Id.*

Whether Jeff Martin or the Jeff Martin Trust in fact received payments in some way from the Debtors or affiliates of the Debtors does not seem to be in dispute. It is also not in dispute whether affiliates of the Debtors received payments from the Debtors, whether through a leasing or subleasing arrangement or otherwise. However, material fact question exists with respect to whether Jeff Martin actually made or authorized the alleged preferential payments for his own benefit. In Count III of the Amended Complaint, the Committee alleges that Jeff Martin "paid [himself] and [his] entities . . . in violation of Georgia law." (Doc. 113 at ¶ 121.) Jeff Martin stated, while he was a director of TMT, he did not "take any action to ensure that the distributions" to the Jeff Martin Trust from Martin Sublease, Martin Investments, Inc., or Vance R. Martin Holdings, LLLP would continue. (*See* Doc. 188-6 at 93, 140, 144.) Furthermore, a material factual dispute exists regarding Jeff Martin's knowledge, involvement, or participation with the affiliates of the Debtors' operations. Jeff Martin asserts that he was never employed by Martin Family Group or Martin Sublease nor was he involved with their management or controlled their operations. (Doc. 193-1 at ¶¶ 83-85.) While the Jeff Martin Trust owned 33% interest in Martin Family Group, the Trust had no managerial voting interest or control over Martin Family Group; instead, Martin Investments, Inc. held 100% of the voting interest and control over Martin Family Group. (*Id.* at ¶ 65.) He also states that he had no involvement or participation with any initiation or

transfer of any distributions to the Jeff Martin Trust from Martin Family Group or the Motor Club.  (*Id.* at ¶ 83.)

The record also does not support a conclusive finding, nor does the Committee so argue, that Jeff Martin used his position as director of the Debtors to make or authorize alleged preferential payments for his benefit or to other insiders.  At most, the Committee argues that Jeff Martin was aware of the alleged schemes designed to prefer him and his siblings over non-insider creditors, and in turn, Jeff Martin reaped an unlawful benefit by receiving certain preferences.  Regardless of whether Jeff Martin was aware of the alleged schemes, simple receipt of alleged preferential payments is insufficient to establish liability for breach of trust under Georgia law.  *See Ware*, 104 S.E.2d at 558 (directors "cannot in any manner use their powers for the purpose of *obtaining* a preference or advantage to themselves") (emphasis added) (internal quotation marks omitted); *McEwen*, 79 S.E. at 779 (directors "cannot *misappropriate* the corporate assets or *give them away*") (emphasis added). Thus, viewing the facts in a light most favorably to Jeff Martin, a reasonable jury could find that Jeff Martin did not make or authorize payments to himself or the Jeff Martin Trust during his directorship over the Debtors.[6]  Accordingly, the Court cannot grant summary judgment in favor of the Committee and against Jeff Martin here.

## II.    Breach of Fiduciary Duty and the Business Judgment Rule

The Committee submits that Jeff Martin breached his fiduciary duties[7] to the Debtors by "negligently" sitting by while the Debtors were "looted" through alleged fraudulent

---

[6] While it is also a fact question whether Jeff Martin manifested the "intent or purpose" to prefer his interests over the interests of non-insider creditors, it must be clear that Jeff Martin also *made* the alleged preferential payments before the question of intent or purpose can be reached.  *See Ware v. Rankin*, 104 S.E.2d 555, 559 (Ga. Ct. App. 1958).  Because the Committee could not show from the record evidence alone that no genuine dispute as to any material fact that Jeff Martin made the alleged preferential payments, the Court need not reach the question of Jeff Martin's intent or purpose here.  Such an inquiry should be reserved for a jury.  *See Drake v. Peeples (In re Topfallant Grp., Inc.)*, Nos. 89-41996, 91-4141, 1996 WL 33366600, at *6 (Bankr. S.D. Ga. Feb. 29, 1996) ("The defendants' intent when making the transfers may not be readily ascertained on a motion for summary judgment.  This is particularly so when the facts of the case from which the Court could glean intent are in dispute.")

[7] In their reply (Doc. 205), the Committee asserts that the business judgment rule is inapplicable in the context of breach of trust claims.  The Court agrees.  A claim under Georgia's common law breach of trust is tantamount to a claim for fraud.  *See Ware*, 104 S.E.2d at 559.  However, the Committee initially argued that the business judgment rule does not apply to Jeff Martin due to his purportedly unwarranted reliance on management and conflicts of interest.  Thus, the Court will address the initial arguments Jeff Martin had an opportunity to respond to in this section.

schemes that served to financially benefit Jeff Martin. *See McEwen*, 79 S.E. at 779. The Committee also argues that Jeff Martin was actively participating in the benefits of the alleged schemes. According to the record, the extent of Jeff Martin's business decisions seemed to be based on his unwavering reliance on the knowledge, expertise, and experience of "the management of the company to make the best decisions" for the Money Tree. (Doc. 188-6 at 103. *See also id.* at 38-43, 89-92, 103-105, 130-131, 134-136, 144-145, 183, 218-219, 222-224, 228, 230-232, 244, 250-252, 254-255, 291, 293-294, 297-300, 302-303, 308-309, 372, 410-412, 413.) Jeff Martin could not even recall a time where he disagreed with a management's decision-making ability. (*Id.* at 309-310.) The Committee relies on record evidence, namely Jeff Martin's deposition testimony, to show that Jeff Martin breached his fiduciary duties by failing to take independent action in monitoring the Debtor's affairs. They also reference the 2009 10-K Report, executed by Jeff Martin, to show how Jeff Martin allegedly continued to profit from the Debtors and their subsidiaries when the Debtors were operating as a going concern. (*See* Doc. 174-2 at 19.)

Because of his allegedly unwarranted reliance on management and alleged numerous conflicts of interest as both a director and a beneficiary, the Committee argues that the business judgment rule is inapplicable and cites *FDIC v. Loudermilk*, 761 S.E.2d 332 (Ga. 2014) and *N.J. Carpenters Pension Fund v. Infogroup, Inc.*, No. Civ.A. 5334-VCN, 2011 WL 4825888 (Del. Ch. 2011) for support. Jeff Martin responds that not only did he fulfill his statutory fiduciary duties, pursuant to O.C.G.A. § 14-2-830, the business judgment rule is also applicable. Specifically, Jeff Martin cites *Munford v. Valuation Research Corp. (In re Munford, Inc.)* to show that, under Georgia law, the business judgment rule is applicable. 98 F.3d 604, 611 (11th Cir. 1996) ("In determining whether directors and officers have satisfied their statutory duty, Georgia courts apply the business judgment rule." (citing *Milsap v. Am. Family Corp.*, 430 S.E.2d 385, 388 (Ga. Ct. App. 1993))). Based on this rule of Georgia law alone, the Court cannot unequivocally reject application of the business judgment rule with respect to Jeff Martin's alleged breach of fiduciary duties.

Regarding Jeff Martin's reliance on management, there is indeed a question in the underlying facts that first must be resolved with respect to whether the business judgment rule applies under Georgia law. In *Loudermilk*, the Supreme Court of Georgia clarified that

the business judgment rule is well-settled part of Georgia's common law, and the rule "generally precludes claims against officers and directors for their business decisions that sound in ordinary negligence, except to the extent that those decisions are shown to have been made without deliberation, without the requisite diligence to ascertain and assess the facts and circumstances upon which the decisions are based, or in bad faith." 761 S.E.2d at 338; *see also In re Munford*, 98 F.3d at 611 ("The business judgment rule protects directors and officers from liability when they make good faith business decisions in an informed and deliberate manner.").

The record more than sufficiently establishes that Jeff Martin, as director of the Debtor, relied on and agreed with, if not all, the vast majority of management's business decisions. However, viewing the record evidence in a light most favorably to Jeff Martin, there is a genuine question of material fact as to whether Jeff Martin's decisions were made without deliberation, the requisite diligence to ascertain and assess the reasoning behind those decisions, or whether Jeff Martin acted in bad faith. More than one inference could be drawn here. While Jeff Martin's seemingly incessant reliance on management to make business decisions for the company may resemble the "figureheads and dummies" caricature contemplated by the *McEwen* decision, the record also reveals reason for Jeff Martin's reliance. He testified that he himself had no accounting or financial background, expertise, or training during the time he served as a director of the Debtors, and looked to those who possessed those qualities to make those decisions. It could also be inferred that Jeff Martin honestly believed that his reliance on others was for the best interest of the company due to his lack of expertise and training. Moreover, in discharging his duties as director, Jeff Martin has a statutory right to rely on "information, opinions, reports, or statements" prepared or presented by individuals, such as officers or employees, "who the director reasonably believes to be reliable and competent in the matters presented," as well as other professionals similarly reliable and competent to advise the director on matters in their areas of expertise. *See* O.C.G.A. § 14-2-830(b). Accordingly, a genuine material fact question exists as to whether Jeff Martin's judgement lacked deliberation, diligence, or lack of good faith. Thus, the Court cannot, on motion for summary judgment, find that the business judgment rule is inapplicable to Jeff Martin by reason of his asserted reliance on others.

Lastly, the business judgment rule (if applicable) serves as a rebuttable presumption that a director of a corporation was informed and approached their business decision with honesty and good faith. *See Cottle v. Storer Comm., Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). While Georgia courts have not explicitly held that the business judgment rule is inapplicable if the director has a conflict of interest, it is at least questionable whether a conflicted director can make a business decision honestly and in good faith. *See, e.g., In re Intercat, Inc.*, 247 B.R. 911, 922 n.5 (Bankr. S.D. Ga. 2000) ("Protection of the business judgment rule will be lost if the director appears on both sides of a transaction or derives any personal financial benefit from it." (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971))). Jeff Martin was indeed director of the Debtors and, whether individually or through the Jeff Martin Trust, was also a beneficiary of certain transfers. However, as established above, a fact question exist regarding whether Jeff Martin, as director, actually made or authorized the alleged preferential payments for his own benefit. Because that genuine material fact question remains, the Court cannot indisputably find that there was a conflict of interest without the resolution of contested facts, including credibility determinations. In fact, this Court is not authorized to do so on motion for summary judgment. Thus, the Court need not reach the question of whether or not the business judgment rule applies to conflicts of interest.

## CONCLUSION

For the above-stated reasons, Plaintiff Post-Confirmation Committee for Small Loans, Inc., *et al.*'s Motion for Summary Judgment (Doc. 170) against Defendant Jefferey V. Martin is **DENIED.**

**SO ORDERED,** this   13th   day of June, 2016.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**